## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **SIERRA CLUB**,<br>85 Second Street, 2nd Floor<br>San Francisco, CA 94105,<br><br>**WESTERN WATERSHEDS PROJECT**,<br>126 South Main Street, #B2<br>Hailey, ID 83333<br><br>Plaintiffs,<br><br>v.<br><br>**SALLY JEWELL**, Secretary,<br>U.S. Department of the Interior<br>1849 C Street, N.W.<br>Washington, D.C. 20240,<br><br>**DANIEL M. ASHE**, Director,<br>U.S. Fish and Wildlife Service,<br>U.S. Department of the Interior<br>1849 C Street, N.W.<br>Washington, D.C. 20240,<br><br>and<br><br>**JONATHAN B. JARVIS**, Director,<br>National Park Service<br>U.S. Department of the Interior<br>1849 C Street, N.W.<br>Washington, D.C. 20240<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Case No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.      This case challenges unlawful federal agency actions to exempt from civil and criminal liability the killing of four grizzly bears, a threatened species, in one of our nation's premiere national parks—Grand Teton National Park in northwest Wyoming.

2.      The United States Fish and Wildlife Service ("FWS" or "Service") and National Park Service ("NPS") violated section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536, in exempting these anticipated grizzly bear killings from otherwise applicable ESA liability in connection with an Elk Reduction Program in Grand Teton National Park. Specifically, FWS's issuance to NPS of a September 13, 2013 "addendum" document regarding the Elk Reduction Program, and NPS's subsequent reliance on that document to satisfy its ESA obligations, violate these agencies' ESA section 7 duties because the "addendum" does not lawfully or rationally justify FWS's extraordinary attempt to exempt from ESA liability the killing of four grizzly bears within a national park.

3.      Grizzly bears find their last refuge within the lower-48 states in the Northern Rocky Mountains region of Wyoming, Montana, and Idaho.  Like large carnivores elsewhere across the United States, the grizzly bear was driven to near extinction in the lower-48 states as a result of human persecution in the mid-19th to mid-20th centuries.  Nevertheless, grizzlies managed to hang on in a few remnant islands of wild country, including the Greater Yellowstone Ecosystem encompassing Yellowstone and Grand Teton national parks and surrounding lands.

4.      FWS recognized the precarious status of the grizzly bear and listed the species under the ESA as threatened in the lower 48 states in 1975.  Since then, grizzly numbers have increased, but the species continue to face a host of challenges that threaten its continued recovery.

5.      A primary challenge facing grizzly bears in the Greater Yellowstone area is the demise of the whitebark pine tree.  Until very recently, the seeds of the whitebark pine provided a critically important and nutritious food source for grizzly bears in the Greater Yellowstone region.  However, the last decade has seen catastrophic whitebark pine mortality across the Yellowstone region as warmer climatic conditions made the trees vulnerable to unprecedented attacks by the mountain pine beetle and an exotic disease called blister rust.  As a result, grizzly bears abruptly have been forced to seek food elsewhere.  Increasingly, bears have turned to meat as an alternative, high-quality food source, which in turn has brought grizzlies into closer and ever more frequent contact with humans, including hunters.

6.      One location of such grizzly bear-hunter conflicts is Grand Teton National Park, which encompasses the stunning Teton Range and surrounding public lands directly south of Yellowstone National Park in northwest Wyoming.  Each year, in an effort to address regional elk overpopulation, the Park hosts an "Elk Reduction Program" that allows hunters to kill elk within park boundaries.  The Elk Reduction Program principally results from a misguided program of winter elk feeding by FWS on the nearby Jackson Hole National Elk Refuge.  That feeding program artificially inflates the local elk population such that the extraordinary step of hunting wildlife within a national park has been deemed necessary to control the population.  In recent years, the wildlife disease consequences of the elk-feeding program have come to be recognized as a threat to the local elk population that overwhelms any benefit of winter feeding.  Nevertheless, despite promises by FWS to phase out its elk feeding program—including a promise made to the D.C. Circuit Court of Appeals only four years ago—the winter feeding program continues unabated, and has actually increased in recent years.  Now, as a result of the agency actions challenged in this complaint, Grand Teton National Park's iconic grizzly bears

have been added to the list of the program's casualties.  Plaintiffs Sierra Club and Western

Watersheds Project ask this Court to vacate and remand the challenged agency actions in the

interest of protecting the integrity of Grand Teton National Park and its resident grizzly bears as

Congress intended.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331

(federal question) and 16 U.S.C. § 1540(c), (g) (ESA), and may issue a declaratory judgment and

further relief pursuant to 28 U.S.C. §§ 2201-02 and 16 U.S.C. § 1540 (ESA).  Plaintiffs bring this

action pursuant to the Administrative Procedure Act, 5 U.S.C. § 706, and the ESA citizen suit

provision, 16 U.S.C. § 1540(g), both of which waive Defendants' sovereign immunity.

8.     Plaintiffs provided Defendants with notice of Plaintiffs' intent to sue on January

14, 2015, as required by 16 U.S.C. § 1540(g)(2).  Neither FWS nor NPS has responded to

Plaintiffs' letter.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because federal

Defendants reside in this District.

## PARTIES

10.     Plaintiff Sierra Club is a national non-profit conservation organization with more

than 595,000 members.  Headquartered in San Francisco, California, the Sierra Club maintains

offices throughout the country, including an office in Washington, D.C.  Its mission is to explore,

enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the

earth's ecosystems and resources; to educate and enlist humanity to protect and restore the

quality of the natural and human environment; and to use all lawful means to carry out these

objectives.

11.     Plaintiff Western Watersheds Project is a non-profit conservation organization founded in 1993 with the mission of protecting and restoring western watersheds and wildlife through education, public policy initiatives, and legal advocacy.  Headquartered in Hailey, Idaho, Western Watersheds Project has 1,500 members and field offices in Idaho, Montana, Oregon, Wyoming, Arizona, and California.

12.     Plaintiffs have a long-standing interest in the preservation and recovery of the grizzly bear in the Greater Yellowstone Ecosystem because individual and organizational Plaintiffs and their members place a high value on grizzly bears as a species and because the presence of these bears promotes the healthy functioning of ecosystems.  Plaintiffs actively seek to protect and recover the grizzly bear through a wide array of actions including public education, scientific analysis, and advocacy.

13.     Plaintiffs and/or Plaintiffs' members use public lands in the Greater Yellowstone Ecosystem, including lands in Grand Teton National Park, for recreational pursuits, including hiking, fishing, camping, backpacking, hunting, horseback riding, wildlife viewing (including bear watching), and aesthetic enjoyment.  Some of Plaintiffs' members work in industries, such as tourism, that depend on the opportunity to view grizzly bears.  Plaintiffs' staff and/or members have viewed and have planned concrete efforts to view grizzly bears and signs of bear presence in the wild in the Greater Yellowstone Ecosystem including Grand Teton National Park.  FWS and NPS's actions in this case would unlawfully facilitate and exempt from otherwise applicable civil and criminal liability the killing of grizzly bears within Grand Teton National Park, thereby reducing Plaintiffs' opportunity to view grizzly bears and signs of bear presence in Grand Teton National Park and surrounding areas.  For this reason, FWS and NPS's challenged actions represent a direct threat to the interests of all Plaintiffs.  Accordingly, the

legal violations alleged in this complaint cause direct injury to the aesthetic, conservation, economic, recreational, scientific, educational, and wildlife preservation interests of the Plaintiffs and/or Plaintiffs' members.

14.     Plaintiffs' aesthetic, conservation, economic, recreational, scientific, educational, and wildlife preservation interests have been, are being, and, unless their requested relief is granted, will continue to be adversely and irreparably injured by Defendants' failure to comply with federal law.  These are actual, concrete injuries, traceable to Defendants' conduct that would be redressed by the requested relief.  Plaintiffs have no adequate remedy at law.

15.     Defendant Sally Jewell is the United States Secretary of the Interior.  In that capacity, Secretary Jewell has supervisory responsibility over the United States Fish and Wildlife Service.  Defendant Jewell is sued in her official capacity.

16.     Defendant Dan Ashe is the Director of the United States Fish and Wildlife Service.  Defendant Ashe is sued in his official capacity.

17.     Defendant Jon Jarvis is the Director of the National Park Service.  In that capacity, Director Jarvis has supervisory responsibility over all units of the National Park System, including Grand Teton National Park.  Defendant Jarvis is sued in his official capacity.

## THE ENDANGERED SPECIES ACT

18.     The Endangered Species Act, 16 U.S.C. § 1531 et seq., is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180 (1978).  Congress passed this law specifically "to provide a program for the conservation of … endangered species and threatened species" and "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved."  16 U.S.C. § 1531(b).

19.     To receive the full protections of the ESA, a species must first be listed by the Secretary of the Interior as "endangered" or "threatened" pursuant to ESA section 4.  See id. § 1533.  The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range."  Id. § 1532(6).  A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  Id. § 1532(20).

20.     Section 7 of the ESA commands that all federal agencies "shall, in consultation with and with the assistance of" a federal wildlife agency (the FWS for terrestrial species such as the grizzly bear): (1) "utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered and threatened species," id. § 1536(a)(1), and (2) "insure that any action authorized, funded, or carried out by [any agency] is not likely to jeopardize the continued existence of any endangered species or threatened species," id. § 1536(a)(2).  Regulations implementing this consultation requirement direct that formal consultation is required before a federal agency may take "any action [that] may affect listed species."  50 C.F.R. § 402.14(a).  Section 7(a)(2) of the ESA requires every federal agency to "use the best scientific and commercial data available" in assessing impacts to protected species during this consultation process.  16 U.S.C. § 1536(a)(2).

21.     Formal consultation results in the issuance of a biological opinion by the wildlife agency, in this case FWS.  If FWS concludes in the biological opinion that the proposed action is likely to jeopardize an endangered species or threatened species, FWS may recommend reasonable alternatives, if any, to avoid the likelihood of jeopardy so that the agency action may proceed.  See id. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3).

22.     But even if FWS concludes in the biological opinion that the agency's proposed action is not likely to jeopardize a listed species, FWS still must specify the amount or extent of any incidental "taking" of the species that is anticipated to occur as a result of the action and specify "reasonable and prudent measures" to minimize the impact of such takings, as well as the "terms and conditions" that the agency must follow in implementing such measures.  16 U.S.C. § 1536(b)(4); 50 C.F.R. §§ 402.14(i)(1)(i), (ii), (iv).  "Taking," under the ESA, "means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  Such provisions concerning the incidental taking of endangered or threatened wildlife are embodied in an "incidental take statement."  50 C.F.R. § 402.14(i).  The incidental take statement authorizes the agency, if in compliance with the statement's terms and conditions, to "take" listed species without facing otherwise applicable ESA civil or criminal liability.  16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i)(5).

23.     Even after the procedural requirements of a consultation are complete, however, the ultimate duty to ensure that an activity does not jeopardize a listed species lies with the action agency, in this case NPS.  An action agency's reliance on an inadequate, incomplete, or flawed biological opinion to satisfy its ESA section 7 duty is unlawful under the ESA.  See 16 U.S.C. § 1536(a)(2).

## FACTUAL ALLEGATIONS

24.     Although hunting is generally prohibited in national parks, the 1950 legislation establishing Grand Teton National Park provided for NPS and the Wyoming Game and Fish Commission ("Commission") to devise a program for "the controlled reduction of elk" in the park "when it is found necessary for the purpose of proper management and protection of the elk."  16 U.S.C. § 673c(a).  Under this legislation, at least once yearly between February 1 and

8

April 1, NPS and the Commission must submit to the Interior Secretary and Wyoming's governor for their approval "their joint recommendations for the management, protection, and control of the elk for that year."  Id. § 673c(b).

25.     In 2007, NPS assessed its management of the park-area elk herd in a formal Bison and Elk Management Plan prepared together with FWS, which manages a large proportion of the herd each winter on the nearby Jackson Hole National Elk Refuge.  The 2007 Plan reflected a decision by NPS to continue the Elk Reduction Program in Grand Teton National Park "when necessary."  U.S. Fish & Wildlife Serv. & Nat'l Park Serv., Record of Decision: Nat'l Elk Refuge/Grand Teton Nat'l Park, Final Bison and Elk Mgmt. Plan & Envtl. Impact Statement, at 5 (Apr. 2007).

26.     A principal cause of perceived "necessity" for the Elk Reduction Program is the winter feeding of elk conducted by FWS on the National Elk Refuge.  Feeding sustains high numbers of elk with unnaturally low mortality rates, thereby rendering intensive hunting necessary to control elk population numbers, including within Grand Teton National Park.

27.     However, the feeding program itself is both biologically and legally flawed. Feeding leads to high concentrations of elk and thereby facilitates the transmission of wildlife diseases among the fed elk population.  Already elk that concentrate on winter feeding areas manifest an unnaturally high incidence of brucellosis, a wildlife and livestock disease that causes an infected female to abort her first calf.  Of potentially much greater consequence, the feedground elk are more susceptible to chronic wasting disease, the elk form of mad cow disease, which is not yet present in northwest Wyoming but has been steadily advancing toward the Refuge from southern and eastern Wyoming in recent years and is always fatal to infected

animals.  The D.C. Circuit Court of Appeals summarized these impacts in <u>Defenders of Wildlife</u> <u>v. Salazar</u>, 651 F.3d 112, 113-14 (D.C. Cir. 2011).

28.     Because of these acknowledged impacts of feeding, the 2007 Bison and Elk Management Plan for Grand Teton National Park and the Jackson Hole National Elk Refuge promised a 15-year program designed to "create conditions that would allow the elk and bison to survive the winter without supplemental feeding and, in the meantime, manage the risk of contagion until the practice ended."  <u>Id.</u> at 114-15.

29.     Based on the promise of this 15-year program, the D.C. Circuit in 2011 rejected a challenge to the 2007 Plan by conservationists who sought a firm deadline for the end of winter elk feeding on the Jackson Hole National Elk Refuge pursuant to the National Wildlife Refuge System Improvement Act.  <u>See id.</u> at 117-18.  Given the plan's stated commitment to "ending the practice over time while maintaining the flexibility needed to respond to facts on the ground," the D.C. Circuit held that it was not arbitrary and capricious for FWS to set no deadline for termination of winter feeding.  <u>See id.</u> at 117.  Nevertheless, the Circuit Court left "no doubt that unmitigated continuation of supplemental feeding would undermine the conservation purpose of the National Wildlife Refuge System."  <u>Id.</u>  And, the Court said, "[i]t is highly significant and indeed dispositive to us … that the agencies are committed to ending supplemental feeding."  <u>Id.</u> Indeed, the Court stated, "the plan might well have been unreasonable had the agencies categorically refused to phase out the winter feeding program in spite of all the evidence in the record about the dangers of supplemental feeding."  <u>Id.</u> (quotations and citation omitted).

30.     Nevertheless, despite the passage of eight years since adoption of the 2007 Bison and Elk Management Plan and nearly four years since the D.C. Circuit's decision, winter elk feeding on the National Elk Refuge continues with no evidence of the phase-down promised by

FWS.  Indeed, while the National Elk Refuge hosted approximately 7,000 elk on its winter feed

lines when the Bison and Elk Management Plan was issued in 2007, FWS fed 8,296 elk on the

refuge during the winter of 2013-14 and 8,390 during the winter of 2014-15.  In fact, FWS fed

more elk on the refuge during the winter of 2014-15 than it has at any time over the past 17

years.

31.     Pursuant to an ESA biological opinion issued in conjunction with the 2007 Bison

and Elk Management Plan, FWS anticipated and exempted from ESA liability the lethal taking

of one grizzly bear in conjunction with NPS's authorization of the Elk Reduction Program over a

fifteen-year time period (2007-2022).  FWS expected such grizzly mortality to occur as a result

of lethal encounters between bears and elk hunters that arise when grizzlies claim hunter-killed

elk or when hunters surprise grizzlies in dense vegetation.

32.     In 2012, a group of three hunters participating in the Elk Reduction Program shot

and killed an adult male grizzly bear within Grand Teton National Park, leaving the Park with no

additional exempted grizzly bear mortalities for the next ten years.   NPS believed it likely that

more bears would be killed in this time frame, and thus requested reinitiation of consultation

with FWS pursuant to section 7 of the ESA.

33.     Rather than complete a full consultation process, FWS responded by producing in

September 2013 an abbreviated "addendum" to the 2007 biological opinion.  This four-page

"addendum," which purports to supersede relevant portions of the biological opinion, anticipates

and exempts from ESA liability the killing of four additional bears over nine years (i.e., through

2022) within Grand Teton National Park in connection with the Elk Reduction Program.

34.     To arrive at its conclusion that the death of four bears in Grand Teton National

Park will not jeopardize the grizzly's continued existence, FWS relied on mortality thresholds set

by FWS itself to ensure a viable grizzly bear population across the entire Greater Yellowstone Ecosystem.  FWS reasoned that since the death of four bears would not cause these ecosystem-wide mortality thresholds to be exceeded, then those bear deaths would not likely jeopardize the species.

35.     However, FWS neglected to consider the "big picture" in making this determination.  That is, FWS failed to analyze—or even acknowledge—all of the additional lethal taking of grizzly bears that the agency had already anticipated and exempted in other biological opinions operative elsewhere across the Greater Yellowstone Ecosystem.

36.     All such take counts against the mortality thresholds that FWS relied upon in the 2013 Grand Teton "addendum."  Accordingly, only by considering the anticipated taking of grizzly bears in Grand Teton National Park in combination with other anticipated taking of grizzly bears across the Greater Yellowstone Ecosystem could FWS rationally determine whether the lethal taking of four bears in Grand Teton may constitute the "straw that breaks the camel's back" for purposes of the Service's established Greater Yellowstone Ecosystem mortality thresholds and, concomitantly, its jeopardy analysis.  Yet FWS undertook no such consideration—a failure that is all the more troubling because readily available information demonstrates that the combined taking of grizzly bears anticipated and exempted by FWS across the Greater Yellowstone Ecosystem is indeed sufficient to exceed by more than three times the agency's own sustainable mortality threshold for the independent female portion of the population.  Accordingly, FWS's "no jeopardy" conclusion was irrational.

37.     Further, by producing an "addendum" rather than a full biological opinion, FWS short-circuited the ESA consultation process and failed to comply with the duties imposed by ESA section 7 with respect to agency actions that "may affect" endangered and threatened

wildlife. 50 C.F.R. § 402.14(a). FWS also failed to undertake required consideration of available measures to minimize the impact of the anticipated taking of four grizzly bears, omitting even discussion of new mitigation measures that NPS had imposed on an interim basis in the wake of the 2012 grizzly bear killing.

38.     Because FWS in the 2013 Grand Teton "addendum" failed to conduct a rational jeopardy analysis utilizing the best available scientific information to ensure that the Elk Reduction Program will not jeopardize the continued existence of the grizzly bear and to minimize the impact of the anticipated taking of four grizzly bears, the Service has violated section 7 of the ESA, 16 U.S.C. § 1536. Further, the National Park Service's reliance on this flawed document to satisfy its own ESA section 7 duties in connection with the Elk Reduction Program is also unlawful.

### FIRST CAUSE OF ACTION
### (Violation of Endangered Species Act § 7(a)(2), 16 U.S.C. § 1536(a)(2))

39.     Plaintiffs hereby reallege and incorporate paragraphs 1 through 38, supra.

40.     The ESA permits FWS to anticipate and exempt incidental taking of a threatened species from otherwise applicable civil and criminal liability in connection with a federal agency action only after determining that such taking is not likely to jeopardize the continued existence of the affected species.  See 16 U.S.C. § 1536(b)(4)(B); accord 50 C.F.R. § 402.14(i).

41.     In 2013, FWS prepared an "addendum" to its 2007 final biological opinion for the Bison and Elk Management Plan that purported to anticipate and exempt the incidental taking of four grizzly bears in Grand Teton National Park over nine years.  FWS found that this level of incidental taking would not jeopardize the continued existence of the grizzly bear population.

42.     FWS reached this "no jeopardy" conclusion by looking at the overall population trajectory of and mortality thresholds established for viability of the Greater Yellowstone

Ecosystem grizzly bear population writ large, and determining that the taking of four bears in

Grand Teton National Park is not likely to cause those ecosystem-wide thresholds to be

exceeded.  FWS thus relied on satisfaction of ecosystem-wide mortality limits to ensure the

continuing viability of the species in the face of lethal impacts anticipated to be caused by the

Elk Reduction Program.

43.     Having chosen to rely on ecosystem-wide mortality limits for a viable population

to support its "no jeopardy" determinations, FWS could not rationally ignore all of the additional

taking of grizzly bears that the agency has anticipated and exempted throughout the Greater

Yellowstone Ecosystem, all of which counts against the recovery criteria mortality limits that

FWS invoked.  Only through comprehensive consideration of all anticipated taking of grizzly

bears throughout the Greater Yellowstone Ecosystem could FWS rationally determine whether

the anticipated further taking of four more bears as a result of the Elk Reduction Program would

have a relatively minor impact, as FWS concluded, or instead constitute the "straw that breaks

the camel's back" by jeopardizing the species.

44.     FWS's failure to examine the "big picture" of all grizzly bear taking anticipated

across the Greater Yellowstone Ecosystem is particularly significant because review of operative

incidental take statements issued by FWS for grizzly bears in the Yellowstone region reveals that

the agency anticipates the killing of 65 grizzly bears (inclusive of those anticipated in Grand

Teton), all of which could be female under the Service's determinations.  Depending on when

they occur, these anticipated takings could more than triple the annual sustainable level of female

grizzly bear mortality that FWS has established for the Yellowstone region.  Nevertheless, FWS

failed to even consider this level of incidental taking, or the implications of this level of taking

for total grizzly bear mortality in the Greater Yellowstone Ecosystem, before relying on "overall

sustainable annual mortality levels" to conclude that its anticipated and exempted taking of four grizzly bears in Grand Teton National Park would be inconsequential for the larger Yellowstone-region population.

45.     FWS's failure to consider all the taking of grizzly bears that the agency has anticipated and exempted throughout the Greater Yellowstone Ecosystem violated the ESA because FWS failed to utilize "the best scientific and commercial data available" in its jeopardy analysis.  16 U.S.C. § 1536(a)(2).  In this case, the available scientific data included the incidental take statements contained within FWS's own operative biological opinions for the Greater Yellowstone Ecosystem; FWS never considered them.

46.     FWS's failure to utilize "the best scientific and commercial data available" further violated the ESA by corrupting the substance of the Service's jeopardy analysis, yielding an arbitrary and unlawful determination that the Park Service's administration of the Elk Reduction Program is "not likely to jeopardize the continued existence of the grizzly bear.  Id.

### SECOND CAUSE OF ACTION
### (Violation of Endangered Species Act Regulations, 50 C.F.R. §§ 402.14, 402.16)

47.     Plaintiffs hereby reallege and incorporate paragraphs 1 through 46, supra.

48.     FWS's 2013 "addendum" to the 2007 Biological Opinion for the Bison and Elk Management Plan violates the ESA's implementing regulations providing that, "[i]f the amount or extent of taking specified in [a biological opinion's] incidental take statement is exceeded" or "[i]f new information reveals effects of the action that may affect listed species … in a manner or to an extent not previously considered," then "[r]einitiation of formal consultation is required and shall be requested by the Federal agency or by the Service."  50 C.F.R. § 402.16(a), (b).  Formal consultation, in turn, is a process defined by ESA regulations to require FWS to undertake specific information-gathering and analysis obligations, including evaluating the current status of

the affected species, id. § 402.14(g)(2); evaluating the effects of the proposed agency action together with cumulative effects on the affected species, id. § 402.14(g)(3); and, ultimately, "[f]ormulat[ing] its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence" of the species, id. § 402.14(g)(4).  Only after FWS has engaged in that formal consultation procedure and formulated a comprehensive biological opinion regarding the jeopardy issue may the agency provide "a statement concerning incidental take."  Id. § 402.14(i).

49.     FWS's 2013 "addendum" does not even attempt to comply with these formal consultation requirements.  Rather than preparing a new comprehensive biological opinion, FWS asserted that the "addendum" "tiers off" of the agency's 2007 Biological Opinion.  Memorandum from Field Supervisor, U.S. Fish & Wildlife Serv., Wyo. Field Office, Cheyenne, Wyo., to Superintendent, Nat'l Park Serv., Grand Teton Nat'l Park, Moose, Wyo. & Refuge Manager, U.S. Fish & Wildlife Serv., Nat'l Elk Refuge, Jackson, Wyo. 2 (Sept. 13, 2013) [hereinafter "Addendum"].  However, the ESA regulations provide for no such "tiering" where reinitiation of formal consultation is undertaken.  See 50 C.F.R. §§ 402.14, 402.16.

50.     Further, while purporting to "tier off" of the 2007 Biological Opinion, the "addendum" admits that circumstances have changed since that Biological Opinion was issued, rendering the 2007 Biological Opinion an inadequate environmental analysis tool even if such "tiering" were permitted—which it is not.  For instance, the "addendum" admits that, in the years since issuance of the 2007 Biological Opinion, the "population growth rate" of the Yellowstone-area grizzly bear population has slowed or stopped while "grizzly bear distribution has expanded in various areas of the ecosystem, including in [Grand Teton National] Park."  Addendum, at 3. Indeed, much has changed for grizzly bears in the Yellowstone area since 2007.  Most notably,

while FWS's 2007 Biological Opinion noted in passing the importance of whitebark pine seed

cones as a food source for the region's grizzly bears, in the years since 2007 an effort by FWS to

remove Yellowstone-area grizzlies from the list of species protected under the ESA failed when

the U.S. Court of Appeals for the Ninth Circuit held that FWS failed to account for the threat

posed to grizzlies by the ongoing large-scale loss of whitebark pine from the Yellowstone region

due to warming climatic conditions.  See Greater Yellowstone Coalition v. Servheen, 665 F.3d

1015 (9th Cir. 2011).  Contemporaneous with the loss of the whitebark pine food source, grizzly

bears have increasingly turned to meat as an alternative, high-quality food source, which in turn

has brought grizzlies into more frequent conflict with humans.  At the same time, the grizzly

population trajectory has flattened and the population may even have declined.  The "addendum"

fails to address or consider these new circumstances.

51.     In short, the "addendum" fails to fulfill the requirements of a comprehensive

biological opinion that is mandatory when reinitiation of consultation is undertaken pursuant to

50 C.F.R. § 402.16.  Because FWS can anticipate and exempt the incidental taking of listed

species only after preparing a comprehensive biological opinion, the "addendum" cannot

lawfully convey a statutory exemption for the taking of grizzly bears.

52.     FWS violated the ESA by attempting to anticipate and exempt from legal liability

the killing of four grizzly bears in Grand Teton National Park without satisfying the requirements

for issuance of such a statutory exemption under 50 C.F.R. §§ 402.14 and 402.16.

### THIRD CAUSE OF ACTION
### (Violation of Endangered Species Act § 7(b)(4)(C)(ii), 16 U.S.C. § 1536(b)(4)(C)(ii))

53.     Plaintiffs hereby reallege and incorporate paragraphs 1 through 52, supra.

54.     Despite anticipating the killing of four grizzly bears within Grand Teton National

Park, FWS undertook no consideration and offered no discussion of additional "reasonable and

prudent measures" to minimize the impact of the anticipated taking in its 2013 "addendum" to the 2007 Biological Opinion for the Bison and Elk Management Plan.

55.     The ESA requires that, when FWS issues an incidental take statement, the agency "shall" also "specif[y] those reasonable and prudent measures that the [agency] considers necessary or appropriate to minimize such impact" of the taking.  16 U.S.C. § 1536(b)(4)(C)(ii); accord 50 C.F.R. § 402.14(i)(1)(ii).

56.     However, FWS's "addendum" fails even to discuss, let alone specify, any such additional measures.  Most notably, although FWS stated its agreement with certain mitigation actions taken by NPS in administering the 2013 Elk Reduction Program and further acknowledged that such actions were only temporary, FWS offered no discussion and apparently undertook no consideration as to whether any of those actions should be imposed as mandatory "reasonable and prudent measures" to minimize the impacts on the grizzly bear, or whether other actions not yet implemented or contemplated by NPS should be adopted for that purpose.

57.     FWS's failure to specify—or even consider—any "reasonable and prudent measures" to minimize the impact of the Grand Teton National Park Elk Reduction Program on grizzly bears violated the ESA.

### FOURTH CAUSE OF ACTION
### (Violation of Endangered Species Act § 7(a)(2), 16 U.S.C. § 1536(a)(2))

58.     Plaintiffs hereby reallege and incorporate paragraphs 1 through 57, supra.

59.     Because the "no jeopardy" determination in FWS's 2013 "addendum" was arbitrary and unlawful for the reasons stated above, the National Park Service could not lawfully rely on that document to discharge that agency's own ESA responsibilities in connection with grizzly bear taking in the Greater Yellowstone Ecosystem.

60.     "Consulting with the FWS alone does not satisfy an agency's duty under the

Endangered Species Act."  <u>Resources Ltd., Inc. v. Robertson</u>, 35 F.3d 1300, 1304 (9th Cir.

1993).  To the contrary, the ESA independently requires each agency to "insure that any action

[it] authorize[s], fund[s], or carrie[s] out … is not likely to jeopardize the continued existence of

any endangered species or threatened species."  16 U.S.C. § 1536(a)(2).  Because "[a]n agency

cannot abrogate its responsibility to ensure that its actions will not jeopardize a listed species[,]

its decision to rely on a FWS biological opinion must not have been arbitrary or capricious."

<u>Resources Ltd.</u>, 35 F.3d at 1304 (quotations and citation omitted).

61.     Here, FWS's 2013 Grand Teton "addendum" was arbitrary, capricious, and

unlawful and the National Park Service could not rationally or lawfully rely on it.

62.     NPS violated the ESA by arbitrarily and capriciously relying on FWS's unlawful

"addendum" document to satisfy NPS's duties under the ESA in connection with the anticipated

killing of grizzly bears resulting from NPS's authorization of the Elk Reduction Program in

Grand Teton National Park.

## REQUEST FOR RELIEF

THEREFORE, Plaintiffs respectfully requests that this Court:

1.     Declare that FWS and NPS violated the ESA in connection with FWS's issuance

of the 2013 "addendum" and NPS's reliance on that document to authorize the Elk Reduction

Program in Grand Teton National Park;

2.     Set aside FWS's 2013 "addendum" document and remand the issue of grizzly

bear taking in connection with the Elk Reduction Program to FWS and NPS for further action

consistent with the requirements of the ESA;

3.     Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys

fees, associated with this litigation; and

      4.      Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

      Respectfully submitted this 3rd day of April, 2015.

/s/ Timothy J. Preso
Timothy J. Preso (D.C. Bar No. 456531)
Earthjustice
313 East Main Street
Bozeman, MT 59715
Fax: (406) 586-9695
tpreso@earthjustice.org
Phone: (406) 586-9699

*Attorney for Plaintiffs Sierra Club and Western Watersheds Project*