## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SIERRA CLUB**, et al., )<br><br>           Plaintiffs, )<br><br>v. )<br><br>**SALLY JEWELL**, Secretary, )<br>U.S. Department of the Interior, et al., )<br><br>           Defendants, )<br><br>and )<br><br>**STATE OF WYOMING**, et al., )<br><br>           Defendant-Intervenors. ) | Case No. 1:15-CV-00479-RC |

### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Sierra Club, Western Watersheds Project, and Center for Biological Diversity hereby move for summary judgment on all of their claims pursuant to Federal Rule of Civil Procedure 56(a). This motion is supported by the accompanying Memorandum of Points and Authorities and Statement of Facts. Plaintiffs' standing to bring this case is demonstrated by the accompanying declarations of Dr. Franz Camenzind, Donald L. Getty, Jonathan B. Ratner, Andrea L. Santarsiere, and George Wuerthner.

As set forth in Plaintiffs' accompanying Memorandum of Points and Authorities, the Federal Defendants in this case violated the Endangered Species Act, 16 U.S.C. § 1531 et seq., in issuing and relying on the Sept. 13, 2013 "addendum" document challenged in this case. Because there is no genuine dispute as to any material fact and Plaintiffs are entitled to judgment

as a matter of law, this Court should enter summary judgment for Plaintiffs.  <u>See</u> Fed. R. Civ. P.

56(a).

Because this case involves matters of public interest and significance and oral argument

may assist this Court in resolving the parties' summary-judgment motions, Plaintiffs respectfully

request the opportunity for an oral hearing.

Respectfully submitted this 17th day of July, 2015.


/s/ Timothy J. Preso
Timothy J. Preso (D.C. Bar No. 456531)
Earthjustice
313 East Main Street
Bozeman, MT 59715
Fax: (406) 586-9695
tpreso@earthjustice.org
Phone: (406) 586-9699

*Attorney for Plaintiffs Sierra Club, Western*
*Watersheds Project, and Center for Biological*
*Diversity*

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was today served via the Court's CM/ECF
system on all counsel of record.

/s/ Timothy J. Preso

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **SIERRA CLUB**, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:15-CV-00479-RC |
| | ) | |
| v. | ) | |
| | ) | |
| **SALLY JEWELL**, Secretary, | ) | |
| U.S. Department of the Interior, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **STATE OF WYOMING**, et al., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| | ) | |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Timothy J. Preso (D.C. Bar No. 456531)
Earthjustice
313 East Main Street
Bozeman, MT 59715
Fax: (406) 586-9695
tpreso@earthjustice.org
Phone: (406) 586-9699

*Attorney for Plaintiffs Sierra Club, Western
Watersheds Project, and Center for
Biological Diversity*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................2

I.      THE GRIZZLY BEAR ..........................................................................................2

II.     THE ENDANGERED SPECIES ACT ...................................................................3

III.    GRAND TETON NATIONAL PARK'S ELK REDUCTION PROGRAM.....................6

IV.     TAKING OF GRIZZLY BEARS IN GRAND TETON NATIONAL PARK ..................8

V.      THE CHALLENGED "ADDENDUM" ...................................................................11

ARGUMENT .....................................................................................................................13

I.      STANDARD OF REVIEW ...................................................................................13

II.     FWS'S "ADDENDUM" FAILED TO CONSIDER ESSENTIAL
        INFORMATION IN REACHING ITS "NO-JEOPARDY" CONCLUSION
        FOR GRIZZLY BEARS ........................................................................................14

III.    FWS'S CURSORY "ADDENDUM" COULD NOT LAWFULLY EXEMPT
        TAKING OF GRIZZLY BEARS FROM ESA LIABILITY ...........................................21

IV.     FWS FAILED TO SPECIFY, OR EVEN CONSIDER, REQUIRED
        MEASURES TO MINIMIZE THE IMPACT OF THE ANTICIPATED
        TAKING ..............................................................................................................27

V.      NPS VIOLATED THE ESA BY ARBITRARILY RELYING ON FWS'S
        UNLAWFUL "ADDENDUM" TO SATISFY ESA OBLIGATIONS ............................29

CONCLUSION..................................................................................................................30

## TABLE OF AUTHORITIES

### FEDERAL CASES

Am. Bioscience, Inc. v. Thompson,
269 F.3d 1077 (D.C. Cir. 2001) ............................................................... 30

Am. Wildlands v. Norton,
193 F. Supp. 2d 244 (D.D.C. 2002) .......................................................... 14

Ass'n of Civilian Technicians, Mont. Air Ch. No. 29 v. Fed. Labor Relations
Auth.,
22 F.3d 1150 (D.C. Cir. 1994) ................................................................. 27

Az. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.,
273 F.3d 1229 (9th Cir. 2001) ............................................................... 5,15

Buckeye Forest Council v. U.S. Forest Serv.,
378 F. Supp. 2d 835 (S.D. Ohio 2005) ..................................................... 23

Cabinet Mountains Wilderness v. Peterson,
685 F.2d 678 (D.C. Cir. 1982) ................................................................. 13

Citizens to Preserve Overton Park, Inc. v. Volpe,
401 U.S. 402 (1971) ................................................................................. 13

Ctr. for Biological Diversity v. Bureau of Land Mgmt.,
698 F.3d 1101 (9th Cir. 2012) ................................................................. 24

*Defenders of Wildlife v. Babbitt,
130 F. Supp. 2d 121 (D.D.C. 2001) .................................................... 19,20

Defenders of Wildlife v. Norton,
No. 99-927 (ESH), 2003 WL 24122459 (D.D.C. Jan. 7, 2003) ............... 20

Defenders of Wildlife v. Salazar,
651 F.3d 112 (D.C. Cir. 2011) ........................................................... 7,8,27

Fund for Animals v. Babbitt,
903 F. Supp. 96 (D.D.C. 1995) ................................................................... 2

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.,
378 F.3d 1059 (9th Cir. 2004), amended on other grounds by 387 F.3d 968
(9th Cir. 2004) ..................................................................................... 23,24

Greater Yellowstone Coal. v. Servheen,
665 F.3d 1015 (9th Cir. 2011) ........................................................... 10,25

\*Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv.,
    281 F. Supp. 2d 1 (D.D.C. 2003) ..........................................................30

Humane Soc'y of U.S. v. Kempthorne,
    579 F. Supp. 2d 7 (D.D.C. 2008) ...........................................................30

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983) ...............................................................14,18,21

Nat'l Wildlife Fed'n v. Norton,
    332 F. Supp. 2d 170 (D.D.C. 2004) ................................................... 18-19

Nat. Res. Def. Council v. Daley,
    209 F.3d 747 (D.C. Cir. 2000) ...............................................................14

Nat. Res. Def. Council v. Rodgers,
    381 F. Supp. 2d 1212 (E.D. Cal. 2005), reconsideration denied, No. CIV. S-
    88-1658 LKK (Oct. 5, 2005)..........................................................23,25

\*Native Ecosystems Council v. Krueger,
    63 F. Supp. 3d 1246, 1253 (D. Mont. 2014), appeal filed No. 15-35100 (Feb.
    04, 2015) ........................................................................23,25

Oceana, Inc. v. Evans,
    384 F.Supp.2d 203 (D.D.C. 2005) ...........................................................20

\*Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs,
    538 F. Supp. 2d 242 (D.D.C. 2008) ..........................................................28

Pub. Emp. for Envtl. Responsibility v. Beaudreau,
    25 F. Supp. 3d 67, 108 (D.D.C. 2014), appeal dismissed, No. 14-5117 (D.C.
    Cir. June 11, 2014)................................................................... 27-28

\*Resources Ltd. v. Robertson,
    35 F.3d 1300 (9th Cir. 1993) ...........................................................5,29

Swan View Coal. v. Weber,
    52 F. Supp. 3d 1133, 1154-55 (D. Mont. 2014), appeal filed, No. 15-35111
    (Feb. 06, 2015)......................................................................23

Tenn. Valley Auth. v. Hill,
    437 U.S. 153 (1978).....................................................................2

## STATUTES AND LEGISLATIVE MATERIALS

5 U.S.C. § 706(2)(A).....................................................................................................13

16 U.S.C. §§ 668dd-668ee.............................................................................................7
    § 673c(a)..................................................................................................................6
    § 673c(b)..................................................................................................................6
    § 1531(b)..................................................................................................................3
    § 1531 et seq............................................................................................................1
    § 1532(6)..................................................................................................................3
    § 1532(19)................................................................................................................5
    § 1532(20)................................................................................................................3
    § 1536(a)(2)......................................................................................4,5,14,21,24,29
    § 1536(b)(3)(A)........................................................................................................4
    § 1536(b)(4).................................................................................................5,22,27
    § 1536(b)(4)(ii)......................................................................................................29
    § 1536(b)(4)(iv).....................................................................................................29
    § 1536(b)(4)(B)................................................................................................15,29-30
    § 1536(b)(4)(C)(ii).................................................................................................27
    § 1536(b)(4)(C)(iv)................................................................................................27
    § 1536(o)..................................................................................................................5
    § 1536(o)(2).............................................................................................................5

42 U.S.C. § 4321 et seq...............................................................................................22

## REGULATIONS AND ADMINISTRATIVE MATERIALS

36 C.F.R. § 2.2.............................................................................................................6

40 C.F.R. § 1508.28................................................................................................22-23
    § 1508.28(b)...........................................................................................................23

50 C.F.R. § 402.02..............................................................................................4,19,20
    § 402.14(i).................................................................................................5,15,22,27
    § 402.14(i)(1)(i).......................................................................................................5
    § 402.14(i)(1)(ii)..............................................................................................5,27,29
    § 402.14(i)(1)(iv).............................................................................................5,27,29
    § 402.14(i)(5)...........................................................................................................5
    § 402.14(a)...............................................................................................................4
    § 402.14(g)(1)....................................................................................................22,27
    § 402.14(g)(2)........................................................................................................22
    § 402.14(g)(3).................................................................................................19,22,27
    § 402.14(g)(4)..................................................................................................4,22,27
    § 402.14(h)(3)..........................................................................................................4
    § 402.15(a)..........................................................................................................5,29
    § 402.16(a)....................................................................................................6,21-22
    § 402.16(b).....................................................................................................6,21-22

**OTHER AUTHORITIES**

Frank T. van Manen et al. (eds.), Yellowstone Grizzly Bear Investigations:
  Annual Report of the Interagency Grizzly Bear Study Team 2013 (2014),
  available at
  http://www.nrmsc.usgs.gov/files/norock/products/IGBST/2013report.pdf............................17

Peter Matthiessen, Wildlife in America (1987) ............................................................................3

## INTRODUCTION

This case concerns actions by the U.S. Fish and Wildlife Service ("FWS") and National Park Service ("NPS") to exempt from otherwise applicable civil and criminal liability the killing of four members of one of our nation's most iconic wildlife species—the grizzly bear—within one of our nation's premiere national parks—Grand Teton National Park in northwest Wyoming. Our national parks are ordinarily perceived as refuges for native wildlife, but in this case FWS and NPS took the extraordinary step of exempting from legal liability the "taking"—i.e., killing—of four grizzly bears within Grand Teton National Park to facilitate an annual park elk hunt, dubbed an "Elk Reduction Program," in which grizzly bears come into conflict with hunters.

In so doing, however, these agencies failed to comply with requirements imposed by the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq., for the protection of imperiled wildlife in connection with any such exempted killing. Most significantly, they failed to rationally determine whether the anticipated killing of four grizzlies in Grand Teton National Park, when combined with a mounting number of additional grizzly bear killings anticipated and exempted by FWS in connection with other federal agency actions across the Yellowstone region, would jeopardize the survival and recovery of the species. They failed to undertake such a "big-picture" analysis even though readily available information demonstrates that the amount of grizzly bear killing anticipated and exempted by FWS across the Yellowstone region could more than double FWS's own sustainable mortality limit for every monitored component of the affected population, including the most sensitive component—independent female bears that drive population growth and recovery.

The ESA shines as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180 (1978), but it can fulfill its purpose only if its implementing agencies follow its procedural and substantive requirements for species protection. FWS and NPS failed to do so in this case. Accordingly, plaintiffs Sierra Club, Western Watersheds Project, and Center for Biological Diversity ask this Court to vacate and remand the challenged agency actions.

## BACKGROUND

## I.    THE GRIZZLY BEAR

The history of the North American grizzly bear is one of widespread persecution at the hands of European-American settlers. Before European-American settlement of the American West, grizzly bears roamed from the Great Plains to the Pacific coast and from the Canadian border to Mexico, inhabiting every habitat except the most hot and arid desert lands. See AR-FWS-211 (1993 Recovery Plan).[1] With settlement, grizzlies were shot, poisoned, and trapped wherever they were found, resulting in their extirpation everywhere except mountain redoubts far from human intolerance. See id.

In an historical blink of an eye—from 1800 to 1975—humans restricted the range of grizzly bears by 98 to 99 percent, isolating the remaining bears in a few remnant islands of wild country. See AR-FWS-211-12 (1993 Recovery Plan). Once at least 50,000 strong, the lower-48 grizzly population was reduced to fewer than 1,000 bears. See AR-FWS-211 (1993 Recovery Plan); see also Fund for Animals v. Babbitt, 903 F. Supp. 96, 102 (D.D.C. 1995) (describing

---

[1] Plaintiffs cite the administrative record ("AR") by agency of origin or subject and Bates-stamped page number. "FWS" indicates the U.S. Fish and Wildlife Service record. "NPS" indicates the National Park Service record. "GB" indicates the independent U.S. Fish and Wildlife Service record of grizzly bear-related documents.

historic grizzly persecution).  The result, as American author Peter Matthiessen commented, is that "[f]or many of us, the great grizzly will always represent a wild, legendary America somewhere to the north and west which we were born too late ever to see."  Peter Matthiessen, Wildlife in America 90 (1987).

However, that "wild, legendary America" still exists in Yellowstone and Grand Teton National Parks and surrounding public lands in northwest Wyoming, southwest Montana, and eastern Idaho.  See AR-FWS-213 (1993 Recovery Plan).  Even as grizzly bear populations were extirpated from one mountain range after another across the American West, an isolated grizzly bear population persisted in the rugged and largely undeveloped landscape that extends from the Gallatin Range in Montana to the Teton Range and adjacent Jackson Hole in Wyoming—an area known as the Greater Yellowstone Ecosystem.  AR-FWS-211-13 (1993 Recovery Plan).

## II.     THE ENDANGERED SPECIES ACT

In 1975, FWS responded to the grizzly bear's plight by listing the species as threatened in the lower-48 states under the ESA.  See AR-FWS-1-3 (grizzly bear listing rule).  Congress passed the ESA in 1973 specifically "to provide a program for the conservation of … endangered species and threatened species" and "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved."  16 U.S.C. § 1531(b).  Under the ESA, a threatened species is one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," whereas an endangered species is one that is "in danger of extinction throughout all or a significant portion of its range."  Id. §§ 1532(6), (20).  Among the "[m]ajor factors" cited by FWS to justify the grizzly's listing under the ESA was excessive killing by humans.  AR-FWS-1 (grizzly bear listing rule).

3

The ESA prescribes numerous legal tools to accomplish the survival and recovery of listed species.  Most pertinent to this case, once a species is listed, section 7 of the ESA commands that all federal agencies "shall, in consultation with and with the assistance of" a federal wildlife agency (the FWS for terrestrial species such as the grizzly bear), "insure that any action authorized, funded, or carried out by [any agency] is not likely to jeopardize the continued existence of any endangered species or threatened species."  16 U.S.C. § 1536(a)(2). "Jeopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.  Regulations implementing this ESA section 7 consultation requirement direct that such consultation is required before a federal agency may take "any action [that] may affect listed species."  Id. § 402.14(a).  Section 7(a)(2) of the ESA requires every federal agency to "use the best scientific and commercial data available" in assessing impacts to protected species during the required consultation.  16 U.S.C. § 1536(a)(2).

Formal consultation under ESA section 7 results in the issuance by FWS of a biological opinion regarding the impacts of a proposed action.  The biological opinion must convey FWS's determination "as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species."  50 C.F.R. § 402.14(g)(4).  If FWS concludes in the biological opinion that the proposed action is likely to jeopardize a listed species, FWS may recommend reasonable alternatives, if any, to avoid the likelihood of jeopardy so that the agency action may proceed.  See 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3).  But even if FWS concludes in the biological opinion that the agency's proposed action is not likely to jeopardize a listed species, FWS still must specify important safeguards to

mitigate any harm to the species.  In particular, FWS must specify the amount or extent of any incidental "taking" of the species that is anticipated to occur as a result of the action, "reasonable and prudent measures" to minimize the impact of such takings, and the "terms and conditions" that the agency must follow in implementing such measures.  16 U.S.C. § 1536(b)(4); 50 C.F.R. §§ 402.14(i)(1)(i), (ii), (iv).  "Taking," under the ESA, "means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

Such provisions concerning the incidental taking of endangered or threatened wildlife are embodied in an "incidental take statement."  50 C.F.R. § 402.14(i).  The incidental take statement authorizes a federal agency, if in compliance with the statement's terms and conditions, to "take" listed species without facing otherwise applicable ESA civil or criminal liability.  16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i)(5).  In other words, such a statement "functions as a safe harbor provision immunizing persons from [ESA] liability and penalties for takings committed during activities that are otherwise lawful and in compliance with its terms and conditions."  Az. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv., 273 F.3d 1229, 1239 (9th Cir. 2001) (citing 16 U.S.C. § 1536(o)).

Even after the procedural requirements of an ESA section 7 consultation are completed, however, the ultimate duty to ensure that an activity does not jeopardize a listed species lies with the agency undertaking the proposed action.  See 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.15(a).  An action agency's reliance on an inadequate, incomplete, or flawed biological opinion to satisfy its ESA section 7 duty is itself unlawful under the ESA.  See Resources Ltd. v. Robertson, 35 F.3d 1300, 1304 (9th Cir. 1993) (invalidating action agency's arbitrary reliance on FWS biological opinion).

Further, even after consultation is completed, if, among other things, "the amount or extent of taking specified in the incidental take statement is exceeded" or "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," then "[r]einitiation of formal consultation is required and shall be requested by the Federal agency or by the Service."  50 C.F.R. § 402.16(a), (b).

## III.     GRAND TETON NATIONAL PARK'S ELK REDUCTION PROGRAM

Grand Teton National Park encompasses 310,000 acres that sweep from the valley floor of Jackson Hole, Wyoming, to the rugged summits of the Teton Range, affording some of the most spectacular scenery in the United States.  AR-NPS-2966-67 (Bison & Elk Mgmt. Plan). Although hunting is generally prohibited in national parks, see 36 C.F.R. § 2.2, the 1950 legislation establishing Grand Teton National Park provided for NPS and the Wyoming Game and Fish Commission ("Commission") to devise "a program to insure the permanent conservation of the elk" within the park, including "the controlled reduction of elk in such park, by hunters licensed by the State of Wyoming and deputized as rangers by the Secretary of the Interior, when it is found necessary for the purpose of proper management and protection of the elk."  16 U.S.C. § 673c(a).  Under this legislation, at least once yearly between February 1 and April 1, NPS and the Commission must submit to the Interior secretary and Wyoming's governor for their approval "their joint recommendations for the management, protection, and control of the elk for that year."  Id. § 673c(b).  Consistent with this direction, the NPS's operative Bison and Elk Management Plan for Grand Teton National Park, prepared jointly with FWS in 2007, called for continuing the Elk Reduction Program "when necessary."  AR-NPS-2853.

Although the statute and plan provide for elk hunting within Grand Teton National Park only when "necessary" for elk management, 16 U.S.C. § 673c(a); AR-NPS-2853, in practice elk

hunting has been a near "annual event" in the park since 1955, occurring every year except 1959 and 1960.  AR-NPS-2073; see AR-NPS-236.  As FWS and NPS have explained, the principal reason such annual hunting has been deemed "necessary" arises from a program of winter elk feeding by FWS on the nearby Jackson Hole National Elk Refuge; "[b]ecause the winter feeding program on the refuge results in minimal mortality, it necessitates an elk reduction program in the park in order to help meet state objectives for the Jackson elk herd."  AR-NPS-2868 (Bison & Elk Mgmt. Plan).

Yet, while the feeding program largely drives the need for the Elk Reduction Program, the feeding program itself is both biologically and legally flawed.  Regarding wildlife biology, the D.C. Circuit recently summarized the wildlife disease problems created by the dense clustering of elk on the refuge's winter feed lines—disease problems that threaten to overwhelm any benefit of winter feeding.  Brucellosis, a non-lethal disease "which causes an infected female to abort her fist calf," already is prevalent at nearly eight times natural levels among elk on feed lines, while chronic wasting disease, which is the "elk version of mad cow disease" and is always lethal, threatens to infect and kill as much as ninety percent or more of the fed elk population if, as expected, it eventually manifests on the feed lines.  Defenders of Wildlife v. Salazar, 651 F.3d 112, 114 (D.C. Cir. 2011).  Accordingly, the D.C. Circuit observed, the feeding program "poses an existential threat to the elk … and puts the very purpose of the Refuge at jeopardy."  Id. at 113.

Given these grave consequences of the feeding program, the D.C. Circuit left "no doubt that unmitigated continuation of supplemental feeding would undermine the conservation purpose of the National Wildlife Refuge System," of which the refuge is a part, and thereby violate the National Wildlife Refuge System Improvement Act, 16 U.S.C. §§ 668dd-668ee.  Id.

at 117.  However, because the 2007 Bison and Elk Management Plan for the park and refuge promised a 15-year program to phase out the refuge's winter feeding program, the D.C. Circuit held that it was not arbitrary and capricious for the agencies' plan to set no deadline for termination of winter feeding.  See id.  Nevertheless, the Court made clear that "the agencies must proceed in a manner that is consistent with the science and accounts for the risks posed by supplemental feeding."  Id.  And, the Court said, "[i]t is highly significant and indeed dispositive to us … that the agencies are committed to ending supplemental feeding."  Id.  Indeed, the Court stated, "the plan might well have been unreasonable had the agencies categorically refused to phase out the winter feeding program in spite of all the evidence in the record about the dangers of supplemental feeding."  Id. (quotations and citation omitted).

Nevertheless, despite the passage of more than eight years since adoption of the 2007 Bison and Elk Management Plan and nearly four years since the D.C. Circuit's decision, winter elk feeding on the National Elk Refuge continues unabated, with no evidence of the phase down promised by FWS.  To the contrary, while the D.C. Circuit observed that "approximately 7000 elk" were fed on the refuge each winter at the time of the 2007 plan, id. at 113; accord AR-NPS-2073, FWS fed approximately 8,300 elk on the refuge during the 2013-14 winter, AR-NPS-6851 (Joint Recommendation Concerning Elk Mgmt.).  Accordingly, the annual Elk Reduction Program in Grand Teton National Park also continues—as do its consequences for park wildlife.

## IV.    TAKING OF GRIZZLY BEARS IN GRAND TETON NATIONAL PARK

As recent events have made clear, the consequences of the Elk Reduction Program include the killing of grizzly bears within Grand Teton National Park as a result of lethal encounters between bears and elk hunters that arise when grizzlies claim hunter-killed elk or when hunters surprise grizzlies in dense vegetation.

In conjunction with its adoption of the 2007 Bison and Elk Management Plan, NPS consulted with FWS pursuant to section 7 of the ESA concerning the plan's likely impacts on grizzly bears. FWS's 2007 biological opinion on the plan concluded that "the variability of terrain and densely wooded areas in the Park contribute to an elevated risk of hunting-related conflicts occurring," although it deemed this increased risk to be "minimal in the long term" in light of plans to phase down the Elk Reduction Program in conjunction with FWS's promise to reduce and ultimately end winter elk feeding on the National Elk Refuge. AR-FWS-1549. However, given FWS's anticipation that the Elk Reduction Program "will exacerbate the short-term risk for hunting-related grizzly bear mortality within the Park," the agency anticipated the killing of "1 grizzly bear (adult or juvenile) over the 15-year implementation period of the Plan." AR-FWS-1550. FWS embodied this finding in an incidental take statement that prescribed only one "reasonable and prudent" measure to mitigate the impact of the anticipated taking—"[m]inimize the likelihood of hunting-related human/grizzly bear conflict associated with the Project through education of hunters." AR-FWS-1551.

On November 22, 2012, a group of three hunters participating in the Elk Reduction Program shot and killed an adult male grizzly bear within Grand Teton National Park. See AR FWS-1564. Accordingly, NPS on May 2, 2013, requested to reinitiate ESA section 7 consultation with FWS, stating that the killing of this male grizzly "leaves the park with no additional grizzly bear take related to the [Elk Reduction Program] during the remaining nine years of the plan's intended 15-year life span." Id. NPS's request reported that "grizzly bear distribution and numbers in the south end of the park appear to have increased" since the agencies' 2007 ESA consultation and that "several grizzly bears" had been observed seeking out the remains of hunter-killed elk within the park since 2007. AR-FWS-1565. NPS stated that

9

"[w]e believe that grizzly bears will continue this behavior and that the risk of hunter-grizzly bear contacts will continue to be relatively high as long as the [Elk Reduction Program] is necessary." Id.

The altered grizzly bear distribution and increased scavenging for hunter-killed elk reported by NPS are consistent with a major ecological shift that has occurred in the Greater Yellowstone Ecosystem since 2007. Until very recently, the seeds of the whitebark pine tree provided an important and nutritious late-summer and fall food source for grizzly bears in the Yellowstone region. See Greater Yellowstone Coal. v. Servheen, 665 F.3d 1015, 1024-25 (9th Cir. 2011); AR-FWS-2071-72 (2012 Interagency Grizzly Bear Study Team ("IGBST") Annual Report). However, the last decade has seen catastrophic whitebark pine mortality across the Yellowstone region as warmer climatic conditions left the trees vulnerable to unprecedented attacks by the mountain pine beetle and an exotic disease called blister rust. Greater Yellowstone Coal., 665 F.3d at 1025; AR-FWS-2071-72 (2012 IGBST Annual Report). In 2011, an effort by FWS to remove Yellowstone-area grizzlies from the list of species protected under the ESA failed when the U.S. Court of Appeals for the Ninth Circuit held that FWS overlooked the threat posed to grizzlies by the ongoing large-scale loss of whitebark pine from the Yellowstone region due to warming climatic conditions. See generally Greater Yellowstone Coal., 665 F.3d 1015.

As a result of the loss of whitebark pine seeds, grizzly bears abruptly have been forced to seek food elsewhere. Increasingly, they have turned to meat as an alternative, high-quality food source, which in turn has brought grizzlies into closer and ever more frequent contact with humans, including hunters. See id. at 1027; AR-FWS-2074 (2012 IGBST Annual Report) (describing female grizzly use of carcasses, including hunter-killed elk, in an area of high

whitebark pine mortality).  At the same time, grizzly bear mortalities, including human-caused mortalities, have increased.  <u>See</u> AR-FWS-980, 982-83; AR-FWS-1156, 1160-61; AR-FWS-1325, 1329-30; AR-FWS-1742, 1746; AR-FWS-1860, 1863; AR-FWS-1936, 1941; AR-FWS-1597, 1602; AR-FWS-2051, 2057 (IGBST annual reports documenting an increase in annual grizzly bear mortalities from 14-26 in the four years prior to the 2007 crash of whitebark pine to 31-55 in the six subsequent years).  Further, contemporaneous with these changes, the grizzly population trajectory has flattened.  <u>See</u> AR-FWS-2038; AR-GB-143-44.

## V.    THE CHALLENGED "ADDENDUM"

FWS responded to NPS's request to reinitiate ESA section 7 consultation on September 13, 2013, with a four-page document styled as an "addendum" to FWS's 2007 biological opinion regarding the Bison and Elk Management Plan.  <u>See generally</u> AR-FWS-1661-64.  FWS stated that this "addendum" "tiers off of our original biological opinion."  AR-FWS-1662.  FWS agreed with NPS that elk hunting within Grand Teton National Park creates "a relatively high risk of hunter-grizzly bear contacts as long as the [Elk Reduction Program] is necessary," AR-FWS-1662, and that "continued implementation of the Plan is likely to incur additional losses of grizzly bears from hunter-grizzly bear conflicts, which will adversely affect grizzly bears," AR-FWS-1663.

Based on this information, FWS stated that it "anticipates up to <u>4 additional grizzly bears in the Park … may be incidentally taken directly or indirectly as a result of the Plan during the remaining 9 years this biological opinion is valid</u>."  AR-FWS-1664 (emphasis in original).  FWS further stated that, "given the current estimated population of grizzly bears in the GYE [i.e., Greater Yellowstone Ecosystem] and overall sustainable annual mortality levels … , the number

of bears affected by the Plan will be small and will not jeopardize the continued existence of the Yellowstone ecosystem grizzly bear population."  AR-FWS-1663-64.

In relying on "sustainable annual mortality levels," FWS was referencing criteria established for monitoring the status of the region's grizzly bear population by the Interagency Grizzly Bear Study Team ("IGBST"), an interagency consortium responsible for long-term monitoring and research of grizzly bears in the Greater Yellowstone Ecosystem.  See AR-FWS-1664 ("addendum" referencing "last 5 years of IGBST annual reporting of mortalities and population trends").  FWS and the IGBST establish mortality thresholds for specific cohorts of the region's grizzly bear population at levels designed to ensure that the population does not decline.  See, e.g., AR-FWS-1065-69 (IGBST document reassessing population size and sustainable mortality limits); AR-GB-151-53, 173-74.  In the words of the IGBST, these thresholds have been established "to maintain long-term population viability."  AR-GB-146.

However, despite relying on the IGBST's sustainable mortality levels, which apply across the entire Yellowstone region, FWS did not consider whether the anticipated killing of four grizzly bears as a consequence of the Elk Reduction Program in Grand Teton National Park, when added to other grizzly bear killings that FWS has anticipated as a consequence of other ongoing federal agency actions around the Greater Yellowstone Ecosystem, would be sustainable under the referenced criteria.  Further, despite anticipating a four-fold increase in the anticipated killing of grizzly bears in Grand Teton National Park, FWS did not impose—or even consider— any new reasonable and prudent measures to minimize the impact of the anticipated taking.

In concluding its brief discussion, FWS stated that "[t]his addendum to the 2007 biological opinion and new Incidental Take Statement supersede the relevant portions of our 2007 biological opinion."  AR-FWS-1664 (emphasis in original).  Accordingly, like the taking

anticipated in the 2007 biological opinion, the taking of four grizzly bears in Grand Teton

National Park anticipated in the "addendum" "is not considered to be prohibited taking under the

[ESA]" as a result of its inclusion in an incidental take statement.  AR-FWS-1691.

## ARGUMENT

This Court should vacate and remand the challenged "addendum" and its new incidental

take statement for the killing of four grizzly bears in Grand Teton National Park.  FWS's

"addendum" arbitrarily ignored information in the agency's own files that was essential for FWS

to consider in rationally determining whether the anticipated taking of four grizzlies in Grand

Teton National Park would have a relatively minor impact, as FWS concluded, or instead would

constitute the "straw that breaks the camel's back" by jeopardizing the species.  In addition,

FWS failed to comply with important ESA requirements for section 7 consultations, which

impose essential safeguards for imperiled wildlife.  NPS's arbitrary reliance on the flawed

"addendum" to satisfy its own ESA obligations with respect to the Grand Teton National Park

Elk Reduction Program was equally unlawful.

## I.    STANDARD OF REVIEW

Judicial review of agency action under the ESA is guided by the Administrative

Procedure Act ("APA"), which provides for reviewing courts to "hold unlawful and set aside

agency action … found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  5 U.S.C. § 706(2)(A); see Cabinet Mountains Wilderness v. Peterson,

685 F.2d 678, 685 (D.C. Cir. 1982) ("Since the ESA does not specify a standard of review,

judicial review is governed by section 706 of the Administrative Procedure Act.").  While this

standard does "not empower[] [courts] to substitute [their] judgment for that of the agency," it

requires "a thorough, probing, in-depth review" of challenged decisions.  Citizens to Preserve

Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-16 (1971).  Administrative action is arbitrary

where the agency:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Even where issues involve scientific judgments within the scope of agency expertise, the agency still must rationally explain its findings to warrant judicial deference.  Nat. Res. Def. Council v. Daley, 209 F.3d 747, 755 (D.C. Cir. 2000) (holding that agency "cannot rely on reminders that its scientific determinations are entitled to deference in the absence of reasoned analysis to cogently explain why" its actions satisfy statutory mandates) (quotations omitted).  Further, under the ESA, an agency's failure to "use the best scientific and commercial data available" is arbitrary and capricious.  16 U.S.C. § 1536(a)(2); see Am. Wildlands v. Norton, 193 F. Supp. 2d 244, 257 (D.D.C. 2002) (remanding ESA listing decision to FWS because the agency "ignored scientific data and existing models" relevant to its analysis).

## II.    FWS'S "ADDENDUM" FAILED TO CONSIDER ESSENTIAL INFORMATION IN REACHING ITS "NO-JEOPARDY" CONCLUSION FOR GRIZZLY BEARS

FWS violated the ESA by failing rationally to assess the impact of the anticipated killing of four grizzly bears in Grand Teton National Park in light of other killings of grizzly bears that FWS anticipates will occur, and has exempted from ESA liability, in numerous other incidental take statements that remain operative for grizzly bears around the Greater Yellowstone Ecosystem.

The ESA permits FWS to anticipate and exempt incidental taking of a listed species from otherwise applicable civil and criminal liability in connection with a federal agency action only after determining that such taking is not likely to jeopardize the continued existence of the

affected species.  See 16 U.S.C. § 1536(b)(4)(B); accord 50 C.F.R. § 402.14(i).  FWS's "addendum" concluded that the taking of four grizzly bears in Grand Teton National Park would not jeopardize the Yellowstone-area grizzly bear population "given the current estimated population of grizzly bears in the [Greater Yellowstone Ecosystem] and overall sustainable mortality levels."  AR-FWS-1663-64.  FWS thus reached its "no-jeopardy" conclusion after looking at the total population of grizzly bears in the Greater Yellowstone Ecosystem and overall sustainable levels of mortality under thresholds established for that total population, and then determining that the taking of four bears in Grand Teton National Park is not likely to jeopardize the species.

However, in its analysis, FWS failed to examine the big picture of the impact on grizzly mortality levels resulting from killing of four grizzly bears in Grand Teton National Park when added to other lethal grizzly bear takings that FWS itself has anticipated and exempted from ESA liability in numerous incidental take statements that remain operative throughout the Yellowstone region.  See generally AR-FWS-1661-64.  In this regard, FWS may issue an incidental take statement for a listed species only where it has a "rational basis to conclude that a take will occur incident to [an] otherwise lawful activity."  Az. Cattle Growers' Ass'n, 273 F.3d at 1242.  Accordingly, every incidental take statement issued by FWS for grizzly bears across the Greater Yellowstone Ecosystem necessarily flows from a rational agency determination—not worst-case-scenario agency speculation—that incidental taking of grizzly bears is likely to occur due to a specified federal activity.  Yet nowhere in its "addendum" did FWS analyze the implications of takings anticipated in Grand Teton National Park when added to other takings that FWS previously had rationally determined are likely to occur.  See generally AR-FWS-1661-64.

FWS's failure to examine the big picture of all grizzly bear takings anticipated across the Greater Yellowstone Ecosystem is especially troubling because a review of all operative incidental take statements issued by FWS for grizzly bears in the Yellowstone region reveals that the agency had already anticipated and exempted from legal liability the killing of 63 grizzly bears before issuing the "addendum" challenged in this case.  See attached Exhibit.[2]  Further, under the operative biological opinions, 52 of these anticipated takings could kill female grizzly bears.  See id.  Such female mortality is of particular concern because females effectively drive population growth for grizzlies and FWS has acknowledged that "long-term survival of the GYA grizzly bear is most closely linked to survival of adult females."  AR-FWS-1070 (IGBST document reassessing population size and sustainable mortality limits); see also AR-FWS-207 (1993 Recovery Plan) ("providing maximum protection for females is essential to recovery"). This is because, while one male grizzly bear can breed with multiple females, it is the survival of a female and her cubs that enables the grizzly population to grow—and that growth rate is quite slow.  As FWS has explained,

> [g]rizzly bears have one of the lowest reproductive rates among terrestrial mammals, resulting primarily from the late age of first reproduction, small average litter size, and the long interval between litters. … [D]uring the first 10 years of her life, a female grizzly bear is capable of adding only two litters to the total population.  If there are litters of two cubs with a 50:50 sex ratio, and a 50 percent survivorship of young to age 5.5, at best she can replace herself with one breeding age female in the first decade of her life.

AR-FWS-206 (1993 Recovery Plan).

---

[2] The referenced incidental take statements are included within the administrative record.  For the Court's convenience, the attached Exhibit consists of a spreadsheet that summarizes the information in the referenced incidental take statements with citations to the relevant pages of the administrative record.  The number of takings stated in the text above varies from the number asserted in Plaintiffs' amended complaint, see Dkt.#16 at ¶ 45, because Plaintiffs did not have the benefit of the administrative record in preparing their complaint and therefore utilized the best information available to them at that time.

Given these facts, FWS's anticipated takings of grizzly bears across the Greater

Yellowstone Ecosystem could significantly alter the picture of "overall sustainable mortality

levels" upon which FWS relied in the challenged "addendum." AR-FWS-1664. For example, as

of 2012 (the year of the most recent scientific information included in the record), the sustainable

annual mortality threshold for adult female grizzly bears in the Yellowstone-area population was

9 percent. See AR-FWS-2057 (2012 IGBST Annual Report).[3] Based on that year's estimate of

257 adult female grizzly bears in the Yellowstone-area population, see id., this means that the

independent female cohort could sustain a maximum of 23 mortalities per year across the Greater

Yellowstone Ecosystem before the grizzly population would be pushed into decline.[4] However,

in the aggregate, the lethal taking of female bears that FWS has anticipated and exempted from

legal liability across the Yellowstone region could more than double this limit even before FWS

anticipated four additional grizzly takings in the challenged "addendum." Put another way, the

amount of grizzly bear takings anticipated by FWS across the Yellowstone region is sufficient to

---

[3] In 2012, the IGBST recommended reducing the independent female mortality threshold from 9 percent to 7.6 percent. See AR-GB-144, 173 (2012 IGBST report on population size and sustainable mortality limits).

[4] The most recent IGBST Annual Report provides an estimate of 258 independent female grizzlies. See Frank T. van Manen et al. (eds.), Yellowstone Grizzly Bear Investigations: Annual Report of the Interagency Grizzly Bear Study Team 2013 16 (2014), available at http://www.nrmsc.usgs.gov/files/norock/products/IGBST/2013report.pdf. This number does not affect the allowable number of female mortalities, which remains 23 at the 9 percent mortality level and would be 20 at the proposed 7.6 percent mortality level.

exceed the sustainable annual mortality threshold for adult female grizzly bears for two consecutive years.[5]

 This anticipated taking presents a substantial issue concerning the status of the Yellowstone-area grizzly population given that available scientific information already documents reduced survival rates among significant components of the population, a slowing or stalled population growth rate, and a transition to a more heavily meat-based—and thus more conflict-prone—diet in the wake of the collapse of whitebark pine since 2007. <u>See</u> AR-FWS-2038, 2051, 2074 (2012 IGBST Annual Report); AR-GB-143-44 (2012 IGBST report on population size and sustainable mortality limits). Nevertheless, FWS failed to consider the anticipated takings or their implications for total grizzly bear mortality in the Greater Yellowstone Ecosystem before relying on "overall sustainable annual mortality levels" in its "no-jeopardy" conclusion in the challenged "addendum." <u>See generally</u> AR-FWS-1661-64.

 The ESA does not permit this blinkered approach. At the most fundamental level, FWS's jeopardy determinations under ESA section 7 may be sustained only where the agency articulates the "rational connection between facts and judgment required to pass muster under the arbitrary and capricious standard." <u>State Farm</u>, 463 U.S. at 56; <u>see</u> <u>Nat'l Wildlife Fed'n v. Norton</u>, 332 F.

---

[5] The grizzly bear taking anticipated by FWS across the Yellowstone region is sufficient to exceed the sustainable annual mortality thresholds for the independent male and dependent young cohorts as well. As of 2012, the IGBST estimated 163 males in the Yellowstone grizzly bear population. AR-FWS-2057 (2012 IGBST Annual Report). With a 15 percent sustainable mortality threshold for independent males, this means that 24 males could be killed without exceeding the threshold. <u>Id.</u> The IGBST estimated 190 dependent young during 2012. <u>Id.</u> With a 9 percent sustainable mortality level, this means that 17 could be killed without exceeding the threshold. <u>Id.</u> The 63 grizzly bear mortalities that FWS has anticipated and exempted throughout the ecosystem could more than double the mortality thresholds for each of these cohorts in any given year. <u>See</u> attached Exhibit. Further, it could allow the mortality thresholds for multiple cohorts to be exceeded simultaneously (<u>e.g.</u>, more than 23 independent females and 24 independent males could perish in the same year).

Supp. 2d 170, 176-77 (D.D.C. 2004) (invalidating biological opinion that failed "to make a rational connection between the facts found and the choice made") (quotations and citation omitted).  Here, having chosen to rely on region-wide population levels and sustainable mortality limits to support its "no-jeopardy" determination, FWS could not rationally ignore all of the region-wide lethal takings of grizzly bears that the agency had previously anticipated and exempted—all of which counts against the sustainable mortality limits that FWS invoked to conclude that the taking of four grizzly bears in Grand Teton National Park will not jeopardize the species.  To the contrary, under the ESA, "[t]he impact of an authorized incidental take cannot be determined or analyzed in a vacuum, but must necessarily be addressed in the context of other incidental take authorized by FWS."  Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121, 127 (D.D.C. 2001).

More particularly, the ESA's section 7 implementing regulations require FWS to "[e]valuate the effects of the action," 50 C.F.R. § 402.14(g)(3), which "refers to the direct and indirect effects of an action on the species … that will be added to the environmental baseline," id. § 402.02.  The "environmental baseline" includes, among other things, "the past and present impacts of all Federal, State, or private actions and other human activities in the action area [and] the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation."  Id.  The "action area," in turn, "means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action."  Id.  In applying that analytical methodology here, FWS's treatment of the "environmental baseline" encompassed the "overall sustainable annual mortality levels" for grizzly bears in the Greater Yellowstone Ecosystem, AR-FWS-1664, which reflect the "past and present impacts" of various activities on grizzly bear mortality.  50 C.F.R. § 402.02 (emphasis

added).  But FWS did <u>not</u> comply with the further regulatory requirement to consider "the <u>anticipated</u> impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation"—<u>i.e.</u>, those embodied in operative incidental take statements around the Yellowstone region.  <u>Id.</u> (emphasis added).

This District confronted a similar situation in <u>Defenders of Wildlife v. Babbitt</u>, 130 F. Supp. 2d 121.  There, FWS had prepared ESA biological opinions regarding various projects impacting the Sonoran pronghorn, but in doing so had "authorized a total level of take greater than the incidental take provided for in any individual [biological opinion] without analyzing whether that total level jeopardizes the survival of the pronghorn species."  <u>Id.</u> at 130. Addressing these FWS actions, the Court held that, "[a]s incremental incidental takes are authorized, the impact of those takes on the species must be viewed in the context of previously authorized takes and other impacts that are part of the environmental baseline."  <u>Id.</u> Accordingly, the Court held that FWS's analysis of both the environmental baseline and the impacts of authorized incidental takings in the challenged biological opinions violated the ESA. <u>See</u> <u>id.</u> at 126-28, 130-31.  The same conclusion applies here.[6]

_____

[6] The judge who authored <u>Defenders of Wildlife</u> later clarified that her decision was not meant to impose "a requirement that each [biological opinion] include a collective jeopardy finding, <u>i.e.</u>, a determination whether <u>all</u> federal agency action, considered together, is likely to jeopardize the continued existence of the pronghorn."  <u>Defenders of Wildlife v. Norton</u>, No. 99-927 (ESH), 2003 WL 24122459, at *5 (D.D.C. Jan. 7, 2003) (emphasis in original).  Instead, "[t]he agency must analyze the likely impact of the proposed action on the pronghorn—<u>given the depleted and precarious state of the species that has been caused and continues to be exacerbated (at least in part) by the combined effects of past, present, and future federal agency action.</u>"  <u>Id.</u> at *6 (emphasis in original); <u>see also</u> <u>id.</u> at *6 n.8 (further clarifying this distinction).  FWS failed to conduct that required analysis here.  Although the same judge later upheld a biological opinion "even though it does not numerically add the takes from different sources together," she did so only because the biological opinion in question "details the anticipated takes" both in a narrative discussion and in a table and the agency "could not quantify all sources of mortality."  <u>Oceana, Inc. v. Evans</u>, 384 F.Supp.2d 203, 230-31 (D.D.C. 2005).  No such factors exist here.

In fact, FWS's ESA compliance here is even less defensible than in <u>Defenders of Wildlife</u>, because in that case FWS at least "recit[ed] the activities and impacts that constitute the baseline"—although it did not analyze the impact of new agency action when added to the baseline, as the ESA requires.  <u>Id.</u> at 127-28.  Here, by contrast, FWS did not even recite the activities addressed in the operative biological opinions pursuant to which FWS anticipated the taking of 63 grizzly bears around the Greater Yellowstone Ecosystem prior to issuing the challenged "addendum."  <u>See</u> AR-FWS-1663-64; attached Exhibit.  Instead, FWS ignored them.

In so doing, FWS violated the ESA.  By "entirely fail[ing] to consider an important aspect of the problem" and failing to draw a rational connection between the facts found and the choice made, FWS issued an arbitrary and capricious "no-jeopardy" conclusion in the challenged "addendum" in violation of ESA section 7, 16 U.S.C. § 1536(a)(2).  <u>State Farm</u>, 463 U.S. at 43. Further, by failing to consider readily available information detailing anticipated taking of grizzly bears in the Greater Yellowstone Ecosystem, FWS violated the ESA's separate section 7 requirement to "use the best scientific and commercial information available."  16 U.S.C. § 1536(a)(2).  For these reasons alone, this Court should vacate and remand the challenged "addendum."

## III.    FWS'S CURSORY "ADDENDUM" COULD NOT LAWFULLY EXEMPT TAKING OF GRIZZLY BEARS FROM ESA LIABILITY

FWS further violated the ESA because the agency's cursory "addendum" does not constitute a lawful response to NPS's request to reinitiate consultation under ESA section 7 and therefore could not lawfully convey an incidental take statement to NPS.

The ESA's implementing regulations provide that "[r]einitiation of formal consultation is required and shall be requested by the Federal agency or by the Service" if, among other things, "the amount or extent of taking specified in [a biological opinion's] incidental take statement is

21

exceeded" or "[i]f new information reveals effects of the action that may affect listed species …

in a manner or to an extent not previously considered."  50 C.F.R. § 402.16(a), (b).  Formal

consultation, in turn, is a process defined by ESA regulations to require FWS to undertake

specific information-gathering and analysis obligations, including reviewing all relevant

information, id. § 402.14(g)(1); evaluating the current status of the affected species, id. §

402.14(g)(2); evaluating the effects of the proposed agency action together with cumulative

effects on the affected species, id. § 402.14(g)(3); and, ultimately, "[f]ormulat[ing] its biological

opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize

the continued existence" of the species, id. § 402.14(g)(4).  Only after FWS has engaged in that

formal consultation procedure and formulated its biological opinion that the proposed action will

not likely jeopardize a listed species may the agency provide "a statement concerning incidental

take."  Id. § 402.14(i); accord 16 U.S.C. § 1536(b)(4) (authorizing provision of incidental take

statement only "after consultation").

        Here, FWS did not even attempt to comply with these requirements.  Rather than

preparing a new biological opinion addressing all of the required subjects in response to NPS's

reinitiation request, FWS prepared a cursory, four-page "addendum" and then purported to

comply with ESA section 7 requirements by asserting that its "addendum" "tiers off" of the

agency's 2007 biological opinion concerning the NPS and FWS's Bison and Elk Management

Plan.  AR-FWS-1662.  This approach violated the ESA for two reasons.

        First, FWS attempted to utilize a "tiering" approach to section 7 compliance that is not

permitted under the ESA.  "Tiering" is a concept specified by regulations under the National

Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., which

        refers to the coverage of general matters in broader environmental impact
        statements (such as national program or policy statements) with subsequent

22

> narrower statements or environmental analysis (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.

40 C.F.R. § 1508.28.  However, "while discussed in the implementing regulations of NEPA," such "tiering" "is not described anywhere in ESA or its implementing regulations."  Nat. Res. Def. Council v. Rodgers, 381 F. Supp. 2d 1212, 1228 n.27 (E.D. Cal. 2005), reconsideration denied, No. CIV. S-88-1658 LKK (Oct. 5, 2005).  Although some courts have nevertheless allowed FWS to utilize "tiering" under ESA section 7, they have done so only where such "tiering" involved "programmatic environmental analysis supplemented by later project-specific environmental analysis."  Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv., 378 F.3d 1059, 1068 (9th Cir. 2004), amended on other grounds by 387 F.3d 968 (9th Cir. 2004); accord Swan View Coal. v. Weber, 52 F. Supp. 3d 1133, 1154-55 (D. Mont. 2014), appeal filed, No. 15-35111 (Feb. 06, 2015); Buckeye Forest Council v. U.S. Forest Serv., 378 F. Supp. 2d 835, 843-44 (S.D. Ohio 2005).  In such circumstances, courts have found that "tiering" may serve the same purpose as in the NEPA context—i.e., helping the agency "to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe."  40 C.F.R. § 1508.28(b); see Gifford Pinchot Task Force, 378 F.3d at 1068 (allowing FWS to rely on region-wide "projections and assumptions" of programmatic biological opinion on Northwest Forest Plan while focusing project-specific ESA section 7 analysis on "site-specific data"); Native Ecosystems Council v. Krueger, 63 F. Supp. 3d 1246, 1253 (D. Mont. 2014) (stating that FWS "could tier the site-specific biological opinion" back to a programmatic biological opinion only to the extent that otherwise "the site-specific biological opinion would merely duplicate the programmatic" biological opinion) (quotations and citation omitted), appeal filed No. 15-35100 (Feb. 04, 2015).

Here, however, FWS did not use "tiering" to streamline a project-specific biological opinion by incorporating information from a prior, completed programmatic biological opinion. Rather, FWS attempted to truncate its ESA section 7 analysis of the entire Grand Teton National Park bison and elk management program by purporting to "tier[] off" a prior section 7 analysis of that same agency program.  AR-FWS-1662.  "Tiering" in such circumstances is inappropriate because FWS's task upon reinitiation of consultation under ESA section 7 was not to focus on certain ripe issues and exclude previously decided or unripe issues about the NPS program from analysis, but rather to reexamine the entire NPS program to determine whether, in light of new information revealing previously unexamined impacts of that program, it is "likely to jeopardize the continued existence" of a listed species.  16 U.S.C. § 1536(a)(2); see Ctr. for Biological Diversity v. Bureau of Land Mgmt., 698 F.3d 1101, 1115 (9th Cir. 2012) (stating that ESA reinitiation "requirement provides the FWS with the opportunity—and the obligation—to reexamine altered projects to ensure that any changes will not place species in jeopardy").  No court has approved "tiering" under ESA section 7 in such circumstances.  For the reasons stated, this Court should not be the first to do so.

Second, even if "tiering" could be utilized in such circumstances—which it cannot— FWS misapplied the "tiering" concept in this case to issue an expanded incidental take statement for grizzly bears without analyzing the significant changed circumstances that have arisen since the 2007 biological opinion from which FWS purported to "tier."  Even where courts have approved "tiering" under ESA section 7, they have allowed FWS to rely on a prior biological opinion only "in part," demanding additional analysis to update or focus the agency's prior evaluation.  Gifford Pinchot Task Force, 378 F.3d at 1068.  Accordingly, "tiering" is not permitted under ESA section 7 where its use would allow important new information about the

24

impact of an agency action to be left unexamined.  See <u>Native Ecosystems Council</u>, 63 F. Supp. 3d at 1253 (holding that FWS violated ESA section 7 where its "tiering" approach failed to consider available information about impacts on grizzly bears of logging and alteration of food sources); <u>see generally</u> <u>Nat. Res. Def. Council</u>, 381 F. Supp. 2d at 1228 n.27 (warning that "tiering" in ESA context may "tend to obscure the ability of the agency to identify the direct and indirect consequences of particular action, and thus tend to obscure when government action is prohibited").

Here, in purporting to "tier[] off of our original biological opinion," AR-FWS-1662, FWS's "addendum" left important new information unexamined.  Most significantly, while FWS's 2007 biological opinion noted in passing the importance of whitebark pine seed cones as a food source for the region's grizzly bears, <u>see</u> AR-FWS-1532, the whitebark pine food source has collapsed since 2007 due to climate-change impacts, <u>see</u> AR-FWS-2072, 2082, 2120, 2124 (2012 IGBST Annual Report).  That post-2007 sea change in the food supply for Greater Yellowstone Ecosystem grizzly bears was so significant to the species that its disregard by FWS prompted the Ninth Circuit to invalidate FWS's removal of the region's grizzlies from the ESA threatened-species list.  <u>See generally</u> <u>Greater Yellowstone Coal.</u>, 665 F.3d 1015.  Further, the loss of whitebark pine was a particular blow to the critical and most sensitive independent female cohort of the grizzly bear population, which uses whitebark pine seeds as a food source twice as often as the male cohort and whose reproductive success had been specifically driven by the availability of an abundant whitebark pine food supply.  <u>See</u> AR-FWS-761 (Reinhart et al. article in Western North American Naturalist).  Yet FWS's "addendum" did not even mention whitebark pine or its loss as a grizzly bear food source.  <u>See</u> AR-FWS-1661-64.  Nor did it mention the fact that, contemporaneous with the post-2007 loss of whitebark pine, grizzly bears

in the Yellowstone region have increasingly shifted to meat as an alternative, high-quality food source, which creates a situation ripe for more conflicts with humans, including hunters, see AR FWS-2074 (2012 IGBST Annual Report), or that, contemporaneous and consistent with this shift, human-caused grizzly mortalities in the region have risen, see AR-FWS-980, 982-83; AR-FWS-1156, 1160-61; AR-FWS-1325, 1329-30; AR-FWS-1742, 1746; AR-FWS-1860, 1863; AR-FWS-1936, 1941; AR-FWS-1597, 1602; AR-FWS-2051, 2057 (IGBST annual reports documenting an increase in annual grizzly bear mortalities from 14-26 in the four years prior to the 2007 crash of whitebark pine to 31-55 in the six subsequent years).[7]

FWS's "addendum" also omitted consideration of updated information about the likely scope and duration of Grand Teton National Park's Elk Reduction Program.  FWS's 2007 biological opinion on the Bison and Elk Management Plan deemed the risk to grizzly bears from this program to be "minimal in the long term" due to FWS's own planned phase down of winter feeding on the National Elk Refuge and a corresponding reduction in the NPS's need for elk hunting in the park.  AR-FWS-1549; see also AR-FWS-1544-45 (discussing expected reduction of refuge winter feeding and related park elk hunting programs).  However, with no such phase down apparent at the time of the 2013 "addendum," there was no basis for FWS to simply "tier" to its 2007 analysis.  AR-FWS-1549.  To the contrary, FWS's anticipation that takings of grizzly bears due to the program would increase four-fold from the level expected in the 2007 biological opinion over just the remaining nine years of the Bison and Elk Management Plan, see AR-FWS-1664, amounted to a tacit admission that the FWS's own 2007 promise to phase down and

---

[7] In this regard, some of the largest-scale incidental takings of grizzly bears anticipated by FWS in operative biological opinions throughout the Yellowstone region are associated with bear reliance on meat food sources, including anticipated lethal takings of 11 bears due to conflicts with livestock grazing operations in the Upper Green River area of northwest Wyoming.  See attached Exhibit.

ultimately end the refuge feeding program "over a fifteen-year period," <u>Defenders of Wildlife v. Salazar</u>, 651 F.3d at 115, may not be kept.  Yet FWS failed to update its required analysis of "all relevant information" and the "effects of the action" to reflect this new information, 50 C.F.R. § 402.14(g)(1), (3), (4), instead relying on the 2007 biological opinion's outdated expectation that that impact to grizzly bears would be "minimal in the long term" due to the promised phase down of refuge elk feeding, AR-FWS-1549.

By sidestepping consideration of such matters, FWS's "tiering" approach violated the ESA.  Because FWS can anticipate and exempt the incidental taking of listed species only after lawfully completing the ESA section 7 consultation process, 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i), the incidental take statement set forth in FWS's "addendum" was invalid and could not lawfully convey a statutory exemption for the taking of grizzly bears.

## IV.  FWS FAILED TO SPECIFY, OR EVEN CONSIDER, REQUIRED MEASURES TO MINIMIZE THE IMPACT OF THE ANTICIPATED TAKING

FWS also violated the ESA in the challenged "addendum" by failing to specify, or even consider, additional measures to minimize the impact of the expanded taking of grizzly bears that the agency anticipated within one of our nation's premiere national parks.

The ESA requires that, when FWS issues an incidental take statement, the agency "<u>shall</u>" also "specif[y] those reasonable and prudent measures that the [agency] considers necessary or appropriate to minimize [the] impact" of the taking, and "set[] forth the terms and conditions … that must be complied with by the Federal agency … to implement [such] measures."  16 U.S.C. § 1536(b)(4)(C)(ii), (iv) (emphasis added); <u>accord</u> 50 C.F.R. § 402.14(i)(1)(ii), (iv).  "The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive."  <u>Ass'n of Civilian Technicians, Mont. Air Ch. No. 29 v. Fed. Labor Relations Auth.</u>, 22 F.3d 1150, 1153 (D.C. Cir. 1994).  Accordingly, "it is clear that

the FWS is <u>required</u> to" specify reasonable and prudent measures to minimize the impact of anticipated incidental taking, <u>Pub. Emp. for Envtl. Responsibility v. Beaudreau</u>, 25 F. Supp. 3d 67, 108 (D.D.C. 2014) (emphasis added), <u>appeal dismissed</u>, No. 14-5117 (D.C. Cir. June 11, 2014), as well as the terms and conditions necessary to implement them, <u>see</u> <u>Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs</u>, 538 F. Supp. 2d 242, 258-59 (D.D.C. 2008) (holding that "[a]n incidental take statement that fails to include terms and conditions governing the implementation of reasonable and prudent measures is 'arbitrary and capricious'") (citation omitted).

Here, however, FWS's "addendum" failed to consider, let alone specify, any reasonable and prudent measures or implementing terms and conditions to cushion the blow of the four-fold increase in grizzly bear takings that FWS anticipated in Grand Teton National Park. <u>See generally</u> AR FWS-1661-64. FWS failed to engage in such consideration even though some options to minimize the park Elk Reduction Program's impact on grizzly bears were readily apparent: In the wake of the November 2012 killing of a grizzly bear by hunters in Grand Teton National Park, NPS imposed new limitations on the 2013 hunting season, including closing the most conflict-prone area to hunting, adjusting hunt timing, and restricting the amount of ammunition carried and shots that could permissibly be taken by hunters. <u>See</u> AR-FWS-1662. Although FWS acknowledged that "[t]hese new measures were proposed specifically for the 2013 season and in the future, they may change," AR-FWS-1663, FWS offered no discussion and apparently undertook no consideration whether any of these limitations should be made permanent as reasonable and prudent measures to minimize impacts on the grizzly bear or whether other actions not yet implemented or contemplated by NPS should be specified for that purpose.

28

FWS's failure to specify—or even consider—any "reasonable and prudent measures" and implementing terms and conditions to minimize the impact of the anticipated taking of four grizzly bears in Grand Teton National Park violated 16 U.S.C. § 1536(b)(4)(ii) and (iv) and 50 C.F.R. § 402.14(i)(1)(ii) and (iv).  For this reason too, this Court should vacate and remand the challenged "addendum."

## V.    NPS VIOLATED THE ESA BY ARBITRARILY RELYING ON FWS'S UNLAWFUL "ADDENDUM" TO SATISFY ESA OBLIGATIONS

Finally, NPS violated the ESA by relying on FWS's unlawful "addendum" to satisfy NPS's own ESA obligations in connection with the impact on grizzly bears caused by the Grand Teton National Park Elk Reduction Program.

"Consulting with the FWS alone does not satisfy an agency's duty under the Endangered Species Act."  Resources Ltd., 35 F.3d at 1304.  To the contrary, even where FWS has provided its biological opinion in response to an action agency's ESA section 7 consultation request, the action agency still must "determine whether and in what manner to proceed with the action in light of its section 7 obligations and the Service's biological opinion."  50 C.F.R. § 402.15(a).  Further, an action agency "cannot abrogate its responsibility to ensure that its actions will not jeopardize a listed species; its decision to rely on a FWS biological opinion must not have been arbitrary or capricious."  Resources Ltd., 35 F.3d at 1304 (quotations and citation omitted).

Here, for the reasons stated, FWS acted arbitrarily and capriciously in violation of the ESA in issuing its "addendum."  Therefore, NPS's reliance on the "addendum" could not satisfy NPS's independent statutory obligation to avoid taking action that would likely jeopardize the grizzly bear, see 16 U.S.C. § 1536(a)(2), and the "addendum" could not lawfully convey to NPS an ESA exemption for the incidental taking of four grizzly bears anticipated by FWS, see id. §

29

1536(b)(4)(B) (providing for issuance of incidental take statement only after determination that anticipated taking will not likely jeopardize species).

Further, NPS conducted no independent assessment to satisfy its ESA section 7 requirements, but instead relied exclusively on its consultation with FWS for that purpose.  See AR-FWS-1564-68 (NPS consultation request).  Where, as here, an action agency relies on an unlawful biological opinion without any "independent assessment" of ESA compliance obligations, its conduct "is by definition arbitrary and capricious" under the ESA.  Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv., 281 F. Supp. 2d 1, 26 (D.D.C. 2003).

Accordingly, NPS violated the ESA by arbitrarily and capriciously relying on FWS's unlawful "addendum" to satisfy NPS's duties under the ESA in connection with the Elk Reduction Program in Grand Teton National Park.

## CONCLUSION

For the foregoing reasons, plaintiffs Sierra Club, Western Watersheds Project, and Center for Biological Diversity respectfully request that this Court grant their motion for summary judgment and vacate and remand FWS's 2013 "addendum" document.  See Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (holding that plaintiff that "prevails on its APA claim … is entitled to relief under that statute, which normally will be a vacatur of the agency's order"); Humane Soc'y of U.S. v. Kempthorne, 579 F. Supp. 2d 7, 21 (D.D.C. 2008) (holding that "the ESA's preference for protecting endangered species counsels strongly in favor of vacating" agency action that violated ESA requirements).

Respectfully submitted this 17th day of July, 2015.

/s/ Timothy J. Preso
Timothy J. Preso (D.C. Bar No. 456531)
Earthjustice
313 East Main Street
Bozeman, MT 59715
Fax: (406) 586-9695
tpreso@earthjustice.org
Phone: (406) 586-9699

*Attorney for Plaintiffs Sierra Club, Western Watersheds Project, and Center for Biological Diversity*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was today served via the Court's CM/ECF system on all counsel of record.

/s/ Timothy J. Preso
Timothy J. Preso

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **SIERRA CLUB**, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:15-CV-00479-RC |
| | ) | |
| v. | ) | |
| | ) | |
| **SALLY JEWELL**, Secretary, | ) | |
| U.S. Department of the Interior, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **STATE OF WYOMING**, et al., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

**PLAINTIFFS' STATEMENT OF FACTS**

Pursuant to Local Civil Rule 7(h)(2), Plaintiffs hereby set forth their statement of facts, including references to supporting portions of the record.  Judicial review under the Administrative Procedure Act generally does not require the resolution of factual issues, "the function of the district court [being] to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  <u>Baystate Med. Ctr. v. Leavitt</u>, 545 F. Supp. 2d 20, 34-35 (D.D.C. 2008) (internal quotations omitted); <u>see also</u> Comment to Local Civil Rule 7(h).  Accordingly, "[c]ourts in this Circuit have repeatedly recognized that summary judgment is an appropriate procedure when a court reviews an agency's administrative record."  <u>Fund for Animals v. Norton</u>, 294 F. Supp. 2d 92, 104 (D.D.C. 2003).

The administrative record establishes the following facts:

## I.     THE GRIZZLY BEAR

1.      The grizzly bear (*Ursus arctos horribilis*) is one of two brown bear species occupying North America.  AR-FWS-203 (1993 Recovery Plan).[1]  "Grizzly bears are generally larger than black bears and can be distinguished by longer, curved claws, humped shoulders, and a face that appears to be concave."  Id.  While grizzly bear coloration may range from light brown to nearly black, "[g]uard hairs are often paled at the tips; hence the name 'grizzly.'"  Id.

2.      Before European-American settlement of the American West, grizzly bears roamed from the Great Plains to the Pacific coast and from the Canadian border to Mexico, inhabiting every habitat except the most hot and arid desert lands.  See AR-FWS-211 (1993 Recovery Plan).  With settlement, grizzlies were shot, poisoned, and trapped wherever they were found, resulting in their extirpation everywhere except mountain redoubts far from human intolerance.  See id.  By 1975, this intensive persecution of grizzly bears in the United States had reduced their range by 98 to 99 percent and reduced their population from approximately 50,000 to fewer than 1,000.  See id.

3.      As a result, today only five mountainous areas in the lower-48 United States retain grizzly bear populations.  See AR-FWS-212-13.  These areas include Yellowstone and Grand Teton National Parks and surrounding public lands in northwest Wyoming, southwest Montana, and eastern Idaho, an area know as the Greater Yellowstone Ecosystem.  See AR-FWS-213.

---

[1] Plaintiffs cite the administrative record ("AR") by agency of origin or subject and Bates-stamped page number.  "FWS" indicates the U.S. Fish and Wildlife Service record.  "NPS" indicates the National Park Service record.  "GB" indicates the independent U.S. Fish and Wildlife Service record of grizzly bear-related documents.

4.      In 1975, the U.S. Fish and Wildlife Service ("FWS") recognized the imperilment of the remaining grizzly bear populations by listing the grizzly bear in the lower-48 states as a threatened species under the Endangered Species Act ("ESA").  See AR-FWS-1 (FWS listing notice).  Among the "[m]ajor factors" cited by FWS to justify the grizzly's listing under the ESA was excessive killing by humans.  Id.

5.      In 2012, the Interagency Grizzly Bear Study Team ("IGBST")—an interagency consortium responsible for long-term monitoring and research of grizzly bears in the Greater Yellowstone Ecosystem—used an extrapolation methodology to estimate that the grizzly bear population in the Greater Yellowstone Ecosystem numbered 610 bears.  AR-FWS-2043.  However, growth of the Greater Yellowstone Ecosystem grizzly bear population has slowed or stopped in recent years.  See AR-FWS-2038; AR-GB-143-44.  At the same time, grizzly bear mortalities, including human-caused mortalities, have increased.  See AR-FWS-980, 982-83; AR-FWS-1156, 1160-61; AR-FWS-1325, 1329-30; AR-FWS-1742, 1746; AR-FWS-1860, 1863; AR-FWS-1936, 1941; AR-FWS-1597, 1602; AR-FWS-2051, 2057 (IGBST annual reports documenting an increase in annual grizzly bear mortalities from 14-26 in the four years prior to the 2007 crash of whitebark pine to 31-55 in the six subsequent years).

6.      These trends coincide with the demise of a key grizzly bear food source in the Greater Yellowstone Ecosystem.  See generally AR-FWS-2072, 2120, 2124 (2012 IGBST Annual Report).  Until very recently, the seeds of the whitebark pine tree provided an important and nutritious late-summer and fall food source for grizzly bears in the Yellowstone region.  See AR-FWS-2071-72.  However, the last decade has seen catastrophic whitebark pine mortality across the Yellowstone region as warmer climatic conditions left the trees vulnerable to unprecedented attacks by the mountain pine beetle and an exotic disease called blister rust.  See

AR-FWS-2072.  The loss of whitebark pine was a particular blow to the independent female

cohort of the grizzly bear population, which uses whitebark pine seeds as a food source twice as

often as the male cohort and whose reproductive success has been specifically driven by the

nutrition afforded by the whitebark pine food supply.  See AR-FWS-761.  Independent female

bears are important to the survival and recovery of the grizzly bear population because females

effectively drive population growth and FWS has acknowledged that "long-term survival of the

GYA grizzly bear is most closely linked to survival of adult females."  AR-FWS-1070 (IGBST

document reassessing population size and sustainable mortality limits); see also AR-FWS-207

(1993 Recovery Plan) ("providing maximum protection for females is essential to recovery").  In

2011, an effort by FWS to remove Yellowstone-area grizzlies from the list of species protected

under the ESA failed when the U.S. Court of Appeals for the Ninth Circuit held that FWS

overlooked the threat posed to grizzlies by the ongoing large-scale loss of whitebark pine from

the Yellowstone region due to warming climatic conditions.  AR-FWS-2028.  As a result of the

loss of whitebark pine seeds, grizzly bears abruptly have been forced to seek food elsewhere;

increasingly, they have turned to meat as an alternative, high-quality food source, which in turn

has brought grizzlies into closer and ever more frequent contact with humans, including hunters.

AR-FWS-2074 (describing female grizzly use of carcasses, including hunter-killed elk, in an

area of high whitebark pine mortality).

## II.    GRAND TETON NATIONAL PARK'S ELK REDUCTION PROGRAM

7.    Grand Teton National Park encompasses 310,000 acres that sweep from the valley

floor of Jackson Hole, Wyoming, to the rugged summits of the Teton Range.  AR-NPS-2966-67

(Bison & Elk Mgmt. Plan).  The 1950 legislation establishing Grand Teton National Park

provided for the National Park Service ("NPS") and the Wyoming Game and Fish Commission

"to develop a program for the permanent conservation of elk within the park."  AR-NPS-2872.

Under this legislation, the program may include hunting of elk within the park "when necessary

for proper management."  Id.  Consistent with this direction, the NPS's operative Bison and Elk

Management Plan for Grand Teton National Park, prepared jointly with FWS in 2007, called for

continuing the Elk Reduction Program "when necessary."  AR-NPS-2853.

       8.     Although the statute and plan provide for elk hunting within Grand Teton

National Park only when necessary for elk management, in practice elk hunting has been a near

"annual event" in the park since 1955, occurring every year except 1959 and 1960.  AR-NPS-

2073; see AR-NPS-236.  As FWS and NPS have explained, the principal reason such annual

hunting has been deemed "necessary" arises from a program of winter elk feeding by FWS on

the nearby Jackson Hole National Elk Refuge; "[b]ecause the winter feeding program on the

refuge results in minimal mortality, it necessitates an elk reduction program in the park in order

to help meet state objectives for the Jackson elk herd."  AR-NPS-2868.

       9.     While the refuge feeding program largely drives the need for the Elk Reduction

Program, the feeding program itself creates wildlife disease problems that threaten to overwhelm

any benefits the elk receive from winter feeding:  brucellosis, a non-lethal disease that causes an

infected female to abort her first calf, already is prevalent at nearly eight times natural levels

among elk on refuge feed lines.  See AR-NPS-2924-25 (2007 Bison & Elk Mgmt. Plan).

Chronic wasting disease, which is the elk version of mad cow disease and is always lethal,

threatens to infect and kill the majority of the fed elk population if, as expected, it eventually

manifests on the feed lines.  See AR-NPS-2086-90, 2246 (Final Bison & Elk Mgmt. Plan &

Envtl. Impact Statement).

10.    Recognizing these impacts, the FWS and NPS's 2007 Bison and Elk Management Plan called for a 15-year program to reduce and ultimately end the refuge's winter feeding program.  See AR-NPS-2993-95.  However, FWS's refuge feeding program continues unabated: while approximately 7,000 elk were fed on the refuge annually at the time of the 2007 plan, AR-NPS-2073, FWS fed approximately 8,300 elk on the refuge during the 2013-14 winter, AR-NPS-6851 (2014 Joint Recommendation on Elk Mgmt.).

## III.    TAKING OF GRIZZLY BEARS IN GRAND TETON NATIONAL PARK

11.    In conjunction with its adoption of the 2007 Bison and Elk Management Plan, NPS consulted with FWS pursuant to section 7 of the ESA concerning the plan's likely impacts on grizzly bears.  See generally AR-FWS-1526-57.

12.    FWS's 2007 biological opinion on the plan concluded that "the variability of terrain and densely wooded areas in the Park contribute to an elevated risk of hunting-related conflicts occurring," although it deemed this increased risk to be "minimal in the long term" in light of plans to phase down the Elk Reduction Program in conjunction with FWS's promise to reduce and ultimately end winter elk feeding on the National Elk Refuge.  AR-FWS-1549.  However, given FWS's anticipation that the Elk Reduction Program "will exacerbate the short-term risk for hunting-related grizzly bear mortality within the Park," the agency anticipated the killing of "1 grizzly bear (adult or juvenile) over the 15-year implementation period of the Plan."  AR-FWS-1550.  FWS embodied this finding in an incidental take statement that prescribed only one "reasonable and prudent" measure to mitigate the impact of the anticipated taking—"[m]inimize the likelihood of hunting-related human/grizzly bear conflict associated with the Project through education of hunters."  AR-FWS-1551.

5

13.     On November 22, 2012, a group of three hunters participating in the Elk Reduction Program shot and killed an adult male grizzly bear within Grand Teton National Park. See AR-FWS-1564.

14.     Accordingly, NPS on May 2, 2013, requested to reinitiate ESA section 7 consultation with FWS, stating that the killing of this male grizzly "leaves the park with no additional grizzly bear take related to the [Elk Reduction Program] during the remaining nine years of the plan's intended 15 year life span."  AR-FWS-1564.  NPS's request reported that "grizzly bear distribution and numbers in the south end of the park appear to have increased" since the agencies' 2007 ESA consultation and that  "several grizzly bears" had been observed seeking out the remains of hunter-killed elk within the park since 2007.  AR-FWS-1565.  NPS stated that "[w]e believe that grizzly bears will continue this behavior and that the risk of hunter-grizzly bear contacts will continue to be relatively high as long as the [Elk Reduction Program] is necessary."  Id.

IV.     **FWS'S CHALLENGED "ADDENDUM"**

15.     FWS responded to NPS's request to reinitiate ESA section 7 consultation on September 13, 2013, with a four-page document styled as an "addendum" to FWS's 2007 biological opinion regarding the Bison and Elk Management Plan.  See generally AR-FWS-1661-64.  FWS stated that this "addendum" "tiers off of our original biological opinion."  AR-FWS-1662.  FWS agreed with NPS that elk hunting within Grand Teton National Park creates "a relatively high risk of hunter-grizzly bear contacts as long as the [Elk Reduction Program] is necessary," id., and that "continued implementation of the Plan is likely to incur additional losses of grizzly bears from hunter-grizzly bear conflicts, which will adversely affect grizzly bears," AR-FWS-1663.

6

16.    Based on this information, FWS stated that it "anticipates up to <u>4 additional</u>
<u>grizzly bears in the Park … may be incidentally taken directly or indirectly as a result of the Plan</u>
<u>during the remaining 9 years this biological opinion is valid</u>."  AR-FWS-1664 (emphasis in
original).  FWS further stated that, "given the current estimated population of grizzly bears in the
GYE [<u>i.e.</u>, Greater Yellowstone Ecosystem] and overall sustainable annual mortality levels … ,
the number of bears affected by the Plan will be small and will not jeopardize the continued
existence of the Yellowstone ecosystem grizzly bear population."  AR-FWS-1663-64.

17.    In relying on "sustainable annual mortality levels," FWS was referencing criteria
established for monitoring the status of the region's grizzly bear population by the IGBST.  <u>See</u>
AR-FWS-1664 ("addendum" referencing "last 5 years of IGBST annual reporting of mortalities
and population trends").  FWS and the IGBST establish mortality thresholds for specific cohorts
of the region's grizzly bear population at levels designed to ensure that the population does not
decline.  <u>See</u>, <u>e.g.</u>, AR-FWS-1065-69 (2005 IGBST document reassessing population size and
sustainable mortality limits); AR-GB-151-53, 173-74 (2012 IGBST document reassessing
population size and sustainable mortality limits).  In the words of the IGBST, these thresholds
have been established "to maintain long-term population viability."  AR-GB-146.

18.    FWS's "addendum" did not consider whether the anticipated killing of four
grizzly bears as a consequence of the Elk Reduction Program in Grand Teton National Park,
when added to other grizzly bear killings that FWS has anticipated as a consequence of other
ongoing federal agency actions around the Greater Yellowstone Ecosystem, would be sustainable
under the referenced criteria.  <u>See generally</u> AR-FWS-1661-64.  In operative incidental take
statements issued by FWS for grizzly bears in the Yellowstone region, FWS had anticipated and
exempted from legal liability the killing of 63 grizzly bears before issuing the "addendum" at

issue in this case.  See AR-GB-46; AR-GB-5; AR-GB-10; AR-GB-16; AR-GB-24-25; AR-GB-

31; AR-GB-36-42; AR-GB-53; AR-GB-60; AR-GB-66; AR-GB-69; AR-GB-74; AR-GB-80;

AR-GB-85; AR-GB-91; AR-GB-96; AR-GB-103; AR-GB-120, 121, 122, 123; AR-GB-129;

AR-GB-136 (operative biological opinions and incidental take statements anticipating lethal take

of grizzlies across the Greater Yellowstone Ecosystem).  This amount of anticipated and

exempted grizzly bear mortality could more than double the sustainable annual mortality limits

established by IGBST for any of the cohorts of the grizzly bear population in the Greater

Yellowstone Ecosystem—independent female, independent male, or dependent young—even

before the takings anticipated by FWS in connection with the Grand Teton National Park Elk

Reduction Program are added to the total.  AR-FWS-2057 (2012 IGBST Annual Report).

        19.     FWS's "addendum" did not impose, or consider imposing, any new reasonable

and prudent measures to minimize the impact of the anticipated taking of four grizzly bears in

Grand Teton National Park.  See generally AR-FWS-1661-64.

        20.     In concluding its "addendum" discussion, FWS stated that "[t]his addendum to

the 2007 biological opinion and new Incidental Take Statement supersede the relevant portions

of our 2007 biological opinion."  AR-FWS-1664 (emphasis in original).  Accordingly, like the

taking anticipated in the 2007 biological opinion, the taking of four grizzly bears in Grand Teton

National Park anticipated in the "addendum" "is not considered to be prohibited taking under the

[ESA]" as a result of its inclusion in an incidental take statement.  AR-FWS-1691.

Respectfully submitted this 17th day of July, 2015.

/s/ Timothy J. Preso
Timothy J. Preso (D.C. Bar No. 456531)
Earthjustice
313 East Main Street
Bozeman, MT 59715
Fax: (406) 586-9695
tpreso@earthjustice.org
Phone: (406) 586-9699

*Attorney for Plaintiffs Sierra Club, Western Watersheds Project, and Center for Biological Diversity*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was today served via the Court's CM/ECF system on all counsel of record.

/s/ Timothy J. Preso
Timothy J. Preso