## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **SIERRA CLUB**, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:15-CV-00479-RC |
| | ) | |
| v. | ) | |
| | ) | |
| **SALLY JEWELL**, Secretary, | ) | |
| U.S. Department of the Interior, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **STATE OF WYOMING**, et al., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO FEDERAL DEFENDANTS' AND DEFENDANT-INTERVENORS' MOTIONS FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Timothy J. Preso (D.C. Bar No. 456531)
Earthjustice
313 East Main Street
Bozeman, MT 59715
Fax: (406) 586-9695
tpreso@earthjustice.org
Phone: (406) 586-9699

*Attorney for Plaintiffs Sierra Club, Western Watersheds Project, and Center for Biological Diversity*

# TABLE OF CONTENTS

I.    FWS CANNOT JUSTIFY ITS FAILURE TO CONSIDER THE "BIG PICTURE" OF ANTICIPATED TAKINGS OF YELLOWSTONE-AREA GRIZZLY BEARS..................................................................................................1

    A.    Post-Hoc Rationalizations Cannot Justify FWS's Failure To Analyze The Impact Of Anticipated Takings In The Challenged "Addendum"..........................2

    B.    Neither Governing Law Nor The Record Supports FWS's Action ........................6

II.   FWS FAILS TO SALVAGE ITS UNLAWFUL USE OF "TIERING" IN THE CHALLENGED "ADDENDUM"...................................................................................11

III.  FWS OFFERS NO LEGITIMATE EXCUSE FOR FAILING TO CONSIDER REQUIRED MEASURES TO MINIMIZE THE IMPACT OF ANTICIPATED TAKINGS ................................................................................................................20

IV.   NPS'S RELIANCE ON THE FLAWED "ADDENDUM" WAS NOT LAWFUL ..........22

V.    PLAINTIFFS ARE ENTITLED TO THEIR REQUESTED RELIEF .............................24

VI.   SAFARI CLUB'S STANDING ARGUMENT IS MERITLESS....................................25

CONCLUSION...........................................................................................................30

# TABLE OF AUTHORITIES

## FEDERAL CASES

Am. Farm Bureau Fed'n v. Envtl. Prot. Agency,
  559 F.3d 512 (D.C. Cir. 2009) .............................................................17

Am. Soc'y For Prevention of Cruelty to Animals v. Ringling Bros. & Barnum &
  Bailey Circus,
  317 F.3d 334 (D.C. Cir. 2003) .................................................... 25-26, 27

*Animal Legal Def. Fund v. Glickman,
  154 F.3d 426 (D.C. Cir. 1998) (en banc) ........................................27, 28-29, 29-30

Audubon Soc'y of Portland v. Nat'l Marine Fisheries Serv.,
  849 F. Supp. 2d 1017 (D. Or. 2011) .......................................................7

Bennett v. Spear,
  520 U.S. 154 (1997) .............................................................25

*Burlington Truck Lines v. United States,
  371 U.S. 156 (1962) .............................................................17

Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,
  467 U.S. 837 (1984) .............................................................12

Christensen v. Harris County,
  529 U.S. 576 (2000) ......................................................... 12-13

Citizens to Preserve Overton Park v. Volpe,
  401 U.S. 402 (1971), abrogated on other grounds by Califano v. Sanders,
  430 U.S. 99 (1977) .............................................................21

Defenders of Wildlife v. Gutierrez,
  532 F.3d 913 (D.C. Cir. 2008) ....................................................... 28-29

*Defenders of Wildlife v. Norton,
  No. 99-927 (ESH), 2003 WL 24122459 (D.D.C. Jan. 7, 2003) .................................6

Defenders of Wildlife v. Salazar,
  651 F.3d 112 (D.C. Cir. 2011) .............................................................19

Didrickson v. U.S. Dep't of the Interior,
  982 F.2d 1332 (9th Cir. 1992) ..................................................... 29-30

Friends of the Earth, Inc., v. Laidlaw Envtl. Servs. (TOC), Inc.,
  528 U.S. 167 (2000) ..........................................................26, 27

Gallatin Wildlife Ass'n v. U.S. Forest Serv.,
  No. CV 15–27–BU–BMM, 2015 WL 4528611 (D. Mont. July 27, 2015)............................15

Gerber v. Norton,
  294 F.3d 173 (D.C. Cir. 2002) ...................................................................................9

Greater Yellowstone Coal. v. Servheen,
  665 F.3d 1015 (9th Cir. 2011) ...........................................................10, 13, 16, 17

*Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv.,
  281 F. Supp. 2d 1 (D.D.C. 2003) ...........................................................................23

Hunt v. Wash. State Apple Advertising Comm'n,
  432 U.S. 333 (1977).................................................................................................26

*Japan Whaling Ass'n v. Am. Cetacean Soc'y,
  478 U.S. 221 (1986).......................................................................................... 28-29

Jicarilla Apache Nation v. U.S. Dep't of the Interior,
  613 F.3d 1112 (D.C. Cir. 2010) ............................................................................25

Lujan v. Defenders of Wildlife,
  504 U.S. 555 (1992)...................................................................................26, 27, 29

Mausolf v. Babbitt,
  125 F.3d 661 (8th Cir. 1997) .................................................................................15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
  463 U.S. 29 (1983).............................................................................................2, 3, 8

Native Ecosystems Council v. Krueger,
  63 F. Supp. 3d 1246 (D. Mont. 2014), appeal dismissed, Nos. 15-35100 &
  15-35129 (9th Cir. May 8, 2015) ..........................................................................11

Nevada v. Dep't of Energy,
  457 F.3d 78 (D.C. Cir. 2006) ........................................................................... 10-11

Nw. Envtl. Def. Ctr. v. Nat'l Marine Fisheries Serv.,
  647 F. Supp. 2d 1221 (D. Or. 2009) ........................................................................7

*Oceana, Inc. v. Evans,
  384 F. Supp. 2d 203 (D.D.C. 2005) ......................................................................6, 7

*Oceana, Inc. v. Pritzker,
  75 F. Supp. 3d 469 (D.D.C. 2014) ................................................................. 28, 28-29

Pub. Citizen v. Fed. Motor Carrier Safety Admin.,
  374 F.3d 1209 (D.C. Cir. 2004)...............................................................................4

*Pub. Employees for Envtl. Responsibility v. Beaudreau,
   25 F. Supp. 3d 67 (D.D.C. 2014), appeal dismissed, Nos. 14-5117 et al.,
   2014 WL 3014869 (D.C. Cir. June 11, 2014)........................................................22

Resources Ltd. v. Robertson,
   35 F.3d 1300 (9th Cir. 1993) ............................................................................23

Rock Creek Alliance v. U.S. Forest Serv.,
   703 F. Supp. 2d 1152 (D. Mont. 2010)...............................................................15

*SEC v. Chenery Corp.,
   332 U.S. 194 (1947).............................................................................................4

Sierra Club v. Gorsuch,
   715 F.2d 653 (D.C. Cir. 1983) ............................................................................3

Sierra Club v. Morton,
   405 U.S. 727 (1972)........................................................................................27,29

Tex Tin Corp. v. U.S. Envtl. Prot. Agency,
   935 F.2d 1321 (D.C. Cir. 1991) (per curiam) .....................................................3

Tulare Lake Basin Water Storage Dist. v. United States,
   59 Fed. Cl. 246 (Fed. Cl. 2003) ........................................................................15

**STATUTES AND LEGISLATIVE MATERIALS**

5 U.S.C. § 706........................................................................................... 3, 17-18

16 U.S.C. § 1531 et seq.............................................................................................1
   § 1536(a)(2) ........................................................................................................6
   § 1536(b)(4) ................................................................................................11, 20
   § 1536(b)(4)(C)(ii) .......................................................................................20, 22
   § 1536(b)(4)(C)(iv) .............................................................................................20
   § 1540(g) ............................................................................................................25

**REGULATIONS AND ADMINISTRATIVE MATERIALS**

50 C.F.R. § 402.02 ..................................................................................2, 5, 6, 23
   § 402.14(g)(1)-(2), (h)(1)-(2) .............................................................................14
   § 402.14(g)(1)-(3).............................................................................................12
   § 402.14(g)(2)...................................................................................................13
   § 402.14(g), (h)...........................................................................................11, 12
   § 402.14(h)(2).....................................................................................................6
   § 402.14(i) ...................................................................................................11,20
   § 402.14(i)(1)(ii)...........................................................................................20, 22

§ 402.14(i)(1)(iv) ................................................................................................20
§ 402.14(i)(2) .......................................................................................... 21, 21-22
§ 402.16 .................................................................................................................19
§ 402.16(a) ...........................................................................................................24
§ 402.16(b) ........................................................................................11, 16, 24

**OTHER AUTHORITIES**

Endangered Species Consultation Handbook: Procedures for Conducting
   Consultation and Conference Activities Under Section 7 of the ESA (1998),
   available at https://www.fws.gov/endangered/esa-
   library/pdf/esa_section7_handbook.pdf........................................................ *passim*

Federal Defendants U.S. Fish and Wildlife Service ("FWS") and National Park Service ("NPS"), along with Defendant-Intervenors State of Wyoming and Safari Club International, fail to justify the challenged actions by which the defendant agencies exempted from otherwise applicable legal liability the taking of four grizzly bears, one of our nation's most iconic wildlife species, within Grand Teton National Park, one of the premiere units of our country's national park system.

In an effort to defend the cursory September 13, 2013 "addendum" document that conveyed this extraordinary exemption, the Federal Defendants and Defendant-Intervenors invent rationales that were never invoked by the defendant agencies in taking the challenged actions, rely on information outside the administrative record, and disregard the plain requirements of federal statutory and regulatory provisions. Their arguments are meritless. Because the FWS and NPS violated the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq., and its implementing regulations, this Court should vacate and remand the challenged agency actions.

## I.     FWS CANNOT JUSTIFY ITS FAILURE TO CONSIDER THE "BIG PICTURE" OF ANTICIPATED TAKINGS OF YELLOWSTONE-AREA GRIZZLY BEARS

FWS offers no legitimate defense for its failure in the challenged "addendum" to consider the impact on grizzly bear mortality levels resulting from the anticipated killing of four grizzly bears in Grand Teton National Park against the backdrop of other anticipated grizzly bear takings throughout the Yellowstone region. FWS concluded that the anticipated four grizzly bear killings in Grand Teton National Park would not jeopardize the Yellowstone-area grizzly population based on "the current estimated population of grizzly bears in the [Greater

Yellowstone Ecosystem] and overall sustainable annual mortality levels." AR-FWS-1663-64.[1]

However, FWS reached this conclusion after examining only "the last 5 years of [Interagency

Grizzly Bear Study Team ("IGBST")] annual reporting of mortalities and population trends,"

AR-FWS-1664, and failed to consider "the anticipated impacts of all proposed Federal projects

in the action area that have already undergone formal or early section 7 consultation," as required

by the ESA's implementing regulations, 50 C.F.R. § 402.02 (definition of "Effects of the

action").

This failure was especially problematic because FWS had anticipated and exempted from

ESA liability the killing of 63 grizzly bears before issuing the challenged "addendum"—a level

of mortality that, depending when the anticipated takings occur, could far exceed FWS's own

sustainable mortality limits for the Yellowstone region's grizzly bear population. See Plaintiffs'

Memorandum of Points and Authorities in Support of Motion for Summary Judgment

("Plaintiffs' Mem.") at 16-18 (ECF No. 26) & attached Plaintiffs' Exhibit (ECF No. 26-1).

Because FWS's "no-jeopardy" conclusion in the challenged "addendum" "entirely failed to

consider an important aspect of the problem," Motor Vehicle Mfrs. Ass'n v. State Farm Mut.

Auto. Ins. Co., 463 U.S. 29, 43 (1983), it was arbitrary and capricious and violated the ESA.

A.    **Post-Hoc Rationalizations Cannot Justify FWS's Failure To Analyze The Impact Of Anticipated Takings In The Challenged "Addendum"**

In seeking to defend its conduct, FWS admits that "the text of the 2013 Addendum itself

did not explicitly articulate its additional analysis of the environmental baseline, including the

consideration of previously anticipated incidental take." Federal Defendants' Motion for

---

[1] Plaintiffs cite the administrative record ("AR") by agency of origin or subject and Bates-stamped page number. "FWS" indicates the U.S. Fish and Wildlife Service record. "NPS" indicates the National Park Service record. "GB" indicates the independent U.S. Fish and Wildlife Service record of grizzly bear-related documents.

Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment ("Fed. Mem.")
at 24 (ECF No. 28).  Nevertheless, FWS urges that the omitted "information was, in fact
considered," id., and directs the Court to an email exchange and a spreadsheet in the
administrative record, see id. (citing AR-FWS-1710-15; AR-FWS-2127); accord State of
Wyoming's Cross-Motion for Summary Judgment ("Wyo. Mem.") at 38 (ECF No. 31).

As an initial matter, FWS's argument is unavailing because there is no indication in the
cursory "addendum" that FWS considered either of the cited materials in reaching its "no-
jeopardy" determination.  To pass muster under the Administrative Procedure Act's standard for
judicial review, 5 U.S.C. § 706, "the agency must examine the relevant data and articulate a
satisfactory explanation for its action including a rational connection between the facts found and
the choice made."  State Farm, 463 U.S. at 43 (emphasis added, quotations and citation omitted).
In other words, the agency's action "must not only be explainable; it must also be explained."
Sierra Club v. Gorsuch, 715 F.2d 653, 660-61 (D.C. Cir. 1983); see Tex Tin Corp. v. U.S. Envtl.
Prot. Agency, 935 F.2d 1321, 1324 (D.C. Cir. 1991) (per curiam) (court "cannot defer to agency
expertise that was never explained").  Here, there is no evidence that FWS examined the data it
now proffers to the Court in reaching the challenged decision, much less that it drew any rational
conclusion from it.

In fact, however, FWS's failure goes beyond a simple omission of essential discussion.
This is because the challenged "addendum" explicitly states that FWS based its pivotal finding of
"overall sustainable mortality levels" only "on the last 5 years of IGBST annual reporting of
mortalities and population trends," AR-FWS-1664 (emphasis added)—not on anticipated future
mortalities set forth in FWS's operative incidental take statements.  Accordingly, not only did the

3

"addendum" fail to consider the materials cited by FWS but it actually affirmatively disclaimed

any such consideration.

FWS identifies no evidence to rebut the "addendum's" own statement on this point.

Although the agency cites its biologist's email assertion that she had "been reviewing all BiOps

in the GYA" to "keep better track of project status and incidental take," AR-FWS-2127 (quoted

in Fed. Mem. at 24), the cited email came two months before the ESA consultation process at

issue in this case even began and indicates that the biologist was reviewing such documents to

ascertain whether they properly mandated annual reporting, id.—not whether four additional

anticipated grizzly bear takings in Grand Teton National Park would jeopardize the population.

Apparently recognizing this gap in the record, FWS's brief carefully states that the agency's

biologist "would consult" the referenced spreadsheet "in preparing any biological opinion

involving grizzly bears."  Fed. Mem. at 24.  However, the brief's subsequent assertion that "[s]he

performed this analysis here," id., not only defies the terms of the "addendum" itself but is bereft

of any supporting citation, thereby effectively conceding the absence of any evidence in the

"addendum" or elsewhere in the record that such analysis was actually performed in this case.

As a basic matter of administrative law, agency counsel's post-hoc assurance that the necessary

analysis was performed cannot sustain FWS's decision.  See SEC v. Chenery Corp., 332 U.S.

194, 196 (1947) (holding that "a reviewing court, in dealing with a determination or judgment

which an administrative agency alone is authorized to make, must judge the propriety of such

action solely by the grounds invoked by the agency"); Pub. Citizen v. Fed. Motor Carrier Safety

Admin., 374 F.3d 1209, 1218 (D.C. Cir. 2004) (same; "The expertise of the agency, not its

lawyers, must be brought to bear" to explain agency action.).

Moreover, even assuming for the sake of argument that the referenced spreadsheet of anticipating takings could be considered by this Court even though the "addendum" itself establishes that FWS examined only past grizzly mortalities—which it cannot—the spreadsheet still could not salvage FWS's action in this case for two reasons.  First, the spreadsheet included in the administrative record post-dates by more than 14 months the challenged "addendum" and there is no evidence that a similar document even existed at the time FWS prepared the "addendum."  See AR-FWS-1712.  FWS's brief asserts that its "biologist regularly updated this sheet without saving older versions as separate files," FWS Mem. at 24 n.14, but neither the agency's brief nor the record demonstrates that any version of this spreadsheet existed at the time FWS anticipated and exempted the lethal takings of four additional grizzly bears in Grand Teton National Park.  Second, even if this were not so, the spreadsheet still could not save the day for FWS because it is incomplete.  As FWS acknowledges, the spreadsheet omits operative incidental take statements anticipating the lethal takings of 10 grizzly bears in the Yellowstone region.  See Fed. Mem. at 30.  Accordingly, the spreadsheet does not comprehensively report "the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation," which FWS was required to consider in preparing the challenged "addendum."  50 C.F.R. § 402.02 (emphasis added).[2]

In sum, FWS's attempt to defend its "addendum" fails at the outset because there is no indication that FWS considered the impacts of all anticipated lethal takings of grizzly bears in the Yellowstone region, and post-hoc assertions and discussions of record evidence by agency counsel cannot substitute for timely analysis and reasoning by the agency itself.

---

[2] FWS's erroneous argument that this omission constitutes harmless error is addressed in Point I.B, infra.

5

**B.      Neither Governing Law Nor The Record Supports FWS's Action**

FWS offers a series of additional arguments to salvage its decision.  None has merit.

First, FWS contends that it need not "add up the collective anticipated incidental take" because such a requirement "has no basis in law."  Fed. Mem. at 25.  However, the ESA's section 7 consultation regulations require FWS to set forth "[a] detailed discussion of the effects of the action on listed species" in any jeopardy analysis.  50 C.F.R. § 402.14(h)(2).  Such a discussion of the "effects of the action" must consider "the direct and indirect effects" of the action "that will be added to the environmental baseline."  50 C.F.R. § 402.02.  The "environmental baseline," in turn, includes, among other things, "the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation"—i.e., precisely the information about anticipated takings that FWS failed to consider in this case.  Id.

Accordingly, as FWS apparently concedes, see Fed. Mem. at 25-26, the ESA regulations require FWS to "analyze the likely impact of the proposed action on the [species]—given the depleted and precarious state of the species that has been caused and continues to be exacerbated (at least in part) by the combined effects of past, present, and future federal agency action." Defenders of Wildlife v. Norton, No. 99-927 (ESH), 2003 WL 24122459, at *6 (D.D.C. Jan. 7, 2003) (original emphasis omitted, emphasis added).  Although this District has construed this requirement not to mandate "numerically add[ing] the takes from different sources together" when numeric information is unavailable, FWS still must "detail[] the anticipated takes" in a manner that faithfully implements the ESA's regulatory mandate to do so, see 50 C.F.R. § 402.02, as well as its statutory mandate for FWS to utilize the "best scientific and commercial data available," 16 U.S.C. § 1536(a)(2).  Oceana, Inc. v. Evans, 384 F. Supp. 2d 203, 230-31

6

(D.D.C. 2005) (approving "narrative discussion" of anticipated incidental takings only because "agency could not quantify all sources of mortality").  Here, numeric information about the number of lethal grizzly bear takings anticipated by FWS was readily available in the agency's own operative incidental take statements and constituted the best available data.  See Plaintiffs' Exhibit (ECF No. 26-1).  FWS offers no legitimate justification for failing to consider that readily available numeric information.  In any case, FWS did not "detail[] the anticipated takes," Oceana, 384 F. Supp. 2d at 230, in any manner—numerical or otherwise.[3]

     Second, FWS contends that Plaintiffs "mischaracterize the record" in asserting that FWS's operative incidental take statements in the Yellowstone region authorized the killing of 63 grizzly bears, of which 52 may be female bears, before issuance of the challenged "addendum."  Fed. Mem. at 26.  Despite leveling this charge, FWS immediately admits that Plaintiffs' tally of anticipated takings "is reasonably accurate" and ultimately quibbles only about the implications of this level of predicted mortality.  Id.

     FWS contends that the sustainable annual mortality limits for Yellowstone-area grizzly bears—which could be exceeded more than twice over by the level of lethal takings that FWS anticipated in operative incidental take statements, see Plaintiffs' Mem. at 17-18 & n.5—"are not meant to be a proxy for a jeopardy determination," Fed. Mem. at 27.  But Plaintiffs never contended they were.  Rather, the sustainable mortality thresholds have been established by the

---

[3] The two out-of-District authorities cited by FWS, see Fed. Mem. at 26, both support the conclusion that the ESA requires consideration of anticipated future incidental takings as part of the environmental baseline in a section 7 jeopardy analysis and that, although a surrogate for a numeric tally may at times be justified, "[u]se of a surrogate only comes into play when the agency is unable to determine the actual numbers of take."  Audubon Soc'y of Portland v. Nat'l Marine Fisheries Serv., 849 F. Supp. 2d 1017, 1044-46 (D. Or. 2011) (emphasis in original); see also Nw. Envtl. Def. Ctr. v. Nat'l Marine Fisheries Serv., 647 F. Supp. 2d 1221, 1238 (D. Or. 2009) (holding that, where "it is impossible to numerically quantify the current level of take[,] … a surrogate must be used to estimate take").

IGBST "to maintain long-term population viability" for Yellowstone's grizzly bear population. AR-GB-146. Nevertheless, a level of anticipated mortality that could more than double those limits is, by definition, unsustainable and, if maintained, is inconsistent with long-term population viability. See id. Indeed, FWS conceded the relevance of sustainable mortality to its jeopardy determination for grizzly bears when it relied on "overall sustainable mortality levels" to justify its "no-jeopardy" finding in this case. AR-FWS-1664. Relying on "overall sustainable annual mortality levels," id., while failing to consider anticipated takings that could more than double those levels represents, at a minimum, a failure "to consider an important aspect of the problem" in reaching a "no-jeopardy" conclusion, rendering FWS's decision arbitrary and unlawful. State Farm, 463 U.S. at 43.

FWS also argues that its operative incidental take statements did not predict the anticipated mortalities of 63 grizzly bears "to occur all at once." Fed. Mem. at 28 (emphasis in original). FWS thus proffers to the Court a methodology focusing on "the annual average of the aggregate anticipated incidental take," which the agency calculates at approximately 13 grizzly bears per year. Id. at 29. However, the incidental take statements at issue do not limit their exemptions from ESA liability if sustainable mortality limits for the grizzly bear population are approached or exceeded. See Plaintiffs' Exhibit (ECF No. 26-1). Thus, FWS established no safeguard in those statements to prevent multiple anticipated takings from accruing in close temporal proximity to one another at an unsustainable level. Further, available information demonstrates that grizzly bear mortalities in the Yellowstone region do not occur at a steady rate over time but rather tend to cluster together in particular years, often driven by natural food shortages that bring bears into greater proximity to and conflict with humans; for example, female grizzly bear mortalities in the Yellowstone region jumped from 21 in 2010 to 32 in 2011,

8

which exceeded FWS's sustainable mortality limit for that cohort of the population.  See AR-FWS-1941 (2010 report); AR-FWS-1602 (2011 report).[4]  FWS's methodology of assuming a constant flow of mortalities at a fraction of a bear per year defies this experience and, more fundamentally, obscures FWS's own failure to establish sufficient prophylactic measures in the relevant incidental take statements to prevent an unsustainable level of grizzly takings from clustering together over a short timeframe.[5]

Third, FWS asserts that its post-hoc spreadsheet's failure to include incidental take statements that exempted the killing of 10 grizzly bears from ESA liability was harmless error because, agency counsel contends, consideration of the omitted takings "would not have affected the outcome of FWS's 'no-jeopardy' determination."  Fed. Mem. at 31.  However, as the D.C. Circuit stated in confronting a similar harmless-error argument in an ESA case, "[w]e do not generally give credence to such post hoc rationalizations, but rather consider only the … rationale actually offered by the agency during the development of the [action]."  Gerber v. Norton, 294 F.3d 173, 184 (D.C. Cir. 2002).  Here, of course, the agency failed to consider not only the 10 anticipated takings whose omission FWS now asks this Court to forgive as

_____

[4] The independent female grizzly bear numeric mortality limit is adjusted annually based on the established mortality threshold, which is set at 9 percent of the estimated independent female population in the Yellowstone region.  AR-FWS-1941; AR-FWS-1602; Plaintiffs' Mem. at 17 nn.3, 4 (citing AR-GB-144, 173).  The 2010 mortality limit was 23 independent females, see AR-FWS-1941, while the 2011 mortality limit was 22 independent females, see AR-FWS-1602.

[5] FWS claims that Plaintiffs' demonstration that 52 of the anticipated lethal takings could kill female grizzly bears under the operative incidental take statements is like saying "that a roulette wheel could land on red 52 times in a row."  Fed. Mem. at 30.  However, FWS does not deny that nothing in the agency's incidental take statements affords any safeguard to prevent this result.  Further, although FWS suggests that a more defensible calculation would conclude that 64 percent of the 63 anticipated takings would likely involve male bears, see Fed. Mem. at 30 n.20, this equates to 40 males, which would significantly exceed FWS's sustainable mortality limit for that cohort of the population, and 23 females, which would currently equal the sustainable mortality limit for that cohort at the 9 percent mortality level and exceed it at the IGBST's proposed 7.6 percent mortality level.  See Plaintiffs' Mem. at 17 & nn.3, 4.

9

inconsequential, but also the 53 additional anticipated takings listed in the post-hoc spreadsheet but nowhere considered in the challenged "addendum." Accordingly, while FWS argues strenuously that the impact of such takings "was the agenc[y]'s call to make," Fed. Mem. at 32, the problem here is that the agency did not make that call but instead ignored the pertinent information and now asks this Court to accept counsel's post-hoc assertion that considering it would have made no difference.[6]

        This Court should not do so. Even assuming for the sake of argument that FWS's failure had extended no further than the 10 anticipated takings omitted from its post-hoc spreadsheet—which is not so—adding 10 mortalities to the grizzly bear population could easily shift total mortality from a sustainable to an unsustainable level. For example, the 20 independent female grizzly bear mortalities reported in the Yellowstone region in 2009 did not exceed the sustainable mortality limit for this cohort of the population, but the 30 such mortalities reported in 2008 did. See AR-FWS-1863 (2009 report); AR-FWS-1746 (2008 report).[7] Especially given the escalating levels of grizzly bear mortalities, including human-caused mortalities, experienced in the Yellowstone region since the catastrophic loss of the whitebark pine food source beginning in 2007, see Plaintiffs' Mem. at 10-11, requiring FWS to consider the implications of 10 additional anticipated lethal takings would not be a "meaningless gesture." Nevada v. Dep't of Energy, 457

_____

[6] FWS also argues that this Court should take comfort in "the fact that grizzly bears in the conterminous 48 states are under the very vigilant eye of the IGBST and the Recovery Plan generally." Fed. Mem. at 31. However, recent history demonstrates that this "very vigilant eye" requires judicial oversight to ensure that agency managers properly consider relevant factors impacting the Yellowstone-area grizzly bear population as required by the ESA. See generally Greater Yellowstone Coal. v. Servheen, 665 F.3d 1015 (9th Cir. 2011) (holding that FWS arbitrarily failed to consider ongoing large-scale loss of whitebark pine seed food source in removing Yellowstone-area grizzly bears from list of species protected under the ESA).

[7] See n.4, supra. The 2009 mortality limit was 22 independent females, see AR-FWS-1863, while the 2008 mortality limit was 23 independent females, see AR-FWS-1746.

F.3d 78, 91 (D.C. Cir. 2006) (cited in Fed. Mem. at 30-31).  Accordingly, FWS's harmless-error

argument should be rejected.

## II.     FWS FAILS TO SALVAGE ITS UNLAWFUL USE OF "TIERING" IN THE CHALLENGED "ADDENDUM"

FWS equally errs in defending the "addendum's" attempt to "tier[] off of our original

biological opinion" from 2007.  AR-FWS-1662.  FWS's illegitimate use of "tiering" violated the

ESA's requirements for reinitiation of section 7 consultation, including by failing to consider

important post-2007 information concerning factors impacting Yellowstone-area grizzly bears.

See, e.g., Native Ecosystems Council v. Krueger, 63 F. Supp. 3d 1246, 1253 (D. Mont. 2014),

appeal dismissed, Nos. 15-35100 & 15-35129 (9th Cir. May 8, 2015) (holding that FWS violated

ESA section 7 where its "tiering" approach failed to consider available information about

impacts on grizzly bears of logging and alteration of food sources).

The ESA requires "[r]einitiation of formal consultation" where, among other things,

"new information reveals effects of the action that may affect listed species … in a manner or to

an extent not previously considered," 50 C.F.R. § 402.16(b), and formal consultation is a legally

defined procedure that requires consideration of specified matters by FWS prior to formulation

of any jeopardy determination, see id. § 402.14(g), (h).  FWS cannot lawfully provide "a

statement concerning incidental take" without first legitimately completing that formal

consultation process.  Id. § 402.14(i); accord 16 U.S.C. § 1536(b)(4).  Here, however, FWS

short-circuited the ESA's section 7 formal consultation procedure by providing an incidental take

statement exempting from civil and criminal liability the killing of four grizzly bears in Grand

Teton National Park without first complying with formal consultation requirements, thereby

sidestepping required analysis of significant post-2007 developments affecting grizzly bears in

the Yellowstone region.  See AR-FWS-1661-64.  In so doing, FWS again violated the ESA.  See Plaintiffs' Mem. at 21-27.

Although FWS's "addendum" explicitly states that it "tiers off of our original biological opinion," AR-FWS-1662, FWS does not attempt to defend such utilization of the "tiering" concept in this case.  See Fed. Mem. at 33-35.  Instead, FWS once again attempts to disregard the terms of its own "addendum" by claiming that the "addendum" does not engage in "tiering" at all.  See id. at 33-34.  Rather, FWS claims, it reflects merely an amendment to the agency's 2007 biological opinion for the Grand Teton National Park bison and elk management plan.  See id.  FWS claims use of this abbreviated amendment procedure to respond to reinitiation of ESA section 7 formal consultation, rather than complying with the agency's own regulations specifying the matters that must be considered and addressed in such a formal consultation, see 50 C.F.R. § 402.14(g), (h), is authorized pursuant to its 1998 Consultation Handbook, see Fed. Mem. at 33.

FWS's attempt to trump the ESA's implementing regulations with a Consultation Handbook fails at the outset because "interpretations contained in policy statements, agency manuals, and enforcement guidelines … lack the force of law" and "do not warrant" judicial deference under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  Christensen v. Harris County, 529 U.S. 576, 587 (2000).  Rather, they are entitled to respect "only to the extent that those interpretations have the power to persuade."  Id. (quotations and citation omitted).  Here, even assuming that the Consultation Handbook articulated a policy allowing FWS to complete a reinitiated ESA section 7 consultation through an abbreviated amendment procedure that did not satisfy formal consultation requirements pursuant to 50 C.F.R. § 402.14(g)(1)-(3), it would be unpersuasive for that very reason, see Christensen, 529 U.S. at

587 (finding unpersuasive an agency opinion letter that defied the statute it purported to interpret).

However, the Consultation Handbook does not support FWS's argument. To the contrary, it explicitly states that "[r]einitiations involving major changes in effects analyses or changes in the Services' biological opinion <u>are addressed fully in a new consultation</u>." FWS & Nat'l Marine Fisheries Serv., <u>Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities Under Section 7 of the ESA</u>, at 4-65 (1998) (emphasis added) ("Consultation Handbook"), available at https://www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf.

The reinitiated consultation at issue in this case involved both "changes in the Services' biological opinion" from 2007 and "major changes in effects analyses" and therefore required full analysis "in a new consultation" rather than a cursory "addendum" under the terms of the Consultation Handbook itself. <u>Id.</u> Regarding changes in FWS's biological opinion, the 2007 biological opinion included a required discussion of the "status of the species" that merely noted the importance of the whitebark pine seed food source for Yellowstone-area grizzly bears and observed that blister rust, a disease impacting whitebark pine trees, "has been observed in the Yellowstone area." AR-FWS-1536; <u>see</u> 50 C.F.R. § 402.14(g)(2) (requiring FWS to "[e]valuate the current status of the listed species" during ESA section 7 formal consultation). The 2007 biological opinion thus did not—and could not—discuss and consider the implications of the widespread <u>post-2007</u> loss of whitebark pine in the Yellowstone region as warmer climatic conditions left the trees vulnerable to unprecedented attacks by the mountain pine beetle and blister rust. <u>See</u> AR-FWS-2072 (2012 IGBST Annual Report); <u>Greater Yellowstone Coal.</u>, 665 F.3d at 1025 (recounting impacts on whitebark pine in Yellowstone region). This development

13

alone necessitated "changes in the Services' biological opinion" that FWS was required to "address[] fully in a new consultation."  Consultation Handbook at 4-65; accord 50 C.F.R. § 402.14(g)(1)-(2), (h)(1)-(2).

The matters to be "addressed fully in a new consultation" also extended to "major changes in effects analyses."  Consultation Handbook at 4-65.  Unlike in 2007, today the Grand Teton National Park Elk Reduction Program plays out in the aftermath of an ecological paradigm shift by which grizzly bears in the Yellowstone region were forced to transition from extensively consuming whitebark pine seeds in the late summer and fall to seeking out meat as an alternative, high-quality fall food source, which creates a situation ripe for more conflicts with humans, including hunters.  See AR-FWS-2074 (2012 IGBST Annual Report).  Contemporaneous and consistent with this shift, human-caused grizzly mortalities in the region have increased and the grizzly population trajectory has flattened.  See Plaintiffs' Mem. at 11 (citing agency data).  Further, given FWS's failure to reduce the supplemental elk feeding program as contemplated in the 2007 biological opinion, see id. at 8, there is no foreseeable prospect that the claimed need for elk hunting in Grand Teton National Park, with associated grizzly bear conflicts, will be reduced over time as the 2007 biological opinion anticipated.  See AR-FWS-1549.  FWS's determination in the challenged "addendum" that the Grand Teton National Park Elk Reduction Program threatens a four-fold increase in the number of grizzly bears anticipated to be killed within park boundaries effectively acknowledges that these changed circumstances have magnified the impacts of the program.  See AR-FWS-1664.  These significantly increased effects of the Elk Reduction Program also required comprehensive

assessment "in a new consultation" pursuant to the Consultation Handbook cited by FWS. Consultation Handbook at 4-65.[8]

Indeed, although FWS points out that the Consultation Handbook includes an "exhibit 4-4" that is a "very short" and terse example of agency documentation for a reinitiated ESA consultation, Fed. Mem. at 33, this example does not help FWS because the referenced exhibit 4-4 addresses changed circumstances that <u>reduced</u> the anticipated impact of the agency project addressed in that document. <u>See</u> Consultation Handbook at 4-66 (exhibit 4-4 discussing design change by which project footprint "will be 5 acres less than that of the original facility"). Accordingly, FWS in exhibit 4-4 anticipated that "the level of incidental take that would occur from construction of [the project] <u>would not exceed</u> that which would occur from the original proposal." <u>Id.</u> (emphasis added). This is a far cry from the circumstance here, where FWS anticipated a substantial <u>increase</u> in incidental taking of the affected species. The Consultation Handbook offers no suggestion that similarly cursory documentation would suffice to address and analyze such increased impacts; to the contrary, and as discussed <u>supra</u>, it expressly requires such increased impacts to be "addressed fully in a new consultation." <u>Id.</u> at 4-65.[9]

---

[8] FWS claims "[t]he increase in anticipated incidental take was not a 'four-fold' increase," Fed. Mem. at 37 n.24, but FWS anticipated incidental taking of one grizzly bear in Grand Teton National Park in the 2007 biological opinion and incidental taking of four additional grizzly bears in Grand Teton National Park in the challenged "addendum," <u>see</u> AR-FWS-1550 (2007 biological opinion); AR-FWS-1664 ("addendum").

[9] Nor do the cases cited by Defendant-Intervenor Wyoming justify FWS's action. <u>See</u> Wyo. Mem. at 33. Wyoming cites four out-of-District cases to demonstrate that FWS "routinely amends biological opinions by way of an addendum or similar mechanism," <u>id.</u>, but none addresses the detail contained within such documents or their legality under the ESA and, indeed, none does more than to note that FWS prepared an addendum or supplement in that case. <u>See</u> <u>Mausolf v. Babbitt</u>, 125 F.3d 661, 670 (8th Cir. 1997); <u>Gallatin Wildlife Ass'n v. U.S. Forest Serv.</u>, No. CV 15–27–BU–BMM, 2015 WL 4528611, at *6 (D. Mont. July 27, 2015); <u>Rock Creek Alliance v. U.S. Forest Serv.</u>, 703 F. Supp. 2d 1152, 1157 (D. Mont. 2010); <u>Tulare Lake Basin Water Storage Dist. v. United States</u>, 59 Fed. Cl. 246, 249 (Fed. Cl. 2003).

None of FWS's remaining arguments justifies a different conclusion.  FWS contends that "none of [the ESA's] triggers for mandatory reinitiation have been met" so that "reinitiation was not required."  Fed. Mem. at 41.  However, reinitiation is required whenever, among other things, "new information reveals effects of the action that may affect listed species … in a manner or to an extent not previously considered."  50 C.F.R. § 402.16(b).  Here, FWS anticipated that the Grand Teton National Park Elk Reduction Program may affect the Yellowstone region's grizzly bear population "in a manner or to an extent not previously considered" by causing the lethal takings of four additional grizzly bears, or a total of five, over the life of the relevant NPS management plan, instead of the single grizzly bear taking anticipated in the agency's 2007 biological opinion.  Id.; see AR-FWS-1664.  Accordingly, the regulatory condition for reinitiation was satisfied.

FWS also argues that the post-2007 crash of whitebark pine actually was "considered by FWS"—even though not addressed in the "addendum"—because "no person" involved in grizzly bear management "could possibly be unaware of the status of whitebark pine and its potential effects on GYE bears" in the wake of the Ninth Circuit's Greater Yellowstone Coalition ruling reversing "the 2007 GYE grizzly bear delisting decision."  Fed. Mem. at 35.  FWS thus posits that the fact that the agency previously violated the ESA by irrationally failing to consider the whitebark pine loss should somehow give this Court comfort that it did not do so in this case.  FWS's rhetorical sleight of hand cannot obscure the omission of required analysis in the "addendum" and, indeed, the description of the significant body of scientific information concerning the Yellowstone grizzly's reliance on whitebark pine seeds contained in FWS's brief,

16

see id. at 36, only makes the agency's failure to analyze or even reference any such information in the challenged "addendum" all the more troubling.[10]

FWS next points out that a 2013 report by the IGBST concluded "that the whitebark pine decline does not present a serious threat to the bear's recovery."  Fed. Mem. at 36-37.  However, this report is not referenced in the "addendum" nor, as FWS admits, is it even included in the administrative record.  Id. at 36-37 & n.23.  This is because it post-dates by more than two months the FWS decision challenged in this case.  See id. at 36 (citing report from Dec. 2, 2013).  Accordingly, FWS again offers this Court impermissible "post hoc rationalizations" developed by agency counsel rather than any explanation developed by the agency itself.  Burlington Truck Lines v. United States, 371 U.S. 156, 168-69 (1962).  Because the 2013 report is not in the record and was not before the agency at the time it rendered its challenged decision, it should not be considered by this Court.  See Am. Farm Bureau Fed'n v. Envtl. Prot. Agency, 559 F.3d 512, 521 n* (D.C. Cir. 2009) (per curiam) (declining to consider letter submitted to agency after challenged decision "as it was not part of the administrative record"); 5 U.S.C. § 706

---

[10] Defendant-Intervenor Wyoming suggests that the Ninth Circuit's Greater Yellowstone Coalition decision discounts any need for concern about imperilment of the Yellowstone-area grizzly bear population by describing progress toward species recovery at the time that court ruled.  Wyo. Mem. at 8.  Wyoming ignores the Ninth Circuit's central holding that FWS's recovery finding arbitrarily disregarded a significant threat due to the catastrophic loss of whitebark pine.  See 665 F.3d at 1024-30.  Wyoming also claims that FWS did consider the whitebark pine loss in its "addendum" by examining "the region-wide [grizzly bear] population count" because that count would reflect factors impacting the population.  Wyo. Mem. at 34.  Not only could this rationale excuse FWS's failure to consider any specific factors impacting Yellowstone-area grizzlies, but, as the Ninth Circuit ruled, such reliance on existing population numbers ignores "considerable data—demonstrating a relationship between pine seed shortages, increased bear mortality, and decreased female reproductive success—pointing" toward a looming threat to the population.  Greater Yellowstone Coal., 665 F.3d at 1030.

(Administrative Procedure Act providing for judicial review on "the whole record" before agency).[11]

Further, although FWS notes that the IGBST referenced the then-forthcoming 2013 report in a 2012 document that is included in the record, see Fed. Mem. at 36-37, that document too is not referenced in the "addendum" and, in any event, it repeatedly concedes that its determinations concerning the impact of whitebark pine loss on the Yellowstone-area grizzly bear population are only "preliminary" and "are currently being refined and re-checked." AR-GB-172. Accordingly, even if it had been addressed in the "addendum"—which it was not—this document provided no foundation for a rational determination that the catastrophic post-2007 loss of the whitebark pine seed food source was inconsequential for Yellowstone-area grizzly bears, as FWS suggests.

FWS next asserts that Plaintiffs are wrong to argue that the "addendum" omitted consideration of important new information about the likely scope and duration of the Grand Teton National Park Elk Reduction Program. See Plaintiffs' Mem. at 26-27. FWS argues that, since 2009, actual numbers of hunters and, in two of four years, numbers of elk taken in the Elk Reduction Program have been below levels projected in the 2007 biological opinion. Fed. Mem. at 38. However, the "no-jeopardy" conclusion in FWS's 2007 biological opinion determined that the risk to grizzly bears from the Elk Reduction Program "would be minimal in the long

_____

[11] As discussed above, the post-hoc, extra-record 2013 IGBST report referenced by FWS should not be considered by this Court. To the extent that the Court nevertheless considers this report, Plaintiffs request that in fairness this Court should also consider the Declaration of David Mattson submitted by Plaintiffs in response to erroneous factual assertions set forth in Wyoming's motion to intervene in this case. See Declaration ("Decl.") of David Mattson (ECF No. 11-1 at 1-19). This expert declaration from a scientist who has studied Yellowstone-area grizzly bears since 1979 explains that the IGBST's own data indicate that the Yellowstone-area grizzly bear population likely entered a decline from 2007-2013 following the catastrophic loss of two key grizzly bear food sources in the region: whitebark pine seeds and cutthroat trout. See Mattson Decl. ¶ 4 & Fig. 1.

term as a result of the proposed action" in the 2007 Bison and Elk Management Plan for Grand

Teton National Park and the Jackson Hole National Elk Refuge.  AR-FWS-1549.  As FWS

promised to the D.C. Circuit, that proposed action included a "commit[ment] to end[]

supplemental feeding" of elk on the National Elk Refuge that is claimed to drive the need for the

Elk Reduction Program in the Park.  Defenders of Wildlife v. Salazar, 651 F.3d 112, 117 (D.C.

Cir. 2011); see AR-NPS-2868 (Bison & Elk Mgmt. Plan describing relationship between feeding

program and Elk Reduction Program); AR-NPS-3075 (Bison & Elk Mgmt. Plan "clearly states

that the FWS intends to progressively reduce the use of supplemental feeding on the National

Elk Refuge").  Yet, eight years into the Management Plan's prescribed 15-year program, and

more than four years after the D.C. Circuit held that "unmitigated continuation of supplemental

feeding would undermine the conservation purpose of the National Wildlife Refuge System,"

Defenders of Wildlife, 651 F.3d at 117, supplemental feeding has increased, rather than

decreased, on the National Elk Refuge.  See Plaintiffs' Mem. at 8.  FWS's "tier[ed]" reliance on

the 2007 biological opinion in the challenged "addendum" failed to address this changed

circumstance that altered its basic assumptions.[12]

        In sum, whether deemed an amendment or an unlawful effort at "tiering," FWS's cursory

"addendum" violated the procedural requirements for reinitiation of ESA consultation under 50

C.F.R. § 402.16 by omitting consideration of essential matters.  Because FWS can anticipate and

_____

[12] Defendant-Intervenor Wyoming points out that the Management Plan did not "'preclude the
use of supplemental feeding'" and acknowledged uncertainty "'whether or not feeding will be
phased out within 15 years.'"  Wyo. Mem. at 12 (quoting AR-NPS-3075); see also id. at 27-28.
However, the plan "clearly states that the FWS intends to progressively reduce the use of
supplemental feeding on the National Elk Refuge."  AR-NPS-2890, 3075.  More fundamentally,
the D.C. Circuit made clear that the plan's legality depended on FWS's commitment to end
supplemental feeding.  See Defenders of Wildlife, 651 F.3d at 117 ("It is highly significant and
indeed dispositive to us … that the agencies are committed to ending supplemental feeding.").
Wyoming's brief quotes the district court's decision in Defenders of Wildlife but fails to discuss
the D.C. Circuit's reasoning in affirming that decision on appeal.  See Wyo. Mem. at 13-14.

exempt the incidental taking of listed species only after lawfully completing the ESA section 7

consultation process, 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i), the incidental take statement

set forth in FWS's "addendum" was invalid and could not lawfully convey a statutory exemption

for the lethal taking of grizzly bears.

III.    **FWS OFFERS NO LEGITIMATE EXCUSE FOR FAILING TO CONSIDER REQUIRED MEASURES TO MINIMIZE THE IMPACT OF ANTICIPATED TAKINGS**

FWS fares no better in attempting to justify its failure in the challenged "addendum" to

specify, or even consider, additional measures to minimize the impact of the increased taking of

grizzly bears that the agency anticipated within Grand Teton National Park.  The ESA requires

that, whenever FWS issues an incidental take statement, it must also "specif[y] those reasonable

and prudent measures that the [agency] considers necessary or appropriate to minimize such

impact" and set forth the necessary "terms and conditions" to implement such measures.  16

U.S.C. § 1536(b)(4)(C)(ii), (iv); <u>accord</u> 50 C.F.R. § 402.14(i)(1)(ii), (iv).  Here, however, FWS's

"addendum" failed to consider specifying any new reasonable and prudent measures to minimize

the impact of the anticipated killing of four additional grizzly bears in one of our country's

premiere national parks.  <u>See</u> Plaintiffs' Mem. at 27-29.

FWS argues that the ESA requires only those reasonable and prudent measures that the

agency deems "necessary or appropriate," 16 U.S.C. § 1536(b)(4)(C)(ii), and that FWS

determined that the "original conservation measures" prescribed in the agency's 2007 biological

opinion for the Grand Teton National Park Elk Reduction Program "are appropriate, adequate,

and do not need revising."  AR-FWS-1664; <u>see</u> Fed. Mem. at 39-40; <u>accord</u> Wyo. Mem. at 39-

40.  However, FWS's own consultation guidelines contemplate that "[t]he impact of incidental

take is to be minimized by the reasonable and prudent measures and implementing terms and

20

conditions.  In many cases, the implementation of the terms and conditions may lead to a

reduction in the anticipated level of incidental take."  Consultation Handbook at 4-56.  Here,

FWS's 2007 biological opinion prescribed a single "reasonable and prudent measure"—

minimization of grizzly-hunter conflicts through hunter education—when the agency anticipated

only one grizzly bear taking due to the Elk Reduction Program.  AR-FWS-1551.  Given that this

measure failed to prevent the killing of a grizzly bear in Grand Teton National Park in 2013, see

AR-FWS-1564, and FWS implicitly determined that it would not prevent the killing of four

additional grizzly bears in the park over the ensuing nine years, see AR-FWS-1664, there was no

apparent basis for FWS to conclude that this single measure was "appropriate, adequate, and

[did] not need revising," and FWS offered none, id.  FWS's decision was sustainable by this

Court only if it "was based on a consideration of the relevant factors."  Citizens to Preserve

Overton Park v. Volpe, 401 U.S. 402, 416 (1971), abrogated on other grounds by Califano v.

Sanders, 430 U.S. 99, 105 (1977).  Here, there is no indication what, if any, factors led the

agency to conclude that no additional reasonable and prudent measures should be specified to

minimize the anticipated taking of four additional grizzly bears in Grand Teton National Park.

AR-FWS-1664.

  FWS also contends that elk-hunting limitations imposed temporarily by the National Park

Service after the 2013 Grand Teton grizzly bear killing, see AR-FWS-1662; Plaintiffs' Mem. at

28, could not have been considered for this purpose because reasonable and prudent measures to

minimize incidental taking "cannot alter the basic design, location, scope, duration, or timing of

the action and may involve only minor changes."  50 C.F.R. § 402.14(i)(2) (discussed in Fed.

Mem. at 40).  However, FWS offered no such analysis in the "addendum," and there is no

apparent reason why measures such as restricting the amount of ammunition that could be

carried or shots that could be taken by hunters, or even modifying hunt locations to exclude the most conflict-prone areas, would impermissibly "alter the basic design" of the Elk Reduction Program.  Id.; see, e.g., Consultation Handbook at 4-53 (concluding that reasonable and prudent measure requiring "narrowing of disturbed right-of-way at known species locations" would be "consistent with [a] proposed action's basic design").

Further, even assuming for the sake of argument that such measures might somehow go too far, FWS failed to consider whether other measures—or any new measures at all—might be applied to minimize the anticipated impacts of the Elk Reduction Program on grizzly bears in Grand Teton National Park.  FWS's contention that it "reasonably concluded to leave these finer land and program management decisions with the agencies tasked with running the program," Fed. Mem. at 40, ignores the ESA's mandate for FWS—not another agency—to determine what measures are "necessary or appropriate to minimize" the impact of anticipated incidental takings, 16 U.S.C. § 1536(b)(4)(C)(ii); 50 C.F.R. § 402.14(i)(1)(ii); see Pub. Employees for Envtl. Responsibility v. Beaudreau, 25 F. Supp. 3d 67, 107-110 (D.D.C. 2014), appeal dismissed, Nos. 14-5117 et al., 2014 WL 3014869 (D.C. Cir. June 11, 2014) (holding that ESA places duty to determine reasonable and prudent measures to minimize impact of anticipated incidental takings "on the FWS to the exclusion of any other entities").  FWS's failure to specify—or even consider—any such measures in this case violated that duty.

## IV.    NPS'S RELIANCE ON THE FLAWED "ADDENDUM" WAS NOT LAWFUL

For its part, NPS fails to justify its arbitrary reliance on FWS's unlawful "addendum" to satisfy its ESA obligations in connection with further takings of grizzly bears due to the Grand Teton National Park Elk Reduction Program.  See Plaintiffs' Mem. at 29-30.  NPS primarily argues that, "because the amended biological opinion is valid, … NPS's reliance on it was

lawful."  Fed. Mem. at 42; accord Wyo. Mem. at 40.  However, for the reasons discussed supra

and in Plaintiffs' opening summary judgment brief, the "addendum" did not fulfill ESA

requirements and therefore NPS's reliance on it was arbitrary and capricious.  See Resources

Ltd. v. Robertson, 35 F.3d 1300, 1304 (9th Cir. 1993) (holding that agency "decision to rely on a

FWS biological opinion must not have been arbitrary or capricious").

      NPS further contends that it did "conduct its own assessment of the Management Plan's

potential effects on grizzly bears," citing to its May 2, 2013 memorandum to FWS requesting

reinitiation of consultation concerning the Elk Reduction Program.  Fed. Mem. at 42 (citing AR-

NPS-6148-52).  However, the analysis underlying NPS's determination in that document that the

program "was not likely to jeopardize the continued existence of grizzly bears in the GYE," Fed.

Mem. at 42, was even more illegitimately circumscribed than FWS's own inadequate analysis.

NPS apparently considered only past grizzly bear conflicts and mortalities within Grand Teton

National Park, see AR-NPS-6150, and did not consider past mortalities elsewhere in the

Yellowstone region, much less the anticipated future takings of 63 grizzly bears across the

Yellowstone region that FWS also overlooked, see Point I, supra.  Because NPS undertook no

"independent assessment" of such essential aspects of the environmental baseline to which the

Elk Reduction Program's impacts would be added, its action "is by definition arbitrary and

capricious" under the ESA.  Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv., 281 F. Supp.

2d 1, 26 (D.D.C. 2003) (emphasis omitted); see also 50 C.F.R. § 402.02 (defining

"environmental baseline" for purposes of ESA section 7 analysis as including "past," "present,"

and "anticipated" impacts).

## V.    PLAINTIFFS ARE ENTITLED TO THEIR REQUESTED RELIEF

FWS and NPS contend that "Plaintiffs are not entitled to the relief sought in their

Amended Complaint," Fed. Mem. at 41, but their arguments are meritless.  These agencies

primarily contend that, "[b]ecause none of the[] triggers for mandatory reinitiation [of ESA

section 7 consultation] have been met, reinitiation was not required and the action agencies could

still be operating under the 2007 Biological Opinion even without the amendment."  Id.

However, as discussed in Point II, supra, the regulatory trigger for mandatory reinitiation of ESA

consultation was tripped in this case because "new information reveal[ed] effects of the action

that may affect listed species … in a manner or to an extent not previously considered," 50

C.F.R. § 402.16(b)—i.e., the Elk Reduction Program likely would kill four additional grizzly

bears in Grand Teton National Park, for a total of five, instead of the single grizzly taking

anticipated in FWS's 2007 biological opinion.  Accordingly, "[r]einitiation of formal

consultation" was "required" and the agencies could not continue to operate lawfully under the

2007 biological opinion.  Id. (emphasis added).[13]

Even so, Plaintiffs do not ask this Court to halt the Elk Reduction Program but instead

request that the Court (1) declare that FWS and NPS violated the ESA in connection with FWS's

issuance of the 2013 "addendum" and NPS's reliance on that document to authorize the Elk

Reduction Program in Grand Teton National Park; (2) set aside the "addendum"; and (3) remand

the issue of grizzly bear taking in connection with the Elk Reduction Program to FWS and NPS

---

[13] FWS and NPS point out that "the anticipated incidental take set forth in the 2007 Biological
Opinion has not yet been exceeded as only one bear has been incidentally killed."  Fed. Mem. at
41.  However, exceeding the "the amount or extent of taking specified in the incidental take
statement" is only one basis for reinitiating formal consultation under the ESA regulations.  50
C.F.R. § 402.16(a).  Reinitiation is equally required where, as here, "new information" indicates
that a federal agency action "may affect" an ESA-listed species "in a manner or to an extent not
previously considered."  Id. § 402.16(b).  Thus, reinitiation may be necessary even if the
anticipated incidental taking in an existing biological opinion has not been exceeded.

for further action consistent with the requirements of the ESA. <u>See</u> Amended Complaint for

Declaratory and Injunctive Relief at 20 (ECF No. 16). The propriety of such relief is well-

established in this Circuit. <u>See, e.g.</u>, <u>Jicarilla Apache Nation v. U.S. Dep't of the Interior</u>, 613

F.3d 1112, 1121-22 (D.C. Cir. 2010) (ordering vacatur and remand of agency action where

"Interior's decision fails to consider an important aspect of the problem and does not reflect the

reasoned decisionmaking required of an agency"). Indeed, Federal Defendants acknowledge that

"the Court could, if it finds the amendment to be improper, set aside the amendment." Fed.

Mem. at 41 n.25. Accordingly, this Court should grant the requested relief.

## VI.    SAFARI CLUB'S STANDING ARGUMENT IS MERITLESS

Defendant-Intervenor Safari Club International ("Safari Club") argues that Plaintiffs lack

standing because they have suffered no actual or imminent injury that would suffice to satisfy

Article III standing requirements. Safari Club Int'l's Memorandum of Points and Authorities in

Support of its Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for

Summary Judgment ("Safari Club Mem.") at 1-4 (ECF No. 32). Safari Club is wrong.

Plaintiffs' members' declarations specifically document how FWS's decision to exempt from

legal liability the incidental taking of four additional grizzly bears in Grand Teton National Park

will cause a cognizable, imminent injury to Plaintiffs that could be redressed by a favorable

ruling from this Court. <u>See</u> Camenzind Decl. (ECF No. 26-2); Getty Decl. (ECF No. 26-3);

Ratner Decl. (ECF No. 26-4); Santarsiere Decl. (ECF No. 26-5); Wuerthner Decl. (ECF No. 26-

6). This evidence establishes Plaintiffs' standing.

The citizen-suit provision in the ESA, 16 U.S.C. § 1540(g), embraces a broad concept of

judicial standing; specifically, "any person" may be a plaintiff, thus avoiding any prudential

standing questions. <u>See, e.g.</u>, <u>Bennett v. Spear</u>, 520 U.S. 154, 163–65 (1997); <u>Am. Soc'y For</u>

Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus, 317 F.3d 334,

336 (D.C. Cir. 2003) ("ASPCA").  Therefore, Plaintiffs must satisfy only Article III's standing

requirements by showing that:  (1) they have suffered an injury in fact that is (a) concrete and

particularized and (b) actual or imminent, not conjectural or hypothetical; (2) their injury is fairly

traceable to the Federal Defendants' actions; and (3) it is likely (not speculative) that their injury

can be redressed by a favorable court decision.  Friends of the Earth, Inc., v. Laidlaw Envtl.

Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S.

555, 560–61 (1992)).  Moreover, an organization may bring suit on behalf of its members if its

members would otherwise have standing to sue in their own right; the interests at stake are

germane to the organization's purpose; and neither the claim asserted nor the relief requested

requires members' individual participation.  See id. at 181 (citing Hunt v. Wash. State Apple

Advertising Comm'n, 432 U.S. 333, 343 (1977)).

    Plaintiffs' standing declarations satisfy these requirements.  These declarations from

Plaintiffs' members identify a concrete and particularized, imminent injury to their aesthetic,

conservation, economic, recreational, scientific, educational, and wildlife preservation interests

in observing, studying, and conserving grizzly bears that inhabit Grand Teton National Park and

environs.  See Camenzind Decl. ¶¶ 6-11; Getty Decl. ¶¶ 3-9; Ratner Decl. ¶¶ 7-11; Santarsiere

Decl. ¶¶ 6-9; Wuerthner Decl. ¶¶ 3-10.  This threatened injury is caused by Federal Defendants'

decision to exempt from legal liability the killing of four grizzly bears in Grand Teton National

Park, which imminently threatens to reduce Plaintiffs' members' ability to observe this species

and signs of its presence in the park and surrounding areas, and would be redressed if this Court

set aside that decision.  See Camenzind Decl. ¶¶ 7-11; Getty Decl. ¶ 9; Ratner Decl. ¶ 11;

Santarsiere Decl. ¶ 9; Wuerthner Decl. ¶ 10.  Further, Plaintiffs' members' interests in observing,

studying, and conserving grizzly bears are central to Plaintiffs' organizational purposes, <u>see, e.g.</u>, Ratner Decl. ¶¶ 3-5; Santarsiere Decl. ¶¶ 3-4, and individual participation of Plaintiffs' members' is not required.

This evidence is more than adequate to establish Plaintiffs' Article III standing. "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." <u>Laidlaw</u>, 528 U.S. at 183 (quoting <u>Sierra Club v. Morton</u>, 405 U.S. 727, 735 (1972)). Moreover, "the desire to use or observe an animal species, even for purely [a]esthetic purposes, is undeniably a cognizable interest for purposes of standing." <u>Defenders of Wildlife</u>, 504 U.S. at 562-63; <u>see also</u> <u>ASPCA</u>, 317 F.3d at 336 ("[D]ecisions of this court and the Supreme Court recogniz[e] that harm to one's aesthetic interests in viewing animals may be a sufficient injury in fact."); <u>Animal Legal Def. Fund v. Glickman</u>, 154 F.3d 426, 432 (D.C. Cir. 1998) (<u>en banc</u>) ("The Supreme Court has repeatedly made clear that injury to an aesthetic interest in the observation of animals is sufficient to satisfy the demands of Article III standing."). Plaintiffs' declarations demonstrate Plaintiffs' standing under these well-established principles.

Nevertheless, Safari Club argues that Plaintiffs' injury is only "conjectural" because there is no likelihood that any additional grizzly bears will be killed in connection with the Grand Teton National Park Elk Reduction Program. Safari Club Mem. at 2-4. Safari Club's argument founders on the basic points that one grizzly bear was killed within the past two years as a result of the program, FWS in recent years has observed increased "grizzly bear distribution and numbers in the south end of the Park" where the program occurs, FWS determined that there is "a relatively <u>high</u> risk of hunter-grizzly bear contacts as long as the [Elk Reduction Program] is

necessary," and FWS concluded "that continued implementation of the [Elk Reduction Program] is <u>likely</u> to incur additional looses of grizzly bears from hunter-grizzly conflicts."  AR-FWS-1662-63 (emphases added).  Further, although Safari Club notes measures recently implemented by NPS to reduce the likelihood of hunter-grizzly conflicts, Safari Club Mem. at 4, FWS examined such measures but still anticipated four additional grizzly bear killings in Grand Teton National Park due to the Elk Reduction Program, <u>see</u> AR-FWS-1663-64.  Nothing more is required to establish that Plaintiffs' injury is not conjectural or hypothetical.  <u>See Oceana, Inc. v. Pritzker</u>, 75 F. Supp. 3d 469, 480 (D.D.C. 2014) (finding that plaintiffs had demonstrated standing where connection between their asserted injury and a challenged government program was "supported by the administrative record").

Safari Club takes its standing argument even further afield by asserting that, even if Plaintiffs can establish a likelihood of future grizzly bear takings, Plaintiffs still cannot establish Article III standing unless they demonstrate that a "grizzly bear would be taken from an area where the Plaintiffs visit and/or would be a grizzly bear that the Plaintiffs would have been likely to view."  Safari Club Mem. at 4.  As to Safari Club's argument that Plaintiffs must show that a grizzly bear would be taken from an area where they visit, Plaintiffs have done so by establishing their members' strong interests in observing, studying, and conserving grizzly bears within Grand Teton National Park and surrounding areas.  <u>See</u> declarations cited <u>supra</u>.  As to Safari Club's further argument that Plaintiffs can establish standing only if they somehow demonstrate a likelihood that the particular grizzly bear(s) they intend to view will be killed by a hunter participating in the Elk Reduction Program, this impossible burden is not imposed by governing law.  To the contrary, where, as here, plaintiffs proceed "under conservation statutes whose mission is to preserve the number of animals in existence," they adequately establish standing

where they demonstrate a "threat of <u>diminished animal populations</u>" in the area they visit.

<u>Animal Legal Defense Fund</u>, 154 F.3d at 437 (emphasis added); <u>see</u> <u>Japan Whaling Ass'n v.</u>

<u>Am. Cetacean Soc'y</u>, 478 U.S. 221, 230 n. 4 (1986) (holding that whale conservation groups

"undoubtedly" had standing because "the whale watching and studying of their members will be

adversely affected by continued whale harvesting"); <u>Defenders of Wildlife v. Gutierrez</u>, 532 F.3d

913, 923–25 (D.C. Cir. 2008) (plaintiffs who submitted declarations from individuals who

"engage in whale watching and the studying of whales" had standing to challenge agency actions

concerning the protection of right whales from mortalities caused by ship strikes); <u>Pritzker</u>, 75 F.

Supp. 3d at 480 (holding that plaintiffs had standing where they study and observe sea turtles

"who belong to the specific population segment that is adversely affected by" challenged

government action).

      The cases cited by Safari Club are not to the contrary.  <u>Sierra Club v. Morton</u>, 405 U.S. at

734-35 (cited in Safari Club Mem. at 4), found that the plaintiff in that case lacked standing

because its members failed to establish that they used or had visited any part of the Mineral King

valley in the Sierra Nevada mountain range where a challenged development was to be

constructed.  By contrast, Plaintiffs' declarations here establish their regular use of Grand Teton

National Park and environs.  <u>See</u> declarations cited <u>supra</u>.  <u>Lujan v. Defenders of Wildlife</u>, 504

U.S. at 567, rejected a standing theory under which "anyone who observes or works with an

endangered species, anywhere in the world, is appreciably harmed by a single project affecting

some portion of that species with which he has no more specific connection."  Plaintiffs rely on

no such global "animal nexus" theory but instead establish their specific interest in observing,

studying, and conserving grizzly bears within Grand Teton National Park, where the challenged

government action will impact the species, so this holding too is inapposite.  <u>See</u> declarations

29

cited supra; see also Didrickson v. U.S. Dep't of the Interior, 982 F.2d 1332, 1340-41 (9th Cir. 1992) (finding standing where plaintiffs "declared that they have observed, enjoyed and studied sea otters in specific areas in Alaska ... . The [plaintiffs] are concerned with action harming sea otters in Alaska, where [they] live and in particular areas that they frequent, unlike the declarants in Defenders of Wildlife.") (emphasis added) (cited with apparent approval in Animal Legal Defense Fund, 154 F.3d at 433). Accordingly, Plaintiffs have demonstrated Article III standing and Safari Club's argument to the contrary should be rejected.

## CONCLUSION

For the foregoing reasons and the reasons stated in Plaintiffs' opening summary judgment brief, Plaintiffs Sierra Club, Western Watersheds Project, and Center for Biological Diversity respectfully request that this Court grant their motion for summary judgment and vacate and remand FWS's 2013 "addendum" document.

Respectfully submitted this 23rd day of October, 2015.

/s/ Timothy J. Preso
Timothy J. Preso (D.C. Bar No. 456531)
Earthjustice
313 East Main Street
Bozeman, MT 59715
Fax: (406) 586-9695
tpreso@earthjustice.org
Phone: (406) 586-9699

*Attorney for Plaintiffs Sierra Club, Western Watersheds Project, and Center for Biological Diversity*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was today served via the Court's CM/ECF system on all counsel of record.

/s/ Timothy J. Preso
Timothy J. Preso
