# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| TIMOTHY MAYO, *et al.* | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 14-1751 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 35, 39, 40, 43 |
| | : | | |
| JONATHAN B. JARVIS, *et al.*, | : | | |
| | : | | |
| Defendants, | : | | |
| | : | | |
| STATE OF WYOMING, | : | | |
| SAFARI CLUB INTERNATIONAL, | : | | |
| | : | | |
| Intervenor-Defendants. | : | | |

| | | | |
|---|---|---|---|
| SIERRA CLUB, *et al.* | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 15-0479 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 26, 28, 30, 33 |
| | : | | |
| SALLY JEWELL, *et al.*, | : | | |
| | : | | |
| Defendants, | : | | |
| | : | | |
| STATE OF WYOMING, | : | | |
| SAFARI CLUB INTERNATIONAL, | : | | |
| | : | | |
| Intervenor-Defendants. | : | | |

## MEMORANDUM OPINION

**GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT; AND GRANTING IN PART AND DENYING IN PART INTERVENOR-DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

# I.  INTRODUCTION

The American West is rich with wildlife of considerable ecological value.  These related cases involve two iconic species—the elk and the grizzly bear—and their habitat in the Grand Teton National Park ("the Park") in northwestern Wyoming.  When Congress created the Park in its present form, it provided that the conservation program for the elk "shall include the controlled reduction of elk in such park, . . . when it is found necessary for the purpose of proper management and protection of the elk."  16 U.S.C. § 673c(a).  In 2007, the National Park Service ("the NPS"), along with the Fish and Wildlife Service ("the FWS"), which manages the abutting National Elk Refuge ("the Refuge"), issued a joint plan for the management of the bison and elk herds that migrate across the Park, the Refuge, and nearby federal, state, and private lands.  The plan called for the continuation of the elk reduction program, through an annual hunt, as necessary to reach particular sustainable elk herd population, sex, and age goals.  Accordingly, the Governor of Wyoming and the NPS Regional Director have annually approved a harvest of 300 to 600 elk in the Park since 2007.  The plan was also anticipated to have certain effects on the grizzly bear, a species listed as threatened under the Endangered Species Act ("ESA").  Therefore, the NPS consulted with the FWS in 2007 concerning those effects.  The FWS issued a Biological Opinion concluding that the plan would not jeopardize the continued existence of the grizzly bear, and anticipating that one bear would be incidentally "taken" during the fifteen-year implementation of the plan.  In 2013, after a grizzly bear was killed by hunters in the Park, the NPS reinitiated consultation with the FWS and issued an addendum to its Biological Opinion, increasing the total anticipated incidental take in the Park to five bears.

The Plaintiffs in these related cases challenge several aspects of the continued approvals of the elk hunt and the FWS's 2013 Addendum to its Biological Opinion concerning the grizzly

bear. The plaintiffs in *Mayo v. Jarvis* claim that the NPS's and Governor of Wyoming's approval of the elk hunt in 2015 violated the National Environmental Policy Act ("NEPA"), the Grand Teton National Park Enabling Act ("Enabling Act") and the National Parks Organic Act ("Organic Act"). They also claim that the FWS acted arbitrarily and capriciously when it amended its 2007 Biological Opinion. The plaintiffs in *Sierra Club v. Jewell* similarly claim that the FWS acted unlawfully and arbitrarily and capriciously in amending the 2007 Biological Opinion.

Now before the Court are Plaintiffs' respective motions for summary judgment[1] (*Mayo* ECF No. 35, *Sierra Club* ECF No. 26) and the cross-motions for summary judgment of Defendants (*Mayo* ECF No. 39, *Sierra Club* ECF No. 28), Intervenor-Defendant the State of Wyoming (*Mayo* ECF No. 40, *Sierra Club* ECF No. 30), and Intervenor-Defendant Safari Club International (*Mayo* ECF No. 43, *Sierra Club* ECF No. 33). For the following reasons, the Court grants summary judgment to Defendants on Plaintiffs' NEPA, Organic Act, and Enabling Act claims, but grants summary judgment to Plaintiffs on one of the ESA claims, and will remand the 2013 Addendum to the FWS.

## II.  FACTUAL BACKGROUND

### A.  The Jackson Elk Herd, the Elk Reduction Program, and the 2007 Management Plan

The Jackson elk herd is one of the largest concentrations of elk in North America. NPS-1947.[2] The herd migrates "across several jurisdictional boundaries in northwestern Wyoming"

---

[1] Because the Court is resolving both cases in a single opinion, for clarity the Court will include the case name, *Mayo* or *Sierra Club*, in all citations to the parties' complaints, briefing, or the docket in a particular case.

[2] The administrative record in these cases includes documents from the National Park Service (marked with the prefix "NPS-"), the Fish and Wildlife Service (marked with the prefix "FWS-"), and documents from the Fish and Wildlife Service specific to the grizzly bear (marked

encompassing federal lands that are managed by the NPS, the FWS, the United States Forest Service, the Bureau of Land Management, as well as Wyoming state lands, and private lands. *Id.* The elk, along with the Jackson bison herd, significantly contribute to "the ecology of the southern greater Yellowstone ecosystem" ("GYE") because of the herd's "large numbers, wide distribution, effects on vegetation, and [its] importance to the area's predators and scavengers." NPS-1948.

The Jackson elk herd's status was previously more precarious. By the turn of the twentieth century, the elk's native winter range had been significantly reduced. At that time, the herd "was largely confined to Jackson Hole and the immediately surrounding areas," which left the herd "at the mercy of the sometimes severe winter." NPS-1950. "Compounded by the loss of available winter range in Jackson Hole due to ranching operations and a growing town, significant numbers of elk died during several severe winters in the late 1800s and early 1900s." *Id.* These dramatic mortalities of a regionally important animal population prompted local citizens, organizations, and state and federal officials to begin a feeding program for the elk during the winter of 1910–1911. *Id.* From that concern was born what is now known as the National Elk Refuge. *Id.* Congress initially designated 2,000 acres in Jackson Hole, Wyoming to serve as a "winter game (elk) reserve." *Defs. of Wildlife v. Salazar*, 651 F.3d 112, 113 (D.C. Cir. 2011); *see also* Act of Aug. 10, 1912, Pub. L. No. 62-261, 37 Stat. 293 (codified as amended at 16 U.S.C. § 673). The Refuge has since grown to over 24,700 acres. *Defs. of Wildlife*, 651 F.3d at 113.

---

with the prefix "GB-"). To avoid confusion, and because each collection of documents is independently numbered, the Court's citations to the administrative record will include the appropriate prefix.

While a sizable portion of the Jackson elk herd spends its winter on the Refuge, some of the herd also spends its summer in, or migrates through, the neighboring Grand Teton National Park. *See* NPS-2075 ("Approximately half of the elk wintering on the refuge summer in Grand Teton National Park."); NPS-2074–75 (describing studies estimating that 30% of the total elk herd summers in the Park); NPS-2076 (map depicting fall migration routes). In 1929, Congress initially set aside 150 square miles of the Teton Mountain Range in Wyoming to create the Park. *See* NPS-1959. The original park was combined in 1950 with the Jackson Hole National Monument, to create the Grand Teton National Park that we know today. *See id*; *see also* 16 U.S.C. § 406d-1. The Park "is dedicated to the preservation and protection of the Teton Range and its surrounding landscapes, ecosystems, and cultural and historic resources." NPS-1959.

One of those resources is, of course, the elk. Indeed, the Grand Teton National Park Enabling Act specifically provided for the management of the Jackson elk herd. *See* 16 U.S.C. § 673c(a); *see also Mayo* Defs.' Mem. Supp. Cross-Mot. Summ. J. & Opp'n to Pls.' Mot. Ex. 1, ECF No. 39-1 (President Truman's signing statement, acknowledging that the legislation "contains a number of features which are designed to recognize the interests and wishes of the people living in the immediate vicinity" of the Park, including "detailed procedures for the management of the elk herd which migrates through the region"). Congress directed the "Wyoming Game and Fish Commission and the National Park Service" to "devise . . . and recommend to the Secretary of the Interior and the Governor of Wyoming for their joint approval, a program to insure the permanent conservation of the elk within the Grand Teton National Park." 16 U.S.C. § 673c(a). As part of that conservation program, the Enabling Act also allows for the reduction of the elk herd, providing that the program "shall include the controlled reduction of elk in such park, by hunters licensed by the State of Wyoming and

deputized as rangers by the Secretary of the Interior, when it is found necessary for the purpose

of proper management and protection of the elk." *Id.* "At least once a year between February 1

and April 1," the Wyoming Game and Fish Commission ("WGFC") and the NPS must submit to

the Secretary and Wyoming's Governor a joint recommendation "for the management,

protection, and control of the elk for that year." *Id.* § 673c(b). That plan becomes effective

when approved by the Secretary and the Governor, who are then directed to "separately, but

simultaneously" issue orders and regulations necessary to implement the "portions of the

approved plan that fall within their respective jurisdictions." *Id.* Those regulations "shall

include provision for controlled and managed reduction by qualified and experienced hunters

licensed by the State of Wyoming and deputized as rangers by the Secretary of the Interior, if

and when a reduction in the number of elk by this method . . . is required as a part of the

approved plan for the year." *Id.*

   The management of the elk herd in northwest Wyoming has long been contentious. After

a court in this district enjoined the FWS's bison management plan because it had failed to

consider the elk and bison feeding programs, *see Fund for Animals v. Clark*, 27 F. Supp. 2d 8,

13–14 (D.D.C. 1998), the FWS and the NPS[3] prepared a joint management plan for the bison

and elk herds on the Refuge and in the Park, *see* NPS-1952. The final *Bison and Elk

Management Plan* was issued in 2007 ("the 2007 Management Plan"). The 2007 Management

Plan analyzed six alternatives for the long-term management of the elk and bison herds and their

habitat over a fifteen-year period. *See* NPS-1909.

---

[3] The FWS manages the Refuge, as part of the National Wildlife Refuge System, while
the NPS manages the Park. For ease of reference, the Court will simply refer to "the NPS" in
this opinion when discussing the 2007 Management Plan, because Plaintiffs have only
challenged the plan's discussion of elk hunting in the Park.

The agencies described the need for action as rooted in several consequences resulting from "wintering large numbers of elk and bison on the refuge."  NPS-1914.  While the agencies acknowledged that "there have been many benefits associated with" wintering the populations on the Refuge, "high animal concentrations have created an unnatural situation" that contributed to several problems.  *Id.*  Specifically, the concentration of animals led to: a high level of brucellosis[4] in the bison and elk herds and an increased risk of exotic disease outbreak; damage to and loss of the animals' natural winter habitat; and low winter morbidity rates of bison and elk, which has collateral effects on "predators, scavengers, and detritivores," and which also "necessitates intensive hunting programs."  *Id.*  Overall, the agencies acknowledged that "[a]ll of the biological issues identified . . . stem from the winter feeding program on the National Elk Refuge."  *Id.*; *see also Defs. of Wildlife*, 651 F.3d at 113 (explaining that "[i]n recent years, it has become apparent that" the supplemental feeding program, "though born of benevolence, causes significant problems").

Among the six proposed alternatives analyzed in the 2007 Management Plan, the agencies ultimately settled on Alternative 4.  That alternative called for adaptive management whereby the elk and bison herds and their habitat would be flexibly managed "on the refuge and in the park, with an emphasis on improving winter, summer, and transitional range in the park and on the refuge and on ensuring that the biotic integrity and environmental health of the resources would be sustained over the long term."  NPS-1920.  The approach would be "phased," with an initial period intended to "reduce the number of elk on feed on the refuge."  NPS-1924.

---

[4] Brucellosis is a disease with which the Jackson bison and elk herds are "chronically infected."  NPS-2079.  The disease "causes an infected female to abort her first calf, leaving behind contaminated fetal tissue on the ground capable of transmitting the disease to other animals."  *Defs. of Wildlife*, 651 F.3d at 114; *see generally* NPS-2079–83 (discussing brucellosis among the Jackson elk herd).

By the end of the initial phase, the agencies anticipated that there would be "an estimated 11,000 elk in the Jackson herd," with approximately 5,000 elk wintering on the Refuge. *Id.* The agencies noted that "[r]educing supplemental feeding would decrease refuge elk numbers and densities." *Id.* And, "[a]fter the initial phase, adaptive management would be emphasized to better reach desired conditions and goals concerning habitat, disease, and conflict prevention." *Id.* Throughout, elk hunting would be used—both "on the refuge, and when necessary in the park, to assist the state in managing herd sizes, sex and age ratios, and summer distributions." NPS-1994. As part of its adaptive management approach, Alternative 4 also called for establishing "criteria for progressively transitioning from intensive supplemental winter feeding to greater reliance on free-standing forage." *Id.* Notably, however, the agencies did not specify a particular end date for the supplemental feeding program.

The 2007 Management Plan was initially challenged in this district and appealed to the D.C. Circuit. *See Defs. of Wildlife*, 651 F.3d at 115–16. Several environmental organizations challenged the plan on the basis that its "failure to commit to a deadline for ending supplemental feeding was arbitrary and capricious." *Id.* at 115. The D.C. Circuit upheld the plan, but noted that "[t]here is no doubt that unmitigated continuation of supplemental feeding would undermine the conservation purpose of the National Wildlife Refuge System." *Id.* at 117. The court ultimately concluded, however, that the agencies had acted lawfully in "select[ing] an approach that is geared toward ending the practice over time while maintaining the flexibility needed to respond to facts on the ground." *Id.* The court did note that it was "highly significant and indeed

dispositive to us, as it was to the district court, that the agencies are committed to ending supplemental feeding."[5]  *Id.*

Since 2007, and as part of the Management Plan, the National Park Service Regional Director[6] and the Governor of Wyoming have continued to approve an annual elk reduction program.  For example, in 2015 the NPS and Wyoming's Governor approved the Wyoming Game and Fish Department's ("WGFD") and the Park's joint recommendation to conduct a hunt from October 24 through December 13, 2015.  *See* NPS-7543–49.  Although the post-hunt herd population of elk was estimated in February 2015 to be 11,000—at the 2007 Management Plan's target—the joint recommendation noted that approximately 8,400 elk wintered on the Refuge during the 2014–2015 winter and that the elk on feed on the Refuge had been above the 5,000 elk objective for six of the prior seven winters.  NPS-7546.  In part because of the number of elk wintering on the Refuge, the joint recommendation concluded that a harvest of elk was "necessary for the proper management and protection of the elk."  *Id.*; *see* NPS-7543 (adopting that finding).  The program called for the issuance of 650 licenses, and a harvest of 300 elk from

---

[5] It is unclear whether this unequivocal commitment was an *ex post* representation made to the D.C. Circuit, as it conflicts to some extent with the NPS's representations made in response to comments on the Draft Plan at the time it was issued.  Therein, the NPS represented that Alternative 4 "does not specify the number of years that feeding would take place, *nor that it would be eliminated*, but it focuses on achieving the desired conditions for sustaining bison and elk populations over time." NPS-2587 (emphasis added).  Wyoming's memorandum in this case similarly refers to the plan's goal as simply "reducing" supplemental feeding.  *See Mayo* Wyo.'s Mem. Supp. Cross-Mot. Summ. J. & Resp. to Pls.' Mots. at 27–28 ("*Mayo* Wyo.'s Mem. Supp.").  In other places, however, the Management Plan says that it envisions a "complete transition to free-standing forage if and when several established criteria are met."  NPS-2011.  In any event, the NPS here does not contest that the 2007 Management Plan calls for ending the supplemental feeding program entirely so, in line with *Defenders of Wildlife*, this Court also proceeds on that assumption.

[6] In 1975, the Secretary's authority to approve the annual elk reduction program was delegated to the NPS Regional Director.  *See* NPS-326–30.

the Park.  NPS-7543–44; NPS-7548 (noting a harvest objective of 300 elk in hunt areas 75 and 79).

At the time the 2007 Management Plan was adopted, approximately 6,800 elk had wintered on the Refuge in the most recent year (2005–2006).  *See* NPS-2073.  Since then, and despite the 5,000 elk target the plan established, the number of elk wintering on the Refuge has continued to exceed that target.  In all but one year, it has been well-north of 7,000 elk.  *See* NPS-1895 (7,300 elk in 2006–07); NPS-3382 (7,950 elk in 2007–08); NPS-3933 (7,800 elk in 2008–09); NPS-4251 (6,000 elk in 2009–10[7]); NPS-4785 (7,700 elk in 2010–11); NPS-5582 (7,700 elk in 2011–12); NPS-6142 (7,500 elk in 2012–13); NPS-6851 (8,300 elk in 2013–14).  Most recently, 8,400 elk wintered on the Refuge during the 2014–15 winter.  *See* NPS-7546.  This figure was reported to be "well above" the five year average of 6,807.[8]  NPS-7380.

### B. The Grizzly Bear, the 2007 Biological Opinion, and the 2013 Addendum

Separate and apart from the direct management of the elk herd as part of the 2007 Management Plan, the plan also has the potential to affect the recovery of a threatened species: the grizzly bear.  Although the grizzly bear population in the lower-48 states once numbered 50,000, between 1800 and 1975 the population was reduced to less than 1,000 bears.  *See* FWS-

---

[7] The Court assumes that the reference to the winter of 2010–11 in this document, which was approved in April 2010 (before the 2010–11 winter commenced), is a typographical error.

[8] From the record, it appears that the number of elk wintering on the Refuge may not correspond exactly to the number of elk receiving supplemental feed.  For example, although a FWS Refuge biologist reported the five-year average of elk on feed to be 6,807, between the winters of 2009–10 and 2013–14 the joint field recommendations to Wyoming's Governor and the NPS's Regional Director establish an average number of elk wintering on the Refuge of approximately 7,440.  If one substitutes the 2014–15 winter in place of the 2009–10 winter, the average climbs to 7,920.  Similarly, the 2015 joint recommendation indicated that the "number of elk *on feed* on the Refuge has been above the objective (5000) for 6 of the past 7 winters." NPS-7546 (emphasis added).  But, again, during that time period the yearly joint recommendations indicate that the number of elk wintering on the refuge never fell below 6,000.  Neither party explains these discrepancies.

211.  In 1975, the Fish and Wildlife Service listed the species as threatened under the

Endangered Species Act ("ESA").  *See* FWS-1–3.  Once a species is listed, the ESA and its

implementing regulations prohibit any person from committing a "take" of a member of that

species, which includes, among other things, harassing, harming, hunting, shooting, wounding,

or killing the animal, without authorization from the FWS.  *See* 16 U.S.C. §§ 1538(a), 1532(19);

50 C.F.R. §§ 17.21(c), 17.31(a).

After a species is listed as endangered or threatened, Section 7 of the ESA requires every

federal agency, in consultation with the Secretary of the Interior, to "insure that any action

authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued

existence of any endangered species or threatened species."  16 U.S.C. § 1536(a)(2).  As part of

its formal consultation, the FWS issues what is called a "biological opinion" (or "BiOp") which

sets forth whether the service believes that the action will jeopardize the continued existence of

the species.  50 C.F.R. § 402.14(g)(4).  If the FWS concludes that the action is unlikely to

jeopardize the continued existence of the species, but is nonetheless likely to result in some

"'incidental take'" of the species, "the BiOp must set forth an Incidental Take Statement, which

specifies the permissible 'amount or extent' of this impact on the species."  *Oceana, Inc. v.*

*Pritzker*, --- F. Supp. 3d ----, No. 12-0041, 2015 WL 5138389, at \*2 (D.D.C. Aug. 31, 2015)

(quoting 16 U.S.C. § 1536(b)(4)(B)); *see also* 50 C.F.R. § 402.14(i)(1).  The FWS's BiOp must

also specify the "reasonable and prudent measures" that the Director "considers necessary or

appropriate to minimize" the action's impact.  50 C.F.R. § 402.14(i)(1)(ii).  Finally, regulations

require that the FWS and the applicable agency reinitiate formal consultation in four situations,

including if "the amount or extent of [the] taking specified in the incidental take statement is

exceeded," if "new information reveals effects of the action that may affect listed species or

critical habitat in a manner or to an extent not previously considered," or if "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion."  50 C.F.R. § 402.16.

Consistent with the ESA, the NPS initiated consultation with the FWS concerning the 2007 Management Plan's impact on the grizzly bear population.  After considering the status of the species and the various effects of the 2007 Management Plan, the FWS concluded that the plan, "as proposed, is not likely to jeopardize the continued existence of the grizzly bear."  FWS-1689.  Although the FWS noted that "some adverse effects may occur" as a result of the plan— including an "elevated risk of hunting-related conflicts occurring" in the Park—the agency determined that the increased risk "would be minimal in the long term," but "higher in the short-term."  FWS-1690.  Given the exacerbated short-term risk of a hunting-related grizzly bear mortality in the Park, the FWS anticipated that "1 grizzly bear (adult or juvenile) over the 15-year implementation period of the Plan could be incidentally taken as a result of the proposed action."  FWS-1691.  The FWS reiterated that "this level of anticipated take is not likely to result in jeopardy to the species."  *Id.*  The BiOp also established one reasonable and prudent measure it considered "necessary and appropriate to minimize impacts of incidental take of grizzly bears": it instructed the NPS to "[m]inimize the likelihood of hunting-related human/grizzly bear conflict . . . through education of hunters."  FWS-1692.

The incidental take authorized by the BiOp was reached in November 2012.  In that month, a man and his two sons, who were taking part in the elk reduction program in the Park, had a surprise encounter with a grizzly bear.  The bear charged at the men and was shot, resulting in the bear's death.  See NPS-5863.  Because the level of incidental take was reached, the NPS requested to reinitiate formal consultation with the FWS regarding the 2007 Management Plan's

effects on the grizzly bear.  *See* FWS-1564.  The NPS asserted in a memorandum to the FWS

that conditions associated with the elk reduction program "remain[ed] largely the same as they

were in 2007 except that, as anticipated in the [2007 Management] plan, grizzly bear distribution

and numbers in the south end of the park appear to have increased."  FWS-1565.  The NPS

asserted that it "believe[d] continued implementation of the [2007 Management Plan] is likely to

incur additional losses of grizzly bears from hunter-grizzly bear conflicts, which will adversely

affect grizzly bears," but that it also believed "the number of bears affected will be small and will

not jeopardize the continued existence of the Yellowstone ecosystem grizzly bear population."

FWS-1567.

In response, the FWS issued an "addendum" to its 2007 BiOp that purported to "tier[] off

of [the FWS's] original biological opinion" and provide a new incidental take statement for

grizzly bears "which reflects current conditions within the Park and Refuge."  FWS-1662.  The

new incidental take statement was intended to "supersede" the previous 2007 statement and

would be "valid for the remaining 9 years under the 2007 biological opinion, through the year

2022."  *Id.*  After briefly discussing the contemporary status of the grizzly bear, the addendum

concluded that, "given the current estimated population of grizzly bears" in the GYE, and

"overall sustainable annual mortality levels . . . , the number of bears affected by the Plan will be

small and will not jeopardize the continued existence of the Yellowstone ecosystem grizzly bear

population."  FWS-1663–64.  Thus, the FWS anticipated that "up to 4 additional grizzly bears in

the Park and 2 grizzly bears in the Refuge" may be incidentally taken directly or indirectly as a

result of the Plan during the remaining 9 years this biological opinion is valid."  FWS-1664.

### C.  Procedural History

Plaintiffs in these related cases challenge various aspects of the NPS's and the FWS's actions in managing the annual elk reduction program and in consulting regarding the 2007 Management Plan's impact on the grizzly bear.  Although some of the claims overlap—and the plaintiffs' briefing incorporates certain arguments by reference—the parties' raise different claims in each case.

In the first case, *Mayo v. Jarvis*, Plaintiffs Timothy Mayo and Kent Nelson bring claims against the NPS and the FWS related to the elk reduction program and the FWS's 2013 Addendum to its BiOp regarding the grizzly bear.  Mr. Mayo and Mr. Nelson are both avid wildlife photographers who live near the Park and visit regularly.  *See Mayo* Compl. ¶¶ 5, 12, ECF No. 1-1.  Mayo[9] brings four claims under the Administrative Procedure Act ("APA") and the ESA.  First, he claims that the NPS violated the Grand Teton National Park Enabling Act by failing to set forth an adequate basis for believing that the annual elk reduction program is "necessary for the purpose of proper management and protection of the elk," as required by 16 U.S.C. § 673(c)a.  *Id.* ¶¶ 68–70.  Second, he argues that the NPS similarly failed to make a finding that the elk reduction program will not impair the Park, and thus violated the Organic Act, which instructs the NPS to "conserve" natural parks' wildlife "by such means as will leave them unimpaired for the enjoyment of future generations."  *Id.* ¶¶ 71–72.  Third, he claims that the NPS violated NEPA by failing to prepare an Environmental Assessment or Environmental Impact Statement each year in connection with the elk reduction program.  *Id.* ¶¶ 73–74.  And finally, Mayo contends that the 2013 Addendum to the FWS's BiOp violated Section 7 of the

---

[9] For ease of reference, the Court will refer to the plaintiffs in Case No. 14-cv-1751 simply as "Mayo" throughout the opinion.

ESA. *Id.* ¶¶ 75–80.  Although the complaint was originally founded on the 2014 elk reduction program, after the Governor of Wyoming and the NPS's Regional Director approved the 2015 hunt, Mayo filed a supplemental complaint incorporating the 2015 hunt.  *See generally Mayo* Supp. Compl., ECF No. 32.

In the second case, *Sierra Club v. Jewell*, Plaintiffs Sierra Club, the Western Watersheds Project, and the Center for Biological Diversity[10] bring distinct, but in some cases overlapping, challenges.  Sierra Club exclusively challenges the 2013 Addendum to the FWS's BiOp concerning the grizzly bear, and asserts four causes of action under the ESA.  First, Sierra Club contends that when FWS made its "no jeopardy" determination the agency failed to consider all of the additional incidental takings of grizzly bear that the agency already anticipated to take place in the GYE.  *Sierra Club* Compl. ¶¶ 39–46, ECF No. 1.  Second, Sierra Club claims that the agency's use of an addendum did not suffice to reinitiate formal consultation as required by the ESA and its regulations.  *Id.* ¶¶ 47–52.  Third, Sierra Club urges that the FWS failed to consider additional "reasonable and prudent measures" to minimize the impact of the anticipated incidental take set forth in the addendum.  *Id.* ¶¶ 53–57.  Lastly, Sierra Club asserts that the NPS, too, violated the ESA by relying on the FWS's invalid addendum when discharging the NPS's own duties to comply with the ESA.  *Id.* ¶¶ 58–62.

The Court granted the motions of the State of Wyoming and Safari Club, International, to intervene as defendants.  *See Mayo* ECF Nos. 6, 20; *Sierra Club* ECF Nos. 13; 22.  Mayo and Sierra Club have each moved for summary judgment in their respective cases, *see Mayo* ECF No. 35; *Sierra Club* ECF No. 26, and Defendants, Wyoming, and Safari Club have cross-moved for summary judgment, *see Mayo* ECF Nos. 39, 40, 43; *Sierra Club* ECF Nos. 28, 30, 33.

---

[10] The Court will refer to Plaintiffs in Case No. 15-cv-0479 as "Sierra Club."

### III.  LEGAL STANDARD

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When assessing a motion for summary judgment in an APA case, however, "the district judge sits as an appellate tribunal."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  In such cases the complaint "actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action."  *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). Therefore, "[t]he entire case on review is a question of law, and only a question of law."  *Id.*  The Court's review "is based on the agency record and limited to determining whether the agency acted arbitrarily or capriciously," *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009), or in violation of another standard set out in section 10(e) of the APA, *see* 5 U.S.C. § 706.  Because the ESA does not contain its own standard of review provision, judicial review is likewise governed by the APA's arbitrary and capricious standard.  *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 685–86 (D.C. Cir. 1982).

The scope of a court's "arbitrary and capricious" review "is narrow" and "a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983).  To satisfy the standard, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  An agency's action is arbitrary and capricious if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* And when undertaking that review, a court is to "give an extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise." *Cmtys. for a Better Env't v. EPA*, 748 F.3d 333, 336 (D.C. Cir. 2014) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 247 (D.C. Cir. 2003)); *see also Defs. of Wildlife & Ctr. for Biological Diversity v. Jewell*, -- F.3d ----, No. 14-5284, 2016 WL 790900, at *11 (D.C. Cir. Mar. 1, 2016) ("Because predicting the future status of wildlife is a difficult task, the court has acknowledged deference is appropriate to the agency's evaluation of scientific data within its technical expertise.").

## IV. ANALYSIS

Plaintiffs collectively bring challenges under four statutes: NEPA, the ESA, the Organic Act, and the Grand Teton National Park Enabling Act. The Court will discuss each in turn.

### A. The NEPA Claims

#### 1. Statutory Background

NEPA was enacted in 1970 "to promote efforts which will prevent or eliminate damage to the environment and biosphere." 42 U.S.C. § 4321. The Act "declares a broad national commitment to protecting and promoting environmental quality," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989), and requires agencies to "consider fully the environmental effects of their proposed actions," *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010) [hereinafter *TRCP*].

To accomplish that goal, NEPA instructs all federal agencies to prepare and solicit public comment on an Environmental Impact Statement ("EIS") for every "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). By statute,

an EIS must address : (1) "the environmental impact of the proposed action," (2) "any adverse environmental effects which cannot be avoided should the proposal be implemented," (3) "alternatives to the proposed action," (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity," and (5) "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." *Id.* § 4332(C)(i)–(v).  In requiring agencies to consider and prepare an EIS discussing these factors, the Act has "twin aims": it "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action," and it also "ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).

The Council on Environmental Quality ("CEQ") has promulgated regulations interpreting NEPA and clarifying which agency actions require the preparation of an EIS.  *See generally* 40 C.F.R. § 1500 *et seq.*  Those regulations allow an agency to prepare a more limited Environmental Assessment ("EA") if it is not clear that the agency's action will require the production of a full EIS.  *See* 40 C.F.R. § 1501.4(b).  An EA is "a concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement." *Id.* § 1508.9(a)(1).  If, after producing an EA, an agency determines that an EIS is not required, it may issue a "finding of no signification impact" ("FONSI"), setting forth the reasons why the proposed action will not have a significant effect on the human environment. *Id.* §§ 1501.4(d), 1508.13.

NEPA imposes only "procedural requirements" on federal agencies.  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004).  The Act is merely "meant to ensure" that an agency

makes "a fully informed and well-considered decision"; NEPA, of its own accord, does not require an agency to arrive at the "best decision" from an environmental standpoint. *TRCP*, 616 F.3d at 503 (internal quotation marks omitted) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)). While the procedures "are almost certain to affect the agency's substantive decision, it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson*, 490 U.S. at 350. As a result, "NEPA is 'not a suitable vehicle' for airing grievances about the substantive policies adopted by an agency, as 'NEPA was not intended to resolve fundamental policy disputes.'" *Grunewald v. Jarvis*, 776 F.3d 893, 903 (D.C. Cir. 2015) (quoting *Found. on Econ. Trends v. Lyng*, 817 F.2d 882, 886 (D.C. Cir. 1987)). "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson*, 490 U.S. at 350.

Thus, NEPA only requires that all federal agencies take a "'hard look' at the environmental consequences before taking a major action." *Balt. Gas & Elec.*, 462 U.S. at 97 (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). "The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Id.* at 97–98; *see also Pub. Citizen*, 541 U.S. at 763 ("An agency's decision not to prepare an EIS can be set aside only upon a showing that it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A)). Courts must therefore "review an agency's compliance with NEPA's requirements deferentially." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991). An agency "need only follow a 'rule of reason' in preparing an EIS" and when determining "*which* alternatives the agency must discuss, and the

*extent* to which it must discuss them." *Id.* at 195 (internal quotation mark omitted) (emphasis in original) (quoting *Alaska v. Andrus*, 580 F.2d 465, 475 (D.C. Cir. 1978)). The agency "bears the responsibility for defining at the outset the objectives of an action" and a court will "uphold an agency's definition of objectives so long as the objectives that the agency chooses are reasonable, and [will] uphold its discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail." *Id.* at 195–96.

### 2. NEPA Coverage of the Elk Reduction Program

Mayo claims that the NPS has failed to comply with NEPA because the agency prepares neither an EA nor an EIS before authorizing the elk reduction program in the Park each year.[11] *Mayo* Pls.' Mem. Supp. Mot. Summ. J. at 22–23 ("*Mayo* Pls.' Mem. Supp."), ECF No. 35; *see also Mayo* Compl. ¶ 73; *Mayo* Supp. Compl. ¶ 8. Mayo argues that the NPS undertakes a major federal action when it makes "a new discretionary decision every year concerning whether, and on what specific terms, to authorize the elk hunt in a national park. *Mayo* Pls.' Mem. Supp. at 22.

Defendants do not dispute that the NPS does not prepare an EA or EIS each year when authorizing the annual elk reduction program, and they do not appear to contest that the annual elk hunts generally fall within NEPA's definition of a major federal action.[12] Instead, they claim

---

[11] Mayo also points out that the NPS has not invoked a categorical exclusion exempting the elk reduction program from NEPA review, but the agency does not claim that the elk reduction program is categorically excluded. The CEQ regulations define a categorical exclusion as "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations . . . and for which, therefore, neither an environmental assessment nor an environmental impact statement is required." 40 C.F.R. § 1508.4.

[12] Wyoming, as intervenor, does argue that the NPS's annual authorization of the elk hunt is not a major federal action but "simply one step in the agency's ongoing management of the elk and bison herds pursuant to the 2007 Plan," the latter of which "*is* a major federal action." *Mayo*

that they fulfilled their NEPA obligations when they analyzed the environmental consequences

of the 2007 Management Plan.  Defendants argue that when the agency set overall goals for the

management of the Jackson elk herd and analyzed the anticipated environmental consequences

of each proposed alternative, it also took a "hard look" at the particular environmental

consequences of continuing the elk reduction program in the Park as one management tool.  *See*

*Mayo* Defs.' Mem. Supp. Cross-Mot. Summ. J. & Opp'n to Pls.' Mot. at 15–18 ("*Mayo* Defs.'

Mem. Supp."), ECF No. 39.

On the facts of this case, the Court agrees with the NPS's understanding of the agency's

NEPA obligation.  To understand why requires some background about the 2007 Management

Plan and the alternative it adopted.  NPS's preferred alternative, Alternative 4 (and the one

eventually adopted), called for adaptive management of both the bison and elk herd populations

and their habitat, through which "a dynamic framework for decreasing the need for supplemental

feeding on the refuge" would be developed "based on existing conditions, trends, new research

findings, and other changing circumstances."  NPS-1920.  Under that approach, "the elk herd

reduction program in the park" would "be used to assist the state in managing herd sizes, sex and

age ratios, and summer distributions."  *Id.*  More specifically, Alternative 4 proposed to reduce

the number of elk wintering on the Refuge to approximately 5,000 elk, reduce the number of elk

---

Wyo. Mem. Supp. at 23 (emphasis in original).  One might read Wyoming's argument as
implying that, in the absence of an overarching plan like the 2007 Management Plan, the annual
elk hunt by itself would not be considered a major federal action.  Unlike Wyoming, Defendants
do not seem to claim that, even in the absence of the 2007 Bison and Elk Management Plan, the
annual elk hunt would not constitute a major federal action.  Instead, Defendants' argument is
narrower: they seem to argue that *if* a proposed action has been made part of a NEPA analysis
that focuses on an entire program, a new EIS is not required for "each future component action."
*Mayo* Defs.' Mem. Supp. Cross-Mot. Summ. J. & Opp'n to Pls.' Mot. at 15–16, ECF No. 39
("*Mayo* Defs.' Mem. Supp.") (quoting *Envtl. Def. Fund, Inc. v. Andrus*, 619 F.2d 1368, 1377
(10th Cir. 1980)).

summering in the Park to 1,600 elk, and to manage the overall Jackson elk herd at the WGFD's

11,000 population objective.  *See* NPS-1924; NPS-2011; NPS-2210.  The NPS also proposed to

establish an elk bull-to-cow ratio that is "more reflective of non-hunted populations," and

initially recommended a 35-to-100 ratio based on the summer elk herd.  NPS-2012.  To reach

these goals, the 2007 Management Plan proposed using hunting on both the Refuge and in the

Park, in addition to reestablishing the elk's natural winter habitat.  NPS-2003 (describing

objectives and strategies for improving elk grazing habitat); NPS-2240 (explaining that "a

decrease to the 5,000 Refuge population target would be "gradual" and "accomplished through a

short-term increase in harvest in the park and on the southern part of the refuge," although "[t]he

reduction in herd size would come primarily from the park segment").

The EIS canvassed the environmental consequences that would result both from

achieving the selected goals and implementing the management actions the agencies anticipated

using to meet them.  For example, the EIS anticipated that the elk herd's distribution would

increase as the elk came to rely more heavily on standing forage and native winter range, NPS-

2241, and that the elk's competitiveness and aggressiveness would be reduced as supplemental

feeding and elk numbers on the range decreased, NPS-2243.  In addition, the EIS predicted that

"[c]hanges in hunting practices" would cause "short-duration adverse effects," particularly on the

southern portion of the Refuge, where harvesting elk "in these traditionally safe areas" would

"increase agitation and nervousness, energetic expenditures, and possibly decreasing nutrition

because of reductions in foraging."  NPS-2243.  Overall, the EIS noted that Alternative 4 would

"continue to enhance health and sustainability of the Jackson elk herd in the long term," although

to a lesser extent than some of the alternatives.  NPS-2249.

More to the point, it is clear that the EIS took the requisite "hard look" at the potential environmental effects that might result from continuing the elk reduction program in the Park as a method of managing the herd. To begin with, the 2007 Management Plan itself explained that it intended the EIS's "level of analysis" to be "sufficient to allow several management actions to be carried out without having to complete additional analyses (e.g., environmental assessments) prior to implementation." *Id.* Those additional management actions were forecasted to include changes to "the number of elk and bison inhabiting the National Elk Refuge, Grand Teton National Park, and John D. Rockefeller, Jr. Memorial Park," changes to the "elk herd reduction program in the park, including changes to hunt areas," and changes to "elk hunting on the refuge, including changes to hunt areas." NPS-1974–76.

Beyond this assertion of the EIS's scope, a thorough review of the EIS reveals that throughout its discussion of Alternative 4, and where relevant, the NPS specifically considered the environmental effects of utilizing elk hunting in the Park as a management strategy. For example, the NPS discussed whether elk hunting would have an adverse impact on the natural scenery and other wildlife enjoyment in the park. As the EIS noted, "[c]ontinued elk herd reduction in parts of Grand Teton National Park would detract from the naturalness of the scenery for some visitors during the fall and early winter." NPS-2160; *see also* NPS-2415 (explaining that "[h]unting in the park would continue to adversely affect the experiences of some visitors during the fall and early winter" and that "[i]nitially the number of elk harvested in the park would be higher than now, but in the long term fewer elk would be taken"). But the EIS nevertheless concluded that "[m]oderate to large numbers of elk and bison on the refuge and in the park would continue to be important elements of the scenery of Jackson Hole." NPS-2160.

Overall, the agency believed that Alternative 4 "would not result in the impairment of visual resources in the park." *Id.*

The NPS also explained how the elk reduction program might affect visitors' opportunities to observe elk in the Park.   The EIS anticipated that a reduction of the Park segment of the elk herd from approximately 2,676 elk to 1,600 elk, as Alternative 4 called for, "could result in fewer viewing opportunities for a minority of park visitors, potentially reducing the quality of the outdoor experience for some people." NPS-2415.  While the NPS noted that possibility, it concluded that any adverse effects "would be relatively minor because most visitors from May through October do not see elk," and because in most years "a moderate to large number of elk (but fewer than under baseline conditions and Alternative 1) would continue to be observable during spring and fall migrations, so viewing opportunities might not change substantially." *Id.*  And NPS also explained that it did not believe Park visitors would face fewer opportunities to observe the elk's unique mating patterns.  The NPS predicted that, "although elk numbers would be lower than Alternative 1, bull-to-cow ratios could be higher, which means that opportunities for seeing and hearing bugling elk during the fall rut would not decline proportionally." *Id.*

The effects of hunting on the size, sustainability, and health of the elk herd was also considered.  Hunting would lead to "[m]oderate to major reductions in the number of elk," decreasing herd densities, with an objective to lower the number of the Park herd segment that winters in the Refuge to approximately 1,600 elk.  NPS-2242. This decrease, in turn, would reduce the aggregate number of elk wintering there and "produce a more sustainable situation, with fewer elk being more able to survive on standing forage without supplemental feed."  NPS-2248.  This would also keep the elk mortality level from rising more than a negligible amount.

*Id.* In addition, elk hunting targeting female cows (rather than bulls) would help to "readjust" the bull to cow ratio, which the NPS described as lower than in a more natural elk population that was neither fed nor hunted.  NPS-2247.[13]

The EIS also discussed the possibility of hunting accidents.  The NPS noted that "[h]unting accidents in both the park and the refuge have been relatively low over the last two decades," and that only four, non-fatal hunting accidents involving firearms had been reported in Wyoming in 2003.  NPS-2401.  Thus, the EIS concluded that the eventual reduction in the number of elk harvested under Alternative 4 would "lower the potential for hunting accidents." NPS-2401.

Finally, the EIS considered the adverse effects the 2007 Management Plan, generally, and the elk reduction program, specifically, would have on endangered and threatened species, including the grizzly bear.  The EIS explained that, as winter feeding abated, up to 2,000 more elk could end up feeding off of "native winter range," leading to a higher rate of elk mortality from which grizzly bears "could benefit if more winter-killed elk and bison died in areas accessible to bears after they emerged from hibernation in the spring."  NPS-2309.  In a similar manner, the EIS explained that "[i]f, or when, no supplemental feeding was provided, the vulnerability and mortality of elk and bison on the refuge could be higher, and wolves, grizzly bears, and bald eagles could benefit compared to baseline conditions and Alternative 1."  *Id.*  The EIS did acknowledge the potential *negative* effects on grizzly bears, but ultimately considered

---

[13] The EIS also considered possible effects that would follow from expanding elk hunting in the National Elk Refuge.  For example, the EIS explained that "[c]hanges in hunting practices would also cause short-duration adverse effects, with the extent dependent on disturbance levels. Harvesting elk on the southern part of the refuge early in the season would disturb elk in these traditionally safe areas, increasing agitation and nervousness, energetic expenditures, and possibly decreasing nutrition because of reductions in foraging." NPS-2243

those effects to be limited.  The EIS noted that hunters "walking and horseback riding through the hunt zones and rifles being fired . . . on the eastern side of the park could disturb wolves, grizzly bears, and bald eagles in the immediate area of each hunting party for a short period of time," but considered those impacts "negligible."  NPS-2305.  The EIS further explained that the grizzly bear's population expansion "southward" and the continuation of the "elk reduction program in the park" could increase "the risk of conflicts between hunters and grizzlies."  *Id.* But the EIS posited that in the Park, specifically, "the potential risk of deputized elk hunters killing grizzly bears would be less compared to baseline conditions" because, over the course of the plan's implementation "there would be fewer elk in the park and the elk reduction program would likely be changed as a result."  NPS-2309.  In addition, the EIS pointed out that, as of 2007, "no grizzly bears are known to have been killed . . . during the elk reduction program in Grand Teton National Park," and therefore concluded that "grizzly bears would likely not be affected or [would be] affected to a minor degree."  NPS-2305.

These provide only some examples of the specific considerations the EIS gave to the continued use of the elk reduction program in the Park.  And, to be sure, each of these particular discussions was relatively modest in relation to the overall plan—which spanned more than 600 pages and considered all aspects of the Elk and Bison Management program across several federal lands.  But they demonstrate that the agency sufficiently considered and took a "hard look" at the possible environmental impact of continuing to allow elk hunting in the Park.  *See Balt. Gas & Elec.*, 462 U.S. at 97–98 (explaining that a court's role "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious").

Mayo contends, however, that the 2007 Management Plan constitutes a broad, programmatic EIS which cannot "obviate the need for NEPA compliance on the annual site-specific decisions." *Mayo* Pls.' Mem. Opp'n to Defs.' & Intervenors' Mots. Summ. J. & Reply at 10 ("*Mayo* Pls.' Opp'n & Reply"), ECF No. 45. Courts have "long recognized" a distinction between what are called "programmatic and site-specific environmental analyses." *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 149 (D.D.C. 2012). On the theory that "a systematic program is likely to generate disparate yet related impacts," a programmatic EIS "reflects the broad environmental consequences attendant upon a wide-ranging federal program" and "looks ahead and assimilates 'broad issues' relevant to one program design." *Nat'l Wildlife Fed'n v. Appalachian Reg'l Comm'n*, 677 F.2d 883, 888 (D.C. Cir. 1981). A site-specific EIS, by contrast, "addresses more particularized considerations arising once the overall program reaches the 'second tier,' or implementation stage of its development." *Id.* Typically, a "site-specific" EIS will "be necessary to supplement the environmental analysis of a programmatic impact statement." *Nat. Res. Def. Council, Inc. v. Adm'r, Energy Research & Dev. Admin.*, 451 F. Supp. 1245, 1258 (D.D.C. 1978), *aff'd in relevant part* 606 F.2d 1261 (D.C. Cir. 1979) (footnote omitted). CEQ's regulations accommodate the relationship between programmatic and regional, or site-specific, analyses through a process called "tiering." *See* 40 C.F.R. § 1508.28. Tiering refers to the consideration of "general matters in broader environmental impact statements (such as national program or policy statements)," which are then "incorporat[ed] by reference" in "subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements)." *Id.*; *see also Nevada v. Dep't of Energy*, 457 F.3d 78, 91 (D.C. Cir. 2006) (describing tiering).

There is no doubt that the 2007 Management Plan's EIS is, in part, a programmatic document.  It analyzes a range of management activities affecting both the bison and elk herds in multiple federal management areas.  And the plan labels itself as such.  *See* NPS-1974 ("The bison and elk management planning document, when finalized, will provide programmatic coverage in accordance with [NEPA].").  At the same time, however, not every programmatic NEPA analysis will require a subsequent, site-specific analysis for all actions covered in the programmatic analysis.  This district court has indicated as much, explaining that a subsequent, site-specific EIS "is not necessary if all the environmental analysis required by section 102(2)(C) of NEPA is contained in the programmatic statement."  *Adm'r, Energy Research & Dev. Admin.*, 451 F. Supp. at 1259.  Several other courts have held the same.  *See, e.g.*, *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994) ("A *comprehensive* programmatic impact statement generally obviates the need for a subsequent site-specific or project-specific impact statement, unless new and significant environmental impacts arise that were not previously considered." (emphasis added)); *United States v. 162.20 Acres of Land, More or Less, Situated in Clay Cnty., State of Miss.*, 733 F.2d 377, 381 (5th Cir. 1984) ("A site-specific impact statement is not necessary, however, if the programmatic impact statement contains all the analysis required by section 102(2)(C) of NEPA."); *Envtl. Def. Fund, Inc. v. Andrus*, 619 F.2d 1368, 1377 (10th Cir. 1980) (explaining that "if an EIS prepared for a whole program contains a reasonable, good faith discussion of each of the five NEPA requirements applicable to future actions contemplated in order to implement the program, [then] no separate or supplemental EIS will be required for each future component action, unless a significant change occurs in the interval"); *Ventling v. Bergland*, 479 F. Supp. 174, 180 (D.S.D. 1979) ("[W]here the programmatic EIS is sufficiently detailed, and there is no change in circumstances

or departure from the policy in the programmatic EIS, no useful purpose would be served by requiring a site-specific EIS.").

The D.C. Circuit has similarly suggested that an agency may choose to couple a programmatic analysis with a site-specific analysis. *See Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973) (holding that the agency must prepare a NEPA analysis for a comprehensive federal research program for the Liquid Metal Fast Breeder Reactor—separate and apart from the analysis prepared for major test facilities—but explaining that it was "of little moment whether that analysis is issued as a separate NEPA statement or . . . included with a NEPA statement on a particular facility"); *see also Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regulatory Comm'n*, 606 F.2d 1261, 1271 (D.C. Cir. 1979) (citing *Scientists' Institute* and explaining that the agency "in its discretion, could have chosen to explore alternatives to the particular [waste] tanks" at issue in that case "in either a 'programmatic' or 'site-specific' format"). Such "[q]uestions of format . . . properly reside within the discretion of the issuing agency." *Scientists' Inst.*, 481 F.2d at 1092; *cf. Grunewald*, 776 F.3d at 904–05 (emphasizing an agency's discretion and concluding that the NPS did not act arbitrarily and capriciously when it declined to consider the Exotic Plant Management Plan and the Deer Management Plan for Rock Creek Park in the District of Columbia in a single, programmatic document).

Thus, the Court does not read NEPA to foreclose an agency, in its discretion, from simultaneously analyzing both the broad environmental consequences of a federal program and certain narrower features of the program. If an agency does so, "[a] single EIS may cover *both* programmatic impacts and impacts of particular projects contained within the broader program." *Vt. Pub. Interest Research Grp. v. U.S. Fish & Wildlife Serv.*, 247 F. Supp. 2d 495, 528 (D. Vt.

2002) (emphasis added) (citing *Scientists' Inst.*, 481 F.2d at 1092); *accord Salmon River Concerned Citizens*, 32 F.3d at 1356; *Ventling*, 479 F. Supp. at 180.  Accordingly, the Court is similarly not persuaded that every EIS will necessarily fall squarely into the "programmatic" or "site-specific" category, or that an EIS may only serve a single purpose, rendering the categories mutually exclusive.[14]  The terms "programmatic" and "site-specific" are certainly useful guideposts for determining whether the environmental impact of a particular federal action has been adequately considered in a particular EIS.  But the relevant task for the Court always remains simply determining whether the relevant NEPA document afforded the agency the opportunity to take the requisite "hard look" at the environmental consequences of the particular challenged action.  *Balt. Gas & Elec.*, 462 U.S. at 97.

Here, as already explained above, the 2007 Management Plan's EIS considered a multitude of environmental effects that would flow from the continued use of hunting in the Park.  Indeed, despite embracing the overall description of a programmatic document, the EIS, itself, states that: "this planning document / environmental impact statement provides *more than programmatic coverage* for elk and bison management."  NPS-2143 (emphasis added).  It envisioned providing sufficient analysis to permit changes to the "elk herd reduction program in the park, including changes to hunt areas," and to "elk hunting on the refuge, including changes

---

[14] For this reason, Mayo's repeated invocation of the CEQ's tiering regulation is unavailing.  To be sure, that regulation speaks generally of tiering being *appropriate* when an agency sequences "[f]rom a program, plan, or policy environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a site-specific statement or analysis."  40 C.F.R. § 1508.28(a).  As a result, an agency may find it prudent, or necessary, in many circumstances to tier a site-specific analysis to a national or regional plan.  Contrary to Mayo's claim, however, the regulation does not indicate that a separate site-specific analysis must invariably be created.  *Accord Ventling*, 479 F. Supp. at 179 (explaining that "[a]lthough a programmatic EIS may often be inadequate relative to an individual action, there is no reason to require a site-specific statement that would merely duplicate the programmatic EIS").

to hunt areas." NPS-1974–76. On this basis, the out-of-circuit case on which Mayo most heavily relies, *Fund for Animals v. Mainella*, 283 F. Supp. 2d 418 (D. Mass. 2003) is easily distinguishable. There, a federal district court in Massachusetts considered the NPS's approval of waterfowl, upland game, and pheasant hunting in the Cape Cod National Seashore, a component of the National Park System. *See Mainella*, 283 F. Supp. 2d at 423, 425–26. The NPS had produced a General Management Plan for the National Seashore in 1998, which discussed the hunting and pheasant stocking programs. *See id.* at 425–26. But the EIS prepared as part of that management plan had "specifically adumbrated the limitations of its intended scope," and expressly provided that "[i]n the future, *implementation of specific actions included in the approved final general management plan would require the preparation of more detailed environmental assessments*" which "would be tiered to this programmatic impact statement." *Id.* at 424 (emphasis in original) (quoting EIS). The court therefore concluded that the 1998 EIS "did not, and was not intended to, take a hard site-specific, detailed look at hunting" and, therefore, "[i]n the words of the General Management Plan," a more detailed assessment was "needed before the Seashore's NEPA obligations are satisfied with respect to hunting." *Id.* at 432, 434. The 2007 Management Plan here, by contrast, contains nearly the exact *opposite* representation—it asserts that the EIS does contain detail "sufficient to allow several management actions to be carried out *without having to complete* additional analyses (e.g., environmental assessments) prior to implementation." NPS-2143 (emphasis added). And its analysis accordingly considered the environmental impacts of the elk hunts in the Park.

Moreover, the court in *Mainella* also noted that the 1998 EIS "did not examine the direct and indirect effects of hunting, for example, by examining the effect of hunting on the population of the various different species hunted in the Seashore, the impact of the presence of hunters in

different areas within the Seashore, or public safety concerns associated with hunting weapons being used in the Seashore." 283 F. Supp. 2d at 432–33. But here, as explained above, the 2007 Management Plan's EIS specifically discussed these types of concerns when it analyzed, among other things, the elk reduction program's impact on elk populations and distribution, the potential for public safety hazards, and the effects on threatened species. *See, e.g.*, NPS-2241–43; NPS-2401; NPS-2304–09.

Instead, the closest analogue to the EIS issued in this case is an out-of-circuit district court case which Defendants point to but Mayo fails to distinguish (or even discuss) altogether. *See Mayo* Defs.' Mem. Supp. at 18, 27. In *Vermont Public Interest Research Group v. U.S. Fish & Wildlife Service*, a federal district court in Vermont considered an EIS developed to analyze a program to control the sea lamprey, a parasitic eel-like fish, in Lake Champlain and twenty-seven of its streams or tributaries. 247 F. Supp. 2d 495, 502–04 (D. Vt. 2002). The plan called for a "tributary-specific approach" that would employ two different methods to control the lamprey: lampricides (a type of pesticide) and physical barriers and traps that would inhibit adult lamprey migration from tributaries to Lake Champlain. *Id.* at 503–04. The EIS screened each stream for "site-specific information" in order to determine which methods of control would be most suitable. *Id.* at 504. In response to a NEPA challenge claiming that site-specific analyses were necessary because the EIS failed to sufficiently evaluate the environmental impacts upon each particular stream, the court acknowledged that the EIS provided a "comprehensive analysis of the environmental effects of controlling sea lamprey in Lake Champlain's tributaries" and was therefore "programmatic." *Id.* at 528. But the court went on to note that the EIS "*also provides individual analysis for each tributary*" that adequately examined the potential environmental impacts for each. *Id.* (emphasis added). Noting that "[s]ubsequent individual actions falling

under the auspices of the program require additional assessment *only where* localized

environmental effects have not been fully evaluated in the programmatic statement," the court

rejected the NEPA challenge. *Id.* (emphasis added).

While Mayo casts each annual decision whether to hold an Elk hunt, and the concomitant

determinations regarding the number of hunting licenses to issue or the areas in the Park to open

to the hunt, as site-specific decisions, the Court (like the NPS) disagrees. Although these

decisions are made annually, they are made on only one site: the Park. Indeed, with respect to

elk hunting, the 2007 Management Plan encompasses only *two* "sites": the Grand Teton National

Park, and the National Elk Refuge. *See Mayo* Defs.' Reply at 6, ECF No. 49. In many instances,

the EIS specifically distinguishes among the two sites and describes the unique environmental

effects the NPS anticipates hunting will cause in each location. *See, e.g.*, NPS-2414–15

(considering the wildlife viewing impacts caused by hunting on the Range and Park,

respectively); NPS-2158–60 (same). Thus, the 2007 Management Plan, despite its programmatic

label, also adequately considered the environmental effects of hunting specific to the Park.

*Accord Vt. Pub. Interest Research Grp.*, 247 F. Supp. at 528. And, consequently, the other cases

Mayo cites holding that subsequent, site-specific NEPA analyses were required are also

distinguishable on their facts. In each of those cases, a court was confronted with a far *broader*

programmatic management plan of nationwide scope, and each court concluded that the plan at

issue had not considered the relevant site-specific environmental effects. *See, e.g.*, *Pit River*

*Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 783–84 (9th Cir. 2006) (holding that programmatic EIS

considering how to implement the Geothermal Steam Act *nationwide*, and subsequent, more

geographically-focused EAs which specified that additional EAs would be conducted, both failed

to analyze environmental consequences of gas lease extensions).

Mayo also points to several gaps in "whether, where, and how to conduct a hunt in any particular year" in an effort to show that the NPS must conduct a site-specific analysis each year before it approves the Park elk hunt.  *Mayo* Pls.' Opp'n & Reply at 12 (emphases omitted).  Yet, these gaps are byproducts of the adaptive management process that NPS selected—a type of management that this Circuit has blessed as generally compatible with an agency's NEPA obligations.  The D.C. Circuit has held that selecting an "adaptive management plan" does not violate NEPA's charge "to take a hard look at environmental impacts before actions are taken."  *TRCP*, 616 F.3d at 517.  The Circuit has explained that "[t]he procedural requirements of NEPA do not force agencies to make detailed, unchangeable mitigation plans for long-term development projects"; instead, permitting "adaptable mitigation measures is a responsible decision in light of the inherent uncertainty of environmental impacts."[15]  *Id.*; *see also Powder River Basin Res. Council v. Bureau of Land Mgmt.*, 37 F. Supp. 3d 59, 80–83 (D.D.C. 2014).

Here, the NPS makes a limited number of decisions each year about which areas of the Park to keep open to the hunt and how many elk or what sex to harvest.  These decisions are made in order to target certain elk herd segments or in an attempt to affect reproduction rates.

---

[15] Mayo claims that *TRCP* favors his argument because the Circuit upheld the use of adaptive management only after noting that the exact mitigation measures to be used would be "determined on a site-specific basis."  616 F.3d at 516.  This case differs in two important respects that make this limitation, even if important, irrelevant here.  First, as already explained, the 2007 Management Plan does contain a site-specific analysis for elk hunting in the Park.  Second, the NPS is using adaptive management in the Park not to tailor the *mitigation* techniques it will employ to limit the adverse environmental effects of its action in any one location.  Instead, the agency action, *itself*, (the environmental consequences of which the EIS analyses) is being implemented through adaptive management.  But so long as the goals of that action and its anticipated course are described in sufficient detail to forecast the anticipated environmental effects, an agency should be able to comply with NEPA despite some uncertainty about the exact contours of the agency action.  *See Scientists' Inst.*, 481 F.2d at 1092 ("It must be remembered that the basic thrust of an agency's responsibilit[y] under NEPA is to predict the environmental effects of proposed action before the action is taken and those effects fully known. Reasonable forecasting and speculation is thus implicit in NEPA.").

*See, e.g.*, NPS-6851. But having intensively detailed the anticipated environmental consequences of hunting in the Park, the Court fails to see how these minor alterations undermine the NPS's NEPA analysis. An EIS need only be "reasonably complete," and it need only include "sufficient detail to ensure that environmental consequences have been fairly evaluated." *Parks Conserv. Ass'n v. Jewell*, 965 F. Supp. 2d 67, 75 (D.D.C. 2013). Moreover, the gaps here are quite modest, and the elk reduction program in the Park has been confined to particular areas. *See* NPS-2091 (map of existing elk hunting areas in the Park, the Refuge, and surrounding areas). If "an EIS prepared for a whole program contains a reasonable, good faith discussion of each of the five NEPA requirements applicable to future actions contemplated in order to implement the program, [then] no separate or supplemental EIS will be required for each future component action, unless a significant change occurs in the interval." *Envtl. Def. Fund, Inc.*, 619 F.2d at 1377. Mayo does not identify anything in these annual alterations that would meaningfully change the environmental consequences expected to flow from them.[16] *Cf. Minn. Pub. Interest Research Grp. v. Butz*, 498 F.2d 1314, 1323 n.29 (8th Cir. 1974) (en banc) (suggesting that, on remand, the Forest Service's impact statement concerning timber cutting in a wilderness area would not require "a separate impact statement" or "individual EIS" for "each administrative action taken pursuant to that policy" or for "each timber sale" if "the environmental effects of timber cutting are considered in the overall EIS, . . . absent a material change in circumstances or a departure from the policy covered in the overall EIS").

---

[16] Mayo also asserts that the particular "factual justification for the 'necessity' of elk hunting in any particular year within the multi-year plan" is not discussed by the 2007 Management Plan EIS. *Mayo* Pls.' Opp'n & Reply at 12. The Court fails to see how the particular justification asserted for the hunt in any one year would alter the *environmental consequences* flowing from that hunt.

Finally, Mayo contends that the 2007 Management Plan cannot satisfy the agency's NEPA obligations because the increase in elk being fed on the Refuge demonstrates that the Plan is not being implemented according to its plain terms. *See Mayo* Pls.' Mem. Supp. at 34. As even Mayo's reply indicates, however, this argument is duplicative of his supplemental NEPA claim, *Mayo* Pls.' Opp'n & Reply at 17–19, and the Court will address it as such.

In sum, the Court finds that the EIS prepared as part of the 2007 Management Plan sufficiently considered the environmental impacts of continuing the elk reduction program in the Park without necessitating the preparation of a new EA or EIS each year when a particular hunt is approved. Thus, Mayo's broad NEPA argument fails.[17]

### 3. Supplementation

In the alternative, Mayo argues that even if the 2007 Management Plan sufficed for NEPA purposes, the NPS is now precluded from relying on that plan because it is not being implemented as envisioned or because significant new information exists which requires the NPS to prepare a supplemental EIS.

As the Supreme Court has recognized, the preparation of a supplemental EIS, "although not expressly addressed in NEPA" is "at times necessary to satisfy the Act's 'action forcing' purpose." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 370–71 (1989). The CEQ regulations

---

[17] This conclusion also obviates the need to consider Safari Club's alternative statutory arguments. *See Mayo* Safari Club's Mem. Supp. Cross-Mot. Summ. J. & Opp'n Pls.' Mot. at 8–14 ("*Mayo* Safari Club's Mem. Supp."), ECF No. 43. In any event, the agency has not embraced those arguments as grounds for declining to prepare an annual EIS, and therefore they should not be considered by this Court in an APA case. *See, e.g., U.S. Postal Serv. v. NLRB*, 969 F.2d 1064, 1069 (D.C. Cir. 1992) (rejecting intervenor's "endeavor to achieve disposition of this case on a rationale not set forth by the agency itself" (brackets, internal quotation marks, and citations omitted)); *NRDC v. Herrington*, 768 F.2d 1355, 1397 n.40 (D.C. Cir 1985) (noting that because the court "may sustain the agency's decision only on the rationale it offered," it could not "uphold the agency's result by adopting the new definition intervenors propose").

have codified this requirement, and impose a duty on agencies to prepare a supplemental EIS if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns" or if there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c).  An agency "need not supplement an EIS every time new information comes to light after the EIS is finalized," however.  *Marsh*, 490 U.S. at 373.  Only changes "that cause effects which are significantly different from those already studied require supplementary consideration."[18]  *Davis v. Latschar*, 202 F.3d 359, 369 (D.C. Cir. 2000) (internal quotation mark omitted) (quoting *Corridor H Alts., Inc. v. Slater*, 982 F. Supp. 24, 30 (D.D.C. 1997)).  Like the decision of whether an EIS is warranted in the first instance, an agency's decision whether to supplement an EIS is reviewed under the arbitrary and capricious standard.  *Marsh*, 490 U.S. at 375–77.  A reviewing court must review the record and satisfy itself that "the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information."  *Id.* at 378.  Determining "whether information is either new or significant 'requires a high level of technical expertise,'" and courts therefore will "'defer to the informed decision of the [agency].'"  *Blue Ridge Envtl. Def. League v. Nuclear Regulatory Comm'n*, 716 F.3d 183, 197 (D.C. Cir. 2013) (quoting *Marsh*, 490 U.S. at 377).

As an initial stumbling block, Defendants argue that Mayo has forfeited any supplemental NEPA challenge, focusing on Mayo's single citation to 40 C.F.R. § 1502.9(c),

---

[18] In *Davis*, the D.C. Circuit affirmed the district court's judgment "for the reasons stated in the [district court's] 1998 opinion," noting that the Circuit would adopt the district court's opinion "as our own and reprint [it] as an appendix" to the Circuit's own opinion.  303 F.3d at 360; *see also id.* at 361–371 (reproducing the entirety of the district court's decision).  This Court therefore cites to the D.C. Circuit version of the district court opinion and treats it as binding precedent.

which was accompanied by a parenthetical describing an agency's duty to supplement its NEPA

analysis. Defendants accurately point out that "[a] fleeting statement in the parenthetical of a

citation is no more sufficient to raise a claim than a cursory remark in a footnote, which [the

circuit] ha[s] consistently rejected." *Mayo* Defs.' Mem. Supp. at 27 (quoting *Am. Wildlands v.

Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008)). But their contention overlooks the two

paragraphs of argument that directly preceded that citation. There, Mayo specifically argued that

the 2007 Management Plan "is not even being carried out according to its plain terms" and is

"not being implemented so as to meet its central management objective" in light of the

significant *increase* in the number of elk wintering on the National Elk Refuge. *Mayo* Pls.'

Mem. Supp. at 33–34. In addition, Mayo's brief had previously laid out a number of

circumstances that, he claimed, "cry out for some agency consideration and public involvement."

*Id.* at 25–30. While these arguments are not necessarily the focus of Mayo's opening

memorandum, they are sufficiently developed to merit consideration.[19]

     Proceeding to the merits, the Court finds the putative new circumstances or information

Mayo proffers unavailing. Where possible,[20] the Court is guided in its analysis by the NPS's

---

[19] Notably, Defendants have not argued that Mayo is time-barred from asserting a supplemental NEPA claim.

[20] In May 2012, the Sierra Club submitted a letter to the Park's Superintendent, requesting that the Park "undertake a formal Environmental Analysis of the ongoing Grand Teton National Park . . . elk hunt," and identifying several putative changes in conditions "over the last several years," including the increase in the grizzly bear population in the hunt area as well as an increase in the gray wolf population, that "warrant a comprehensive analysis at this time." NPS-5585. The Superintendent responded in June 2012, addressing each point and concluding that, through the analysis contained in 2007 Management Plan and other, more recent, wildlife surveys and consultations among agencies, "each of the concerns itemized in [the] letter are being or have been addressed." NPS-5592–93. Overall, the Superintendent responded that "no additional analyses are necessary at this time." NPS-5593. Through his counsel, Mayo submitted a similar letter in August 2014, shortly before filing this lawsuit, contending that NPS "has approved changes in the hunt" since 2007 "which have environmental implications that have never been analyzed in any NEPA document," and that "new issues have

June 2012 response to a letter, submitted by the Sierra Club, urging NPS to "undertake a formal Environmental Analysis" because "conditions have changed substantiality in the Park over the last several years." *See* NPS-5585. NPS's response set forth the agency's explanation of why certain conditions did not constitute changed circumstances, to which this court should generally defer. *See* NPS-5589–93; *see also Blue Ridge Envtl. Def. League*, 716 F.3d at 197.

First, Mayo contends that the elk reduction program is producing new and unprecedented effects on the grizzly bear. Mayo highlights what he sees as "increasing" conflicts between humans (specifically hunters) and instances in which grizzly bears have been attracted to elk gut piles left by hunters. *See Mayo* Pls.' Mem. Supp. at 25–26; *Mayo* Pls.' Opp'n & Reply at 24–27. But—as explained in more detail below in reference to Plaintiffs' Endangered Species Act claims—these circumstances are not new. The 2007 Management Plan specifically noted that the grizzly bear's "distribution has been increasing over the past two decades." NPS-2107. The EIS explained that, under each of the six alternatives NPS considered, "[a]s the grizzly bear population *continues to expand southward*, the risk of conflicts between hunters and grizzlies *could increase*." NPS-2305 (emphases added). And the 2007 BiOp both concluded that there was a potential for grizzly bears to expand as far south as the Elk Refuge, FWS-1682, and that grizzly bears within the Park "have increased in numbers and expanded in range," FWS-1690. Accordingly, the NPS explained in its June 2012 letter that this activity "is not new" and was addressed in the 2007 Management Plan. NPS-5590.

Of course, the 2007 Management Plan did predict that an increased risk for conflicts or mortality would be minimized, relying on the fact that no grizzly bears had been killed during

---

emerged that have never been analyzed in any NEPA document." NPS-7553. NPS did not respond to the letter before Mayo filed this lawsuit two months later, and the record does not reveal whether NPS ever responded.

the elk hunt.  NPS-2305.  But those risks also appear to be what led the FWS to conclude that the 2007 Management Plan would "exacerbate the short-term risk for hunting-related grizzly bear mortality within the park," and to anticipate that one bear could be incidentally taken in the Park as a result of the proposed action.  FWS-1691.  Indeed, the FWS's BiOp specifically concluded that hunters might face "a higher risk of grizzly conflict" in the "Snake River bottom" area—where the one take took place—and where "thicker cover exists and grizzly bears are known to frequent."  FWS-1686; *see also* FWS-1683 (explaining that "[t]he relative lack of tree cover across most of the [Park] hunt area makes it less suitable for grizzly bears, with the exception of areas within the Snake River Bottom, Blacktail Butte, and other small forested patches").  But, despite the fact that the incidental take was reached, the NPS and FWS do not view the general circumstances surrounding the impact of the elk management plan on the grizzly bear as all that different.  *See* FWS-1565 (memorandum from the NPS to the FWS contending that "[c]onditions associated with the ERP remain largely the same as they were in 2007 except that, as anticipated in the plan, grizzly bear distribution and numbers in the south end of the park appear to have increased").  The Court perceives little in the record that lends support to Mayo's alternative view.[21]

---

[21] Mayo also relies on several documents in the administrative record that reference the "conflict" between elk management and grizzly bear conservation or stating that recent events have "highlighted" the effects of the elk reduction program on grizzly bears.  *See Mayo* Pls.' Mem. Supp. at 26 n.8; *Mayo* Pls.' Opp'n & Reply at 25–27.  But Defendants do not deny that there are inevitable trade-offs in their management practices, or that the elk reduction program will have some effect on grizzly bears.  Indeed, the 2007 Management Plan and the FWS's BiOp indicate as much.  Although recent events may have brought these conflicts to the fore, the relevant question for Mayo's supplemental NEPA claim is whether present circumstances indicate that the effect on the grizzly bear is now *different in kind*, warranting a supplemental analysis.  For the reasons stated above, the Court concludes that NPS's decision not to conduct a supplemental analysis is not arbitrary and capricious.

As for the gut pile contention, the agency did not act arbitrarily or capriciously in concluding that grizzly bears' reliance on gut piles left behind by hunters was not a new phenomenon.  As the agency stated in its June 2012 letter, "[g]rizzly bears throughout the ecosystem seek out gut piles during hunting season."  NPS-5590.  In fact, that letter cited an academic article, also contained in the administrative record, which explains that as far back as 1986, "researchers estimated that 370 tons of biomass from 'gut piles' and other discarded parts was left by elk hunters annually in the GYE."  NPS-7462; *see also* NPS-5590 (citing this article in footnote 3).  The 2007 Management Plan discussed the potential for additional food sources from the gut piles, *see, e.g.*, NPS-2307–08, and NPS briefing statements continue to reiterate the same, *see* NPS-6766 ("Gut piles left behind by hunters are also a readily available source of nutrition for bears in the fall.").  As a result, the agency did not act arbitrarily or capriciously in concluding that an EA or supplemental EIS was not warranted.

Second, Mayo claims that the fact that predators, like grizzly bears and wolves, have returned to the Park "calls into serious question the extent to which hunting is necessary to keep elk populations in check at all."  *Mayo* Pls.' Mem. Supp. at 27; *see also Mayo* Pls.' Opp'n & Reply at 27–28.  Yet again, this information is not new.  Indeed, the 2007 Management Plan had discussed the impact of wolf predation "in some detail because of public concern about the recent decline of calf-to-cow ratios."  NPS-2092.  At that time, the NPS noted that it was difficult to pinpoint "the relative degree to which wolves, the drought, high elk densities, habitat decline, hunter harvest, or other factors" were causing a decline in calf ratios.  NPS-2093.  Moreover, the NPS explained that four elk herds that were "not subject to wolf predation are also experiencing declining calf-to-cow ratios," although the agency conceded that those herds' calf-to-cow ratios remained higher than the Jackson elk herd.  *Id.*  Overall, the agency concluded that the "decline

in calf-to-cow ratios on the refuge and in the Jackson herd" was "apparently linked to a combination of factors," and that "more research must be done" before any "definitive conclusions can be drawn about the effects of wolves on their prey."  NPS-2094.

The agency's June 2012 letter indicates that the agency perceives no meaningful change in its assessment.  The NPS again conceded that wolves contribute to the decline in calf ratios in certain areas of the park, but noted that those ratios "vary widely geographically . . . with generally higher ratios in southern reaches of the park," and that the overall elk population had not meaningfully increased or decreased since 2001.  NPS-5591–92.  Thus, the agency concluded that "all available data support that the elk reduction program . . . continues to be necessary for regulating the Jackson herd."  NPS-5592.  Mayo relies on a letter sent by Dr. Franz Camenzind to the park Superintendent Mary Gibson Scott, in which Dr. Camenzind opined that certain carnivores, like wolves, "are having an impact on the park's elk population," which may have brought "elk numbers to levels reflecting natural conditions."  NPS-5190.  But Mayo only selectively quotes from Dr. Camenzind's letter; Dr. Camenzind begins his discussion by conceding that he is not "privy to current data."  *Id.*  Moreover, he readily concedes that, although he believes wolves "are having an impact on the park's elk population . . . [t]o what degree I don't know."  *Id.*  Thus, Dr. Camenzind provides nothing more than speculation.  His contentions in fact align with the NPS's concession that wolves *have* had some impact on the elk's population.  The Court must defer to the agency's technical expertise, and Mayo has provided nothing to indicate that the effect of predators on elk meaningfully differs from the situation the agency considered when it developed the 2007 Management Plan's EIS.  *See Marsh*, 490 U.S. at 377; *Defs. of Wildlife & Ctr. for Biological Diversity v. Jewell*, -- F.3d ----, No. 14-5284, 2016 WL 790900, at *11 (D.C. Cir. Mar. 1, 2016) ("Because predicting the future

status of wildlife is a difficult task, the court has acknowledged deference is appropriate to the agency's evaluation of scientific data within its technical expertise.").

Mayo's third claim—that there have been significant changes to the hunt—merits only brief discussion.  Mayo relies largely on a NPS Wildlife Biologist's passing statement in an e-mail, attaching a "summary of the major changes to the ERP [Elk Reduction Program] in the last 2 years."  NPS-7246.  Mayo homes in on the phrase "major changes," in an effort to characterize the agency's changes as significant.  *See Mayo* Pls.' Mem. Supp. at 30; *Mayo* Pls.' Opp'n & Reply at 28–29.  There are several flaws in this argument.  For one thing, the biologist was asked to provide a "bullet summary list of changes" that were made to the hunt "during the last two years."  NPS-7246.  The biologist's use of the qualifier "major" in her reply, when read in context, reads most readily as "noteworthy," rather than "momentous" or "substantial."  NPS-7246.  For another, even taking "major" to mean "significant," this single phrase in an agency staff member's e-mail does not bind the agency, which clearly does not view the changes as significant.  *See Defs. of Wildlife*, 2016 WL 790900, at *9 (noting that "comments by a random Service employee . . . at best indicate a lack of consensus within the Service; they do not bind the Service").  And, finally, to the extent that Mayo characterizes these changes as having been made "in light of environmental impacts," *Mayo* Pls.' Opp'n & Reply at 29, the record simply does not support that characterization.  A review of the listed changes in fact reveals quite modest alterations to the hunt—limiting the possession of ammunition or shots to be fired by hunters, requiring the use of non-lead ammunition, closures to certain areas of the Park to hunting to "decrease the probability of grizzly-bear human conflicts," alterations to other areas to "spread out early hunting pressure," and changes to the hunt's "season structure."  NPS-7247.  While some changes may have been made with an eye toward limiting the environmental consequences

of the hunt, *see id.* (noting that in 2013 the NPS required the use of "non-lead ammunition, to reduce lead contamination of gut piles that are fed on by eagles and other scavengers"), the record indicates that the bulk were made in an effort to meet the 2007 Management Plan's bull-to-cow ratio and winter refuge population targets, *compare id.* (noting changes to certain hunting areas and the time period for the hunt), *with, e.g.*, NPS-6142 (explaining that the 2013 proposed harvest quota and hunt areas "focus on resident and migrating elk that winter on or adjacent to the National Elk Refuge"), NPS-6851 (same for the 2014 proposed hunt), NPS-7457 (same for the 2015 approved hunt), *and id.* (approving a "more liberal harvest on the southern segments and less hunting pressure on the northern migratory segment" of the Park to target elk that have been shown to reproduce at a higher rate).[22]

 In contrast to these three issues, the final circumstance which Mayo describes as a "substantial change" may have some traction in the abstract. But the Court concludes that it is outside the scope of this action and does not indicate that circumstances have changed specific to the environmental effects *of the elk reduction program*, which is the only aspect of the NEPA analysis that Mayo has challenged in this case. *See Mayo* Compl. ¶ 73 (alleging that NPS has failed to comply with NEPA's requirements "for the consideration of environmental impacts *associated with the annual hunts*" (emphasis added)).

 Mayo points out that the number of elk on supplemental feed on the Refuge has grown significantly since the 2007 Management Plan was adopted. Thus, Mayo contends that the plan

---

[22] Mayo also references a newspaper article—discussing this very lawsuit—in which Grand Teton Senior Wildlife Biologist Steve Cain is quoted as stating that NPS has made "a significant change" to the elk hunt in past years. *See Mayo* Pls.' Mem. Supp. at 30; *see also* NPS-7288. Yet again, Mayo's quotation is selective. The full context explains that Mr. Cain was referencing the park's closure of an entire hunt area—Area 79—from hunting. *See* NPS-7288. For the same reasons elucidated above, this alteration to the hunt does not constitute a significant change warranting a supplemental EIS.

is "by Defendants' own omission, *not* being implemented in a manner designed to meet the

Plan's stated objective of reducing the number of elk dependent on artificial feed and thereby

facilitating a more natural ecological regime." *Mayo* Pls.' Opp'n & Reply at 22.  The record

confirms Mayo's factual contention that the number of elk wintering on the Refuge has grown

significantly.  *See, e.g.*, NPS-6851 (8,300 elk on the Refuge during the 2013–14 winter); *See*

NPS-7546 (8,400 elk on the Refuge during the 2014–15 winter).  In the most recent year, the

winter Refuge population exceeded both the number of elk that had wintered on the Refuge in

the winter before the 2007 Management Plan was even implemented, *see* NPS-2073 (6,800

wintered in 2005–06), and the population the NPS anticipated would winter there had the agency

never even implemented the plan, *see* NPS-1909 (forecasting up to 7,500 elk wintering in the

Refuge if the "no action" alternative was selected).

While these circumstances could possibly supply fodder for a supplemental NEPA claim

for other parts of the 2007 Management Plan,[23] they do not undermine the agency's analysis of

the environmental effects of elk hunting in the Park, specifically.  As Defendants note, "the fact

---

[23] Then again, maybe not.  According to the 2007 Management Plan, the ability to move
elk off supplemental feed depended on restoring portions of the elk's native winter habitat.  *See,
e.g.*, NPS-1920.  While the consistency and extent to which the elk population on the Refuge has
exceeded the 5,000 target since 2007 is unsettling, Defendants claim that the administrative
record before this court, compiled with reference to Mayo's challenge to the elk hunt, "contains
limited information addressing how the agencies are implementing the various habitat
development and feeding program objectives outlined in the Management Plan." *Mayo* Defs.'
Mem. Supp. at 25.  The 2007 Management Plan, itself, indicated that elk populations on the
Refuge in any one year had fluctuated considerably (from 3,300 to 11,000) between 1991 and
2006.  *See* NPS-2073.  And the record contains some suggestions that fluctuations are not
unexplainable or necessarily persisting.  *See* NPS-7454 (e-mail from Refuge biologist stating that
the cause "of the increasing proportion of the Jackson Elk Herd using NER feedgrounds over
time is unclear" but positing that "[p]ossible factors include annual changes in snow
accumulation, forage production, and wolf abundance from 2000 to 2015").  This Court takes no
position on the merits of a supplemental NEPA challenge regarding activities on the Refuge, but
merely notes that the record is not entirely clear-cut.

that one of the Plan's objectives has not yet been achieved is no proof that the Plan is not being

implemented." *Mayo* Defs.' Opp'n & Reply at 10.  And the administrative record contains no

indication that the fact that a larger herd segment is wintering on the Refuge has had a spillover

effect on the environmental impacts of elk hunting in the Park.  Elsewhere in their memorandum

Defendants point out that the number of permits issued to hunters has dropped to *below* the

number proposed in the 2007 Management Plan.  *See Mayo* Defs.' Mem. Supp. at 7–8; NPS-

2035 (proposing to lower the average number of hunters from 2,484 to 773–957).  And the

annual joint elk hunt recommendations demonstrate that the number of elk allowed to be

harvested each year in the Park has fallen from 600 elk to 300 elk.  *Compare, e.g.*, NPS-1895

(approving the harvest of 600 elk in hunt areas 75 and 79 in 2007), NPS-3382 (same for 2008)

*with* NPS-6142 (approving the harvest of only 300 elk in those areas for 2013), NPS-6851 (same

for 2014), NPS-7548 (same for 2015).  This roughly corresponds to the 2007 Management Plan's

expectation that in the "long term an estimated average of 232–287 elk per year would be

harvested."  NPS-2424.

Mayo challenges Defendants' response as a *post hoc* rationalization.  Yet, the record

indicates that the NPS had no opportunity to address this supplemental NEPA claim because

Mayo never presented the argument to the NPS.  Mayo's attorney, on his behalf, did submit a

letter to the NPS arguing that a supplemental analysis was necessary for various reasons.  But in

that letter, Mayo's counsel never raised the increase in elk on supplemental feed in the Refuge as

one such reason.[24]  *See* NPS-7553; *see also Davis*, 202 F.3d at 370 (noting that plaintiffs "never

---

[24] Defendants do not claim that Mayo failed to exhaust this supplemental NEPA claim. Without addressing the merits of any such argument, the Court notes that an exhaustion argument may have been available to Defendants. *Cf. Davis*, 202 F.3d at 370 (noting that "plaintiffs should have made a request to the Park Service and allowed it to make a decision"); *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 849 (9th Cir. 2013) (concluding that

requested a supplemental EIS or argued that one was required until they raised the issue in this Court" and explaining that, because the "decision whether a supplemental EIS is required should be made initially by the agency, not by a reviewing court, plaintiffs should have made a request to the Park Service and allowed it to make a decision").  In similar circumstances, courts in this circuit have nevertheless proceeded to consider the supplemental NEPA question on the merits where they have concluded that the purportedly "new information" is, in the court's view, of "questionable value" or otherwise flunks the deferential "reasonableness standard."  *Friends of the River v. FERC*, 720 F.2d 93, 109 (D.C. Cir. 1983) (noting that "[t]he record does not indicate that [plaintiff] ever presented a request to the Commission asking for supplementation of the EIS," but explaining that the court would "not consider the effect of FOR's apparent failure to approach the Commission first, however, since we reject [plaintiff's] request on its merits"); *see also Davis*, 202 F.3d at 370 (same); *Pub. Emps. for Envtl. Responsibility v. U.S. Dep't of Interior*, 832 F. Supp. 2d 5, 31 (D.D.C. 2011) (citing *Friends of the River* and refusing to remand where it would "conflict with the governing 'reasonableness standard'" and "would require the agency to conduct an identical analysis on this question when it is clear that it has already looked closely at the environmental consequences of this decision").

While the growing number of elk wintering in the Refuge may serve as one *justification* for continuing the elk reduction program in the Park, for purposes of NEPA, that factual reality does not show that the anticipated environmental *effects* of continued elk hunting in the Park—which the 2007 Management Plan already envisioned and analyzed—has significantly changed to warrant a supplemental analysis.  Mayo fails to explain how an increase in elk wintering on

plaintiff exhausted its claim that "the Forest Service violated NEPA by not preparing a supplemental EIS" when the plaintiff submitted a letter to the agency which allowed it "to give the issue meaningful consideration" (internal quotation marks and citation omitted)).

the Refuge may have meaningfully changed the anticipated environmental impacts of the fall elk hunt *in the Park*.  *Cf. Pub. Emps. for Envtl. Responsibility*, 832 F. Supp. 2d at 29–30 ("[W]hether a change is 'substantial' so as to warrant an SEIS is determined not by the modification in the abstract, but rather by the significance of the environmental effects of the changes.").  Therefore, the Court does not believe the NPS acted arbitrarily and capriciously in failing to prepare a supplemental NEPA analysis regarding the elk reduction program, notwithstanding the growing winter elk population on the Refuge.[25]

*        *        *

To summarize, the Court concludes that in the EIS created for the 2007 Management Plan the NPS took the requisite "hard look" at the environmental consequences of continuing the elk reduction program in the Park.  While that document was a programmatic analysis in the sense that it considered a multitude of agency actions across several federal management areas, the EIS also contained a detailed analysis of the environmental impacts of elk hunting at a particular site: the Park.  And none of the circumstances Mayo raises indicate that the agency has acted arbitrarily and capriciously in declining to conduct a supplemental NEPA review.  Accordingly, the Court will grant summary judgment to Defendants on Mayo's NEPA claim.

---

[25] Although outside the scope of this action, the Court notes that the most recent NPS briefing statement states the following: "The NER [National Elk Refuge] and GRTE [Grand Teton National Park] anticipate resistance from WGFD to include in the AMP [Adaptive Management Plan] a process and desire to phase out feeding on the NER."  NPS-7535.  This sentiment, of course, does not necessarily indicate what will come to pass.  But the Court reminds Defendants that the D.C. Circuit previously stated quite clearly that: "We take the Secretary at his word that Wyoming has no veto over the Secretary's duty to end a practice that is concededly at odds with the long-term health of the elk and bison in the Refuge."  *Defs. of Wildlife*, 651 F.3d at 118.

## B. The Enabling Act Claim

The Grand Teton National Park Enabling Act provides that the Park's conservation program for the elk "shall include the controlled reduction of elk in such park . . . when it is found necessary for the purpose of proper management and protection of the elk." 16 U.S.C. § 673c(a). Mayo contends that the NPS's 2015 decision authorizing elk hunting in the park is arbitrary and capricious because the NPS has not explained the basis for its finding.[26] *Mayo* Compl. ¶¶ 68–70; *see also Mayo* Pls.' Mem. Supp. at 39–40.

The record plainly contradicts Mayo's claim. The 2015 hunt decision states that "a controlled reduction of elk in Grand Teton National Park (GTNP) in 2015 is necessary for the proper management and protection of the elk," based on the Governor and the NPS Regional Director's Superintendent's "joint review of the Jackson elk herd," including the herd's "size, composition, and ratios," migration patterns, the number of elk on supplemental feed in the Refuge, and "other technical information." NPS-7543. The decisional document also attached the joint recommendation of WGFD's Director and the Park's Superintendent "for the purpose of providing a more complete understanding of the need for the 2015 Elk Reduction Program." *Id.* That document explained that the proposed hunting program "has the long-range objectives of

---

[26] Mayo argues that the 2015 hunt decision, "as with the agency's past decisions" is arbitrary and capricious. *Mayo* Pls.' Mem. Supp. at 40. Yet, Defendants claim that any challenges to the past hunt decisions are now moot because those hunts have been completed. *See Mayo* Defs.' Mem. Supp. at 15. Mayo does not responded to this contention, so the Court treats it as conceded. In addition, while the parties were in the process of briefing these cross-motions, the 2015 elk hunt came and went. Defendants have not argued, however, that the 2015 elk hunt decision is now mooted. Thus, the Court will consider the statutory challenges to the 2015 decision, noting that these issues are "capable of repetition, yet evading review." *See Defs. of Wildlife, Inc. v. Endangered Species Sci. Auth.*, 659 F.2d 168, 175 (D.C. Cir. 1981) (concluding that a challenge to bobcat export limits for the 1979–1980 season was not moot, even after the season concluded, because the annual orders are "capable of repetition, yet evading review").

reducing the need to harvest elk within GTNP, continuing progress toward restoring historical

distributions and migration patterns, and encouraging elk to use historic fall and winter range

areas in the southern half of GTNP." NPS-7546. The recommendation notes that the 2007

Management Plan endeavored to manage the elk herd toward the goal of establishing an overall

population of 11,000, a winter elk population on the Refuge of 5,000, and a bull-to-cow ratio

"more reflective of non-hunted populations." *Id.* And the report went on to detail that 8,400 elk

had wintered on the Refuge in the prior winter (above the 5,000 elk objective), that the summer

bull-to-cow ratio was 23-to-100 (below the recommended 35-to-100 ratio), and that the elk herd

population was at 11,000 (within the state's objective for the herd). NPS-7546–47.

Accordingly, the recommendation stated that "a harvest of elk that summer in GTNP and

hunt areas 78, and winter on the NER [the Refuge] is desired," and concluded that "[t]he

proposed season structure should lead to restoration of traditional elk numbers and migration

patterns . . . and reduce elk numbers toward the NER [the Refuge] objective of 5,000 elk." NPS-

7547. It proposed particular geographic hunt areas to further these objectives, and also proposed

prohibiting the harvesting of bulls in the Park. *See* NPS-7547–49. The agency's decision

therefore articulates "a satisfactory explanation for its action" that includes "a 'rational

connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting

*Burlington Truck Lines*, 371 U.S. at 168).

Mayo claims that because the Governor and Superintended decided a hunt was necessary

despite the fact that the 11,000 elk herd population objective is now being met, the NPS's

determination is arbitrary and capricious and contrary to the evidence before the agency. Not so.

The agency's analysis clearly conceded that the 11,000 elk population target was being met.

NPS-7547. But it indicated that the *other* objectives which were not being met—particularly the

winter Refuge population and the bull-to-cow ratio—drove its decision.[27]  *Id.*; *see Tenneco Gas*

*v. FERC*, 969 F.2d 1187, 1196 (D.C. Cir. 1992) ("Where an agency has considered the relevant

data and articulated a satisfactory explanation for the policy choice made, its choice will be

upheld.").  The agency adequately explained why it considered a reduction program in 2015

"necessary for the proper management and protection of the elk," and therefore it was not

arbitrary and capricious.

---

[27] This reality obviates any need for the Court to consider or definitively resolve whether NPS's reliance on Wyoming's 11,000 elk herd population objective would be arbitrary and capricious.  This issue raises potentially difficult statutory, scientific, and federalism questions that the parties address only perfunctorily in their briefing.  The statute specifically instructs the NPS and WGFC to "jointly" conduct field studies and investigations in order to recommend a program to ensure the conservation of the elk in the Park.  16 U.S.C. § 673c.  The NPS invokes this language and makes a passing, but somewhat undeveloped *Chevron* argument that appears to claim that the agency's reliance on Wyoming's herd objective is reasonable and "gave consideration to Wyoming's interests, as the Enabling Act contemplates."  *Mayo* Defs.' Mem. Supp. at 38, 40 n.23.  Mayo claims that this objective has no scientific foundation and, in any event, that the NPS has a duty to verify that the objective will further proper management and protection of the elk.  *Mayo* Pls.' Mem. Supp. at 42.  None of the parties have pointed to a compelling explanation in the administrative record in this case for the 11,000 objective.  For its part, Wyoming's cross-motion for summary judgment sheds no light on the basis for the population objective.  *See Mayo* Wyo.'s Mem. Supp. at 30–32.  Defendants cite to a 1989 book in the record discussing the Jackson Elk herd—a book which was written neither by the NPS nor WGFD—as providing an explanation of "how Wyoming derives its herd objective."  *Mayo* Defs.' Reply at 23 (citing NPS-921, at 181–85).  But, so far as the Court can tell, the cited pages do no more than state that "[d]etermining a desirable size for the elk herd . . . requires that a number of interests be compromised," and state that Wyoming has set an 11,000 objective.  NPS-921, at 181, 182.  There is no explanation of the scientific basis for that objective.

   At the same time, however, the Court is sensitive to Defendants' contention that the 11,000 herd objective was selected as part of the elk management plan adopted in the 2007 Management Plan, and that the Plaintiffs or other parties could have challenged that objective as arbitrary and capricious, but did not do so within the six-year statute of limitations.  *See* 28 U.S.C. § 2401(a).  Moreover, as part of that process the NPS presumably determined that maintaining the herd at 11,000 elk was consistent with the long-term conservation of the elk.  *See Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004) ("When an agency is evaluating scientific data within its technical expertise, an extreme degree of deference to the agency is warranted.").  Ultimately, because the joint recommendation conceded that the overall population objective was being met but nevertheless concluded that a hunt was necessary to meet *other* objectives of the 2007 Management Plan, the Court need not resolve the issue in order to uphold the 2015 elk hunt determination.

## C.  The Organic Act Claim

The National Park Service Organic Act mandates, in relevant part, that the Secretary of the Interior, acting through the Director of the NPS, "shall promote and regulate the use of the National Park System" by means that "provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a).[28]  Mayo argues that NPS's Management Policies require the agency to make an explicit "non-impairment" finding when it takes any action that may impair park resources, and he claims that "the record reflects no such determination being made for the 2015 hunt," or any of the previous years.  *Mayo* Pls.' Mem. Supp. at 44; *see also* Compl. ¶¶ 71–72.

Putting aside the parties' arguments about whether the agency is required to issue a non-impairment decision in writing,[29] it is clear that the NPS made an explicit, written non-

---

[28] The Organic Act was previously codified in Title 16, but was recently recodified, along with other provisions relating to the NPS, in Title 54.  *See generally* National Park Service and Related Programs Act of 2014, Pub. L. No. 113-287, 128 Stat. 3094.

[29] The NPS's Management Policies provide that "[b]efore approving a proposed action that could lead to an impairment of park resources and values, an NPS decisionmaker must consider the impacts of the proposed action and determine, in writing, that the activity will not lead to an impairment of park resources and values."  *See Mayo* Pls.' Mot. Summ. J. Ex. C at 7, ECF No. 35-3 (reproducing § 1.4.7 of NPS's Management Policies).  The Management Policies are non-binding and not judicially enforceable.  *See The Wilderness Soc'y v. Norton*, 434 F.3d 584, 596 (D.C. Cir. 2006) ("[T]he conclusion is inescapable that the Management Policies [are] a nonbinding, internal agency manual intended to guide and inform Park Service managers and staff" and "[t]here is no indication that the agency meant for these internal directives to be judicially enforceable.").  Courts in this district have said, however, that, "like any other agency," when implementing the Organic Act, the NPS must "'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 100 (D.D.C. 2006) (quoting *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005)).  Here, the 2007 Management Plan provides such a justification, so the Court need not determine the relevance of NPS's Management Policies, if any, in setting forth the form in which an agency must make a non-impairment finding.

impairment finding here.  The 2007 Management Plan's Record of Decision states unequivocally

that the plan's "preferred alternative will not impair resources within Grand Teton National Park

. . . and will not violate the National Park Service Organic Act."  NPS-3078.  While Mayo refers

to the statement as "conclusory"—and, viewed only in isolation, it is—a court "will uphold a

decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman*

*Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).  The NPS's conclusion in

its Record of Decision was meant to encapsulate the agency's lengthy analysis of the 2007

Management Plan.  And, throughout that analysis, the NPS explicitly explained why it did not

believe elk hunting in the Park would impair the Park's resources.  *See, e.g.*, NPS-2160

(acknowledging that "[c]ontinued elk herd reduction in parts of Grand Teton National Park

would detract from the naturalness of the scenery for some visitors during the fall and early

winter," but concluding that "[m]oderate to large numbers of elk and bison on the refuge and in

the park would continue to be important elements of the scenery of Jackson Hole" and that

Alternative 4, overall, "would not result in the impairment of visual resources in the park");

NPS-2250 ("Barring the introduction of serious non-endemic disease, Alternative 4 would not

impair the elk population in the park"); NPS-2310 ("This alternative would not result in the

impairment of wolves, grizzly bears, or bald eagles in the park.").  Moreover, the Enabling Act

specifically provides for hunting in the park.  *See Fund for Animals v. Mainella*, 294 F. Supp. 2d

46, 55 (D.D.C. 2003) ("The Court defers to the agency's view that permitting hunting to occur in

the Recreation Area does not violate the Organic Act, as it is an activity clearly permitted by the

Enabling Act.").

Finally, to the extent Mayo claims that the impairment decision is "outdated" because

recent agency briefing statements emphasize the effects of the elk reduction program on other

park resources and values, *see Mayo* Pls.' Opp'n & Reply at 44–45, the Court concludes for the same reasons it concluded that no supplemental NEPA analysis was warranted that nothing in the record indicates that the effects on other Park resources are different in kind than they were anticipated to be in 2007, *see, e.g.* note 21, *supra*.  That elk hunting may *conflict* with other park management goals does not undermine NPS's reasoned conclusion that it does not *impair* them, to which this court should defer.  *Cf. Davis*, 202 F.3d at 365 ("Because the Organic Act is silent as to the specifics of park management, the Secretary has especially broad discretion on how to implement his statutory mandate.").  On the basis of this record, Mayo's Organic Act claim fails.

### D.  The Endangered Species Act Claims

Sierra Club brings several claims under the Endangered Species Act, contending that the FWS's 2013 Addendum could not lawfully amend the 2007 BiOp's incidental take statement or, alternatively, that the 2013 Addendum is arbitrary and capricious for various reasons.  Mayo has incorporated Sierra Club's arguments by reference, *See Mayo* Pls.' Mem. Supp. at 35–36, and adds two additional grounds for finding the 2013 Amendment arbitrary and capricious.  The Court will discuss each argument in turn.

### 1.  Statutory Background

The ESA "seeks to protect species of animals against threats to their continuing existence caused by man," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 558 (1992), and is considered "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," *Tenn. Valley Auth. v. Hill*, 437 U.S. 152, 180 (1978).  A species may be listed under the Act as either "endangered" or "threatened."  16 U.S.C. § 1533.  A species listed as "threatened," like the grizzly bear, is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  *Id.* § 1532(20).  The FWS

and the National Marine Fisheries Service ("NMFS") jointly administer the ESA, although because the FWS administers the Act with respect to those species under the Secretary of Interior's jurisdiction, the FWS is the relevant agency for purposes of this case.  *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 651 (2007).

After a species is listed as endangered or threatened, Section 7 of the ESA requires that every federal agency, in consultation with the Secretary of the Interior, "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species."[30]  16 U.S.C. § 1536(a)(2).  After an agency formally consults with the FWS, the service issues what is called a "biological opinion" (or "BiOp") which sets forth whether the service believes that "the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat."  50 C.F.R. § 402.14(g)(4).  In the course of formulating its BiOp, the FWS must "use the best scientific and commercial data available."  16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.14(g)(8).

If the FWS "concludes that the agency action is not likely to jeopardize the continued existence of the species but is nonetheless likely to result in some "'incidental take'" of the species, "the BiOp must set forth an Incidental Take Statement, which specifies the permissible 'amount or extent' of this impact on the species."  *Oceana, Inc. v. Pritzker*, --- F. Supp. 3d ----, 2015 WL 5138389, at *2 (D.D.C. Aug. 31, 2015) (quoting 16 U.S.C. § 1536(b)(4)(B)); *see also* 50 C.F.R. § 402.14(i)(1) ("In those cases where the Service concludes that an action . . . and the

---

[30] The ESA also requires agencies to ensure that their actions are not likely to "result in the destruction or adverse modification of habitat" of any endangered or threatened species, 16 U.S.C. § 1536(a)(2), a mandate not at issue in this case, *see* FWS-1689 ("No critical habitat has been designated for grizzly bears, therefore none would be affected.").

resultant incidental take of listed species will not violate section 7(a)(2) . . . the Service will provide with the biological opinion a statement concerning incidental take"). To "take" an animal is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). In its BiOp, the FWS must also specify the "reasonable and prudent measures" that the Director "considers necessary or appropriate to minimize" the action's impact. 50 C.F.R. § 402.14(i)(1)(ii). If takes occur under the conditions provided for in the Incidental Take Statement, those takes are permissible, notwithstanding the ESA's prohibition on taking listed species. *See id.* § 402.14(i)(5); 16 U.S.C. § 1538(a)(1).

Finally, regulations require that the FWS and the applicable agency reinitiate formal consultation in four situations, including if "the amount or extent of taking specified in the incidental take statement is exceeded," if "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," or if "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion." 50 C.F.R. § 402.16.

## 2. Standing

Intervenor-Defendant Safari Club first claims that the Plaintiffs in both cases have failed to establish standing to bring their ESA claims. Yet, Plaintiffs easily satisfy the strictures of Article III and prudential standing.

"The 'irreducible constitutional minimum' for standing is (i) the party must have suffered a concrete and particularized injury in fact, (ii) that was caused by or is fairly traceable to the actions of the defendant, and (iii) is capable of resolution and likely to be redressed by judicial decision." *Sierra Club v. EPA*, 755 F.3d 968, 973 (D.C. Cir. 2014). In other words, to establish

standing as a constitutional matter a plaintiff must "demonstrate the existence of a 'personal injury fairly traceable to the opposing party's allegedly unlawful conduct and likely to be redressed by the requested relief." *Delta Air Lines, Inc. v. Exp.-Imp. Bank of U.S.*, 85 F. Supp. 3d 250, 260 (D.D.C. 2015) (brackets omitted) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). And, to show an injury in fact, a plaintiff must have suffered "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted).

For good reason, Safari Club does not dispute that Mayo, Nelson, and the members of Sierra Club, the Western Watersheds Project, and the Center for Biological Diversity have concrete and particularized interests in viewing the grizzly bear in the Park. *See Mayo* Safari Club's Mem. Supp. Cross-Mot. Summ. J. & Opp'n Pls.' Mot. at 4–5 ("*Mayo* Safari Club's Mem. Supp."), ECF No. 43; *Sierra Club* Safari Club's Mem. Supp. Cross-Mot. Summ. J. & Opp'n Pls.' Mot. at 2 ("*Sierra Club* Safari Club's Mem. Supp."), ECF No. 33; *accord Lujan*, 504 U.S. at 561; *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 432 (D.C. Cir. 1998) (en banc) ("The Supreme Court has repeatedly made clear that injury to an aesthetic interest in the observation of animals is sufficient to satisfy the demands of Article III standing."). For two reasons, however, Safari Club contends that an injury to Plaintiffs' aesthetic interest is not sufficiently actual or imminent to confer standing.

First, they claim that Plaintiffs have not shown any likelihood that their conceded interests will be harmed, because they cannot show it is imminent that another grizzly bear will actually be *taken* as a result of the elk reduction program. *Mayo* Safari Club's Mem. Supp. at 5. In focusing solely on the take of a grizzly bear, Safari Club asserts a crabbed view of the injury

to Plaintiffs' interest. *See Animal Legal Def. Fund*, 154 F.3d at 437 ("[T]here is no case that we know of establishing that the elimination of a species or even the deaths of particular animals is an indispensable element of the plaintiffs' aesthetic injury, and we see no reason to import such a requirement into our standing doctrine so late in the day."). Mayo and Nelson assert that their aesthetic interests in the grizzly bear will be injured more generally because they are unable to view the animals "under natural, undisturbed conditions, when their innate characteristics and behaviors are more readily observed." *See* Mayo Decl. ¶ 1, ECF No. 35-1; Nelson Decl. ¶¶ 5–6, ECF No. 35-2. Sierra Club's, Western Watersheds Project's, and Center for Biological Diversity's members do the same. *See, e.g.*, Camenzind Decl. ¶ 8, ECF No. 26-2; Ratner Decl. ¶ 11, ECF No. 26-4. These types of injuries are "clearly cognizable." *Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45, 52 (D.C. Cir. 1988) (finding that where "the existence of hunting on wildlife refuges forces Society members to witness animal corpses *and environmental degradation*, in addition to depleting the supply of animals and birds that refuge visitors seek to view," the plaintiffs had asserted "classic aesthetic interests, which have always enjoyed protection under standing analysis"); *see also Pub. Emps. for Envtl. Responsibility v. U.S. Dep't of the Interior*, 832 F. Supp. 2d 5, 18 (D.D.C. 2011) (rejecting standing challenge because plaintiffs' declarations asserted that "the noise and visual effects of increased hunting in the March through September time period will impair their enjoyment and professional pursuits in that area"). And the record here supports that even though the FWS determined that the 2007 Elk Management Plan continued to pose no jeopardy to the grizzly bear, the risk of such aesthetic injuries was actual or imminent. *See* FWS-1662 (noting in 2013 Addendum that "[i]t is likely grizzly bears will continue this behavior, resulting in a relatively high risk of hunter-grizzly bear contacts as long as the ERP [Elk Reduction Program] is necessary").

Even if the Plaintiffs were required to show that another grizzly bear mortality was not conjectural or hypothetical in order to demonstrate an interest to their aesthetic interests in viewing and observing the grizzly bear, the FWS's conclusion that up to four bears will be taken during the remaining nine years of the 2007 Management Plan is sufficient to show an imminent injury. *See* FWS-1662–63. The connection between the 2007 Management Plan and the injury to Plaintiffs' aesthetic injuries is thus amply "supported by the administrative record."[31] *Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 480 (D.D.C. 2014).

Second, Safari Club also claims that Plaintiffs have not established that a grizzly bear might be taken "from an area where the Plaintiffs visit" or "would be a grizzly bear that the Plaintiffs would have been likely to see." *Mayo* Sierra Club's Mem. Supp. at 6. But Plaintiffs' declarations demonstrate that they regularly visit the Park and observe particular grizzly bears in the areas of the park open to elk hunting, where the 2007 Management Plan's effects are felt. This is not a case in which the plaintiffs have stated only that they "use unspecified portions of an immense tract of territory." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). In the Court's view, any requirement that the Plaintiffs further pinpoint the exact location where a grizzly bear is most likely to be taken or disturbed, or a particular bear that will be harmed,

---

[31] Moreover, although the Court is not aware of a court in this district to have reached the question, several courts have construed claims of violations to Section 7's consultation requirement as "a procedural injury for standing purposes." *Nat. Res. Def. Council, Inc. v. Jewell*, 749 F.3d 776, 787 (9th Cir. 2014); *see also Salmon Spawning & Recovery Alliance v. U.S. Customs & Border Protection*, 550 F.3d 1121, 1132 (Fed. Cir. 2008); *accord Lujan*, 504 U.S. at 572 n.7 (explaining that "[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability *and immediacy*" (emphasis added)). In those cases, it is enough for the plaintiff to show that the agency's compliance with the section "*could* protect his concrete interests." *Jewell*, 749 F.3d at 783 (emphasis in original). If this district were to adopt that standard, the FWS's acknowledged likelihood that up to four bears would be taken during the remainder of the 2007 Management Plan's operation demonstrates that the agency's compliance with Section 7— should Plaintiffs' claims prove meritorious—could protect Plaintiffs' aesthetic interests.

would establish a nearly impossible standard. Instead, courts have consistently held in ESA cases that an alleged injury to a population segment of animals the plaintiffs have directly visited, observed, or studied is sufficient to support standing. *See, e.g.*, *Oceana, Inc.*, 75 F. Supp. 3d at 480 (distinguishing *Lujan* because plaintiffs "study and observe loggerheads who belong to the specific population segment that is adversely affected" by the challenged action); *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 92 (D.D.C. 2006) (finding standing where "plaintiffs . . . have attested to their present and continued use of specific areas in close proximity to the wells and to areas that are directly affected by the wells"). Anything more specific would demand a far-too-narrow focus that plaintiffs would find difficult to meet.

Finally, the parties also dispute whether the "zone of interest" test applies to this case.[32] Whether it does or not is ultimately immaterial because clear circuit precedent provides that Plaintiffs here fall within that zone. Safari Club argues that the ESA is designed to "protect threatened and endangered species and their habitat," not to "protect an interest in recreating in an area in which a legal elk hunt is authorized"—although it acknowledges the plaintiffs' allegations regarding the elk hunt concern the hunt's "interfer[ence] with their aesthetic

---

[32] Mayo argues that the test is inapplicable because the ESA's citizen-suit provision displaces the zone of interest test, and he has sued NPS, the action agency, for its own violations of the ESA. *Mayo* Pls.' Opp'n & Reply at 7. The Supreme Court has held that the provision "negates the zone-of-interests test," but the Court also concluded in that same opinion that, while the provision provides a cause of action against the agency conducting the action which might jeopardize the species, the ESA's citizen-suit provision *does not* reach the actions of the Secretary in administering the ESA. *See Bennett v. Spear*, 520 U.S. 154, 164, 173–74 (1997); *see also Building Indus. Ass'n v. Babbitt*, 979 F. Supp. 893, 900 (D.D.C. 1997). Some ambiguity is caused in this case by the fact that the relevant "action agency," the NPS, is also an agency within the Department of the Interior and overseen by the Secretary. Hence, despite the Supreme Court's somewhat broadly-worded language, the citizen-suit provision likely reaches *NPS*'s own activities. In any event, Mayo does not dispute that he primarily challenges the FWS's own actions in preparing its 2013 Addendum, so the Court must consider the zone of interests regardless. The Court does not determine whether Mayo would have had to satisfy the zone of interest test had he sued only the NPS.

experience photographing elk and other wildlife." *Mayo* Safari Club's Mem. Supp. at 7.  Yet, an interest in species preservation and aesthetic interests in observing those species go hand-in-hand, as clear circuit precedent has held:  "[T]the activities of observing and studying such wild animals and birds are within the zone of interests protected by the ESA." *Humane Soc. of the U.S.*, 840 F.2d at 61 (internal quotation marks omitted).

Safari Club also notes, correctly, that the zone of interests test does require a court to look "to the substantive provisions of the ESA, the alleged violations of which serve as the gravamen of the complaint." *Bennett v. Spear*, 520 US. 154, 175 (1997).  The organization falters, however, in suggesting that aesthetic interests somehow fall outside the zone of interests intended to be protected by Section 7's requirement that agencies consult regarding the impacts of their actions on endangered or threatened species. *See Mayo* Safari Club's Reply at 3–4, ECF No. 51.  Plaintiffs challenge the NPS's and FWS's consultation process here because they claim it undermines, and therefore threatens, the protection of the grizzly bear which the consultation requirement is intended to ensure. *See Bennett*, 520 U.S. at 176 (noting that an "obvious purpose" of Section 7's requirement that an agency "use the best scientific and commercial data available" is to "ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise," which "no doubt serves to advance the ESA's *overall goal of species preservation*," in addition to other interests (emphasis added)); *see also Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1236 (D.C. Cir. 1996) ("Protecting the grizzly bear . . . is certainly within any zone of interests contemplated by the ESA.").  Thus, their asserted injuries fall within the zone of interests Section 7 of the ESA protects.

Plaintiffs in both cases have standing to pursue their ESA claims.[33]

### 3.  Analysis

#### a.  The FWS's Use of an Addendum

Sierra Club's first challenge to the 2013 Addendum is essentially one of process.  The ESA's implementing regulations require federal agencies or the FWS to reinitiate formal consultation regarding an agency action's effects on an endangered or threatened species in several situations.  These situations include if "the amount or extent of taking specified in the incidental take statement is exceeded" or if "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered."  50 C.F.R. § 402.16(a)–(b).  Here, the NPS reinitiated consultation with the FWS once the incidental take authorized by the 2007 BiOp was reached, but before it was *exceeded*.  After the NPS requested to reinitiate consultation, the FWS prepared a memorandum it described as an "addendum" to the 2007 BiOp.  FWS-1661.  The addendum documented the FWS's "analysis of the Park's new information, tiers off of our original biological opinion, and provides a new Incidental Take Statement . . . reflect[ing] current conditions within the Park and Refuge."

---

[33] Defendants have not raised standing and Safari Club does not claim that Plaintiffs lack standing to pursue their other claims.  Regardless, the Court similarly finds that Plaintiffs have standing to bring their NEPA, Organic Act, and Enabling Act claims, for the same reasons provided above.  *See, e.g.*, *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 479 (D.C. Cir. 2009) (holding that an organization established standing for a NEPA challenge where its members showed "that they possesse[d] a threatened particularized interest" to "their enjoyment of the indigenous animals of the Alaskan areas listed in the Leasing Program," the plaintiffs' affidavits "demonstrate[d] a sufficiently immediate and definite interest in enjoyment of the animals" because they had detailed "definite dates in the near future" of when they would observe the potentially harmed species, and because plaintiffs had shown that the adoption of the program challenged on NEPA grounds "could cause a substantial increase in the risk to their enjoyment of the animals affected by the offshore drilling"); *Mountain States Legal Found.*, 92 F.3d at 1236 ("[P]laintiffs whose members use the Upper Yaak for such purposes as hiking are plainly within the zone of interests protected by NEPA.").

FWS-1662. The FWS asserted that the addendum and new incidental take statement "supersede[d] the previous 2007 ITS [incidental take statement]" and stated that "this addendum and new ITS are valid for the remaining 9 years under the 2007 biological opinion." *Id.* The addendum's new incidental take statement anticipated that four additional grizzly bears (for a total of five) might be incidentally taken in the Park, and an additional two bears may be taken on the Refuge.

Sierra Club contends that once NPS requested to reinitiate consultation, the FWS could not lawfully use an addendum to amend the 2007 BiOp's incidental take statement. *See Sierra Club* Pls.' Mem. Supp. Mot. Summ. J. ("*Sierra Club* Pls.' Mem. Supp.") at 21–27, ECF No. 26. Indeed, Sierra Club seems to labor under the impression that by issuing an addendum, the FWS failed to engage in formal consultation at all. *See Sierra Club* Pls.' Mem. Opp'n to Defs.' & Intervenors' Mots. Summ. J. & Reply at 11 ("*Sierra Club* Pls.' Opp'n & Reply"), ECF No. 36 (stating that "FWS cannot lawfully provide 'a statement concerning incidental take' without first legitimately completing th[e] formal consultation process"). Instead, Sierra Club claims that reinitiation of "formal consultation" invariably requires the preparation of an entirely new biological opinion. *See Sierra Club* Pls.' Mem. Supp. at 22. But, even if issuing an addendum was permissible, Sierra Club argues that it was not appropriate in this case because the addendum left undiscussed significant circumstances that had arisen since the 2007 BiOp was first issued.

The Court rejects Sierra Club's broader argument. Sierra Club has identified no authority for its proposition that, whenever the FWS reinitiates formal consultation, the consultation must result in the production of a new, full-blown BiOp. In fact, the FWS's *Consultation Handbook*, which details procedures for conducting consultation under Section 7 of the ESA, expressly

provides for an addendum as a method of revising a BiOp's incidental take statement following the reinitiation of consultation.  The handbook provides that "[d]ocumentation of a reinitiated consultation must be in writing, and must contain sufficient information to record the nature of the change in the action's effects and the rationale for amended analyses of anticipated incidental take or the reasonable and prudent alternatives or measures."  U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook*, at 4-64–4-65 (March 1998), https://www.fws.gov/ENDANGERED/esa-library/pdf/esa_section7_handbook.pdf [hereinafter "*Consultation Handbook*"].  And the handbook provides an example of a modified incidental take statement which, like the addendum at issue here, is brief and simply sets forth the new information and justifies the changes to the existing BiOp.[34]  *Compare Consultation Handbook* at 4-66–4-67, *with* FWS-1661–64.

There is nothing in the ESA or its implementing regulations that expressly forecloses the use of an addendum to update a BiOp.  The ESA merely requires that the Secretary "provide to the Federal agency . . . a written statement setting forth the Secretary's opinion."  16 U.S.C. § 1536(b)(3)(A); *see also id.* § 1536(b)(4) (explaining what must be included in that "written statement").  The ESA's implementing regulations similarly provide that a BiOp must include a

---

[34] Intervenor Wyoming also identifies several cases in which courts have noted that an addendum or amendment to a BiOp was issued.  *See, e.g.*, *Grand Canyon Tr. v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1015 (9th Cir. 2012) ("In response to the district court's remand, FWS issued a 2009 Supplement to the 2008 BiOp which together with the 2008 BiOp constituted the 2009 BiOp."); *Tulare Lake Basin Water Storage Dist. v. United States*, 59 Fed. Cl. 246, 248 (2003) (describing the amendment of a National Marine Fisheries Service biological opinion "by letters" after the NMFS "concluded that the incidental take of the winter-run chinook salmon appeared to be greater than anticipated in its biological opinion"); *Mausolf v. Babbitt*, 125 F.3d 661, 670 (8th Cir. 1997) (describing the FWS's "1994 supplement" to its 1992 biological opinion).  Sierra Club is correct to point out that these cases did not expressly analyze the *validity* of the agencies' doing so.  But these cases at least demonstrate that, as the *Consultation Handbook* suggests, preparing a brief addendum or amendment is not unusual.

"summary of the information on which the opinion is based," a "detailed discussion of the effects of the action on listed species or critical habitat," and the FWS's opinion on whether the action will or will not jeopardize the continued existence of a listed species. 50 C.F.R. § 402.12(h). Where a full BiOp already exists for a particular federal action, and an agency seeks to reinitiate consultation with the FWS, the regulations do not specify what the *product* of the reinitiated formal consultation should be. Sierra Club has pointed to no case, statute, regulation, or agency guidance document accepting its argument that the FWS is prohibited from relying, by reference, on the original BiOp if that information remains relevant and unchanged. In the Court's view, it is reasonable for the FWS to have interpreted the regulation to allow it to create an addendum, incorporating the prior BiOp to the extent information therein has not changed, in lieu of producing a new—and likely duplicative—BiOp. When circumstances have not meaningfully changed, and the FWS indicates as much by referencing its prior BiOp, the Court does not read the regulation to require FWS to meaninglessly parrot or reproduce its prior analysis in a new BiOp. This Court will defer to the agency's discretion in determining the procedures necessary to fulfill its statutory duties.[35]   *Cf. Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978) ("[T]his Court has for more than four decades emphasized that the formulation of procedures was basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments.").

---

[35] The Court also finds Sierra Club's repeated emphasis on the addendum's passing use of the term "tier" unwarranted. FWS clearly referred to the document as an "addendum to our biological opinion." FWS-1661. Read in context, the Court agrees with Defendants that the addendum's assertion that it "documents our analysis of the Park's new information, tiers off of our original opinion, and provides a new Incidental Take Statement," FWS-1662, is simply an acknowledgement that the bulk of the 2007 BiOp's analysis remained unchanged.

Sierra Club also relies on the regulation's description of the FWS's "responsibilities during formal consultation."  The regulation states that the FWS must "[r]eview all relevant information provided by the Federal agency or otherwise available," "[e]valuate the current status of the listed species or critical habitat," "evaluate the effects of the action and cumulative effects on the listed species or critical habitat," and then "[f]ormulate its biological opinion."  50 C.F.R. § 402.14(g)(1)–(4).  There is every indication that the FWS did so here: it considered the new information the NPS provided by memo, *see* FWS-1564–68, FWS-1662; it discussed the current status of the grizzly bear with specific reference to recent Interagency Grizzly Bear Study Team findings, *see* FWS-1663–64; and it evaluated those effects in the addendum and, by reference, the 2007 BiOp, *see generally* FWS-1661–98.  The operative question is what *form* the biological opinion resulting from the second, reinitiated consultation should take.  And there is nothing to indicate that the FWS cannot confine the "written statement" it issues after formal consultation to an addendum that simply discusses the new information that gave rise to the request to reinitiate consultation and incorporate by reference any undisturbed portions of the original BiOp.[36]

---

[36] As Sierra Club points out, the *Consultation Handbook* seems to indicate that the agency will prepare a more extensive document in certain situations.  The handbook says that "[r]einitiations involving major changes in effects analyses or changes in the Services' biological opinion are addressed fully in a new consultation."  *Consultation Handbook* at 4-65.  It is not immediately clear, however, what constitutes a *new consultation*, how a new consultation is distinct from a *reinitiated consultation*, or whether a new consultation requires an entirely new BiOp.  In fact, the handbook further suggests that, even in a new consultation, a prior BiOp may still be referenced when it states that "[a] reinitiation based on a new species listing or critical habitat designation is treated as a new consultation, although *data in the original opinion* may be referenced when the action has not changed."  *Consultation Handbook* at 4-65 (emphasis added).  In any event, the Court need not determine in this case when a new consultation or full BiOp might be required by the agency's policies.  As explained below, the Court concludes that the circumstances Sierra Club raises do not constitute significant new circumstances or effects facing the grizzly bear.

In the alternative, Sierra Club also argues that the 2013 Addendum was insufficient, and the agency should have prepared an entirely new BiOp, because several categories of new information reveals that elk hunting in the Park is effecting the grizzly bear "in a manner or to an extent not previously considered" by the 2007 BiOp. 50 C.F.R. § 402.16(a)–(b). The Court finds none of these arguments persuasive.

First, Sierra Club contends that the addendum failed to take into account the decline of the whitebark pine in the GYE, whose seed cones have been a reliable food source for the grizzly bear. *See Sierra Club* Pls.' Mem. Supp. at 25; *see also, e.g.*, FWS-2072 (2012 Annual Report of the Interagency Grizzly Bear Study Team discussing the decline). But the 2013 Addendum makes clear, albeit somewhat obliquely, that the FWS considered the declining food source in again confirming that it did not believe the number of bears affected by the Plan would jeopardize the continued existence of the GYE grizzly bear. The addendum acknowledged that the grizzly bear population growth rate has slowed. *See* FWS-1663. The FWS stated, however, that "[t]he slowing population growth rate has been anticipated and may be due to one or a combination of density-dependent effects or *declines in key food sources*." *Id.* (emphasis added). In that paragraph the FWS noted that it drew its population estimates from the Interagency Grizzly Bear Study Team's ("IGBST") 2011 Report. The report, itself, explicitly states that the study team "hypothesized these changes in population growth may be attributed to 1) density-dependent effects, 2) declines in key food resources *such as whitebark pine seeds*, or 3) a combination of density-dependent effects and resource decline." FWS-1586 (emphasis added). Thus, although the addendum does not explicitly mention the whitebark pine outright, the agency's reliance on the Study Team's analysis—and its recitation of nearly identical

language—makes clear that the agency did consider the decline in whitebark pine as a cause of the slowed population growth.[37]

Relatedly, Sierra Club argues that the addendum failed to consider grizzly bears' shift to meat as an alternative to whitebark pine cone seeds, and the accompanying rise in human-caused grizzly mortalities in the region.  Yet again, Sierra Club does not identify a new phenomenon. The original 2007 BiOp explicitly identified meat from ungulate carcasses as a particularly important source of food for the GYE grizzly bear population, while also noting that whitebark pine seeds are an important "vegetative food source."  FWS-1672–73.  More recent information—which the agency had before it when it issued the 2013 Addendum—merely confirm that this relationship persists.  *See, e.g.*, FWS-2074 (2012 IGBST report noting that, "[g]iven the low levels of whitebark pine feeding and high frequency of carcass feeding, it seems that hunter-killed elk and deer provided an alternative food source for bears during fall in these areas with high whitebark pine mortality").  And the relationship between fluctuations in whitebark pine seed cones and increases in human-grizzly bear altercations, including mortalities, was also documented in the 2007 BiOp.  The BiOp noted that "[i]n addition to supplying a food source high in fat, whitebark pine seed crops also serve grizzly bears by keeping them occupied at high elevations far from intense human use," such that "[s]tudies show

---

[37] Sierra Club also criticizes Defendants' reference in their memorandum to a 2013 IGBST report, because that final report was not before the agency at the time it issued the 2013 Addendum.  Sierra Club misreads Defendants' point.  As Defendants note in their memorandum, and reiterate in their reply, a 2012 IGBST report set forth the *anticipated* findings of the 2013 report, which the team acknowledged would not be finalized until October of that year.  That 2012 report explaining the anticipated findings *was* before the FWS when it issued its 2013 Addendum.  *See* GB-172 ("A synthesis report regarding whitebark pine decline, density dependence, and ecological plasticity of grizzly bears in the GYE will be finalized by October 2013. The consensus among the group is the GYE bear population remains healthy and stable at this time and there are no indications the grizzly bear population has entered a prolonged declining trend.").

that in years when high quality bear foods are low, there is an increase in human-bear conflicts as well as human-caused grizzly bear mortality." FWS-1673. Thus, the FWS explained that "[t]he frequency of grizzly bear-human conflicts is inversely associated with the abundance of natural bear foods." FWS-1677. Moreover, the 2007 BiOp further noted that "[m]ost grizzly bear mortalities are directly related to grizzly-bear human conflicts," and that "[t]he greatest increase in recent years is self-defense in fall by big game hunters." *Id.* Accordingly, the FWS did not act arbitrarily or capriciously when it concluded in its 2013 BiOp that conditions "associated with the ERP [Elk Reduction Plan] remain largely the same as they were in 2007." FWS-1662.

Second, Sierra Club argues that the addendum failed to consider updated information about the scope and duration of the elk reduction program in the Park. But the original biological opinion was based on the 2007 Management Plan's projection that the number of hunters on the Park would increase in the short-term from 1,600 to around 2,200 and then decrease in the long-term to 773-957 per year. *See* FWS-1686. The number of elk harvested was similarly expected to rise in the short term to around 650, and then decrease in the long term to 232 to 287. *See id.* When it reinitiated consultation, the NPS included a chart listing the permits issued and elk harvested in each year between 2007 and 2012 (with anticipated permits listed for 2013). *See* FWS-1567. These numbers generally track and are well within the ranges envisioned by the 2007 Management Plan. As already explained above with reference to the Plaintiffs' NEPA arguments, while there has not yet been a meaningful decline in the number of elk on supplemental feed on the Refuge, elk hunting in *the Park* has, by contrast, generally decreased as the 2007 Management Plan anticipated.

The Court ultimately agrees with Defendants that nothing precluded the FWS from setting forth the results of its reinitiated consultation in an addendum that incorporates the

portions of the original BiOp that remain unchanged, and similarly rejects Sierra Club's various arguments that several significant changed circumstances have arisen since the 2007 BiOp, but were not discussed in the 2013 Addendum.

### b. Consideration of the Environmental Baseline and other Incidental Takes

Next, Sierra Club argues that the FWS's addendum is arbitrary and capricious because the agency failed to consider and evaluate the impact of the other incidental takes of the grizzly bear that had been authorized in the GYE since 2007 when making its "no jeopardy" finding. *See Sierra Club* Pls.' Mem. Supp. at 14–21. On this score, the Court agrees that the agency has failed to demonstrate that it even considered this important problem, and will grant summary judgment to Plaintiffs on this ground.[38] Nevertheless, as explained below, the Court believes that a remand without vacatur is appropriate in these circumstances.

During formal consultation, the FWS must evaluate "the effects of the action and cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g). The effects of the action include the "direct and indirect effects of an action on the species . . . together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." *Id.* § 402.02. And the "environmental baseline" is defined to include:

> the past and present impacts of all Federal, State, or private actions and other
> human activities in the action area, the anticipated impacts of all proposed Federal
> projects in the action area that have already undergone formal or early section 7
> consultation, and the impact of State or private actions which are
> contemporaneous with the consultation in process.

---

[38] Because Mayo has incorporated Sierra Club's arguments by reference, granting summary judgment to the plaintiffs in both cases is appropriate.

*Id.*  As courts in this district have previously explained, an action's impact "cannot be determined or analyzed in a vacuum, but must necessarily be addressed in the context of other incidental take authorized by FWS."  *Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 127 (D.D.C. 2001).  Although this does not "impos[e] a requirement that each [BiOp] include a collective jeopardy finding," *Defs. of Wildlife v. Norton*, No. 99-927, 2003 WL 24122459, at *5 (D.D.C. 2003), the FWS must nevertheless engage in a meaningful "analysis of the status of the environment baseline given the listed impacts, not simply a recitation of the activities of the agencies," *Babbitt*, 130 F. Supp. 2d at 128.  The FWS must therefore evaluate the impact of an agency's action "in light of the environmental baseline" even if the BiOp "does not numerically add the takes from different sources together."  *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 230 (D.D.C. 2005).

Here, the 2013 Addendum contains no discussion of the environmental baseline at all, nor does it update the discussion contained in the 2007 BiOp.  Defendants concede that the 2013 Addendum does not "explicitly articulate its additional analysis of the environmental baseline, including the consideration of previously anticipated incidental take."  *Sierra Club* Defs.' Mem. Supp. at 24.  This is so despite the FWS's acknowledgement that it has engaged in several formal consultations—and authorized a number of incidental takes—throughout the GYE since 2007.  When discussing the environmental baseline, the original 2007 BiOp listed the particular past projects that had resulted from previous formal consultations "in the vicinity of the action area," and stated that the projects, their effects on the grizzly bear, and the "level of incidental take" had been considered in the environmental baseline for the BiOp.  *See* FWS-1681.  Yet, there is no similar indication in the 2013 Addendum that that the agency took stock of the environmental

baseline as it existed at that time, and in light of subsequent projects and authorized incidental take.

To salvage the 2013 Addendum, Defendants point to a spreadsheet in the record containing information on all the BiOps in the GYE, and an e-mail from a FWS Wildlife Biologist referencing that spreadsheet. On the basis of these documents, Defendants claim that "the record shows that this information was, in fact, considered." *Sierra Club* Defs.' Mem. Supp. at 24. They argue that "in preparing any biological opinion involving grizzly bears, the FWS's Wyoming Field Office wildlife biologist . . . would consult the spreadsheet she created specifically to track anticipated grizzly bear incidental take in the GYE" and that she "performed [that] analysis here." *Id.*

The record belies this contention. For one thing, the e-mail indicates that the biologist was reviewing the spreadsheet to determine whether the BiOps required "annual reporting," which is a requirement for issuing an incidental take statement. FWS-2127. It was only during that discussion that the Park's Wildlife Biologist—the recipient of the e-mail—raised that the incidental take of one grizzly bear anticipated for the 2007 Management Plan had been reached, and discussed the possibility of reinitiating consultation. *Id.* Thus, it is a stretch to cite this e-mail, and the spreadsheet, as the sole evidence that the biologist "regularly" considers the other BiOps and incidental take statements when amending a BiOp or creating a new one. As just explained, the 2007 BiOp explicitly referenced the other projects it had considered, but there is no similar indication in the 2013 Addendum.

Even if this e-mail does imply that the biologist would *typically* consult the spreadsheet when formulating an addendum to a BiOp, however, the record is silent on whether she did so when considering the 2013 Addendum at issue here. Although the spreadsheet "may provide

enough factual evidence for the agency's conclusion," the Court "cannot defer to agency expertise that was never explained." *Tex Tin Corp. v. EPA*, 935 F.2d 1321, 1324 (D.C. Cir. 1991); *see also Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) ("When a statute requires an agency to make a finding as a prerequisite to action, it must do so. Merely '[r]eferencing a requirement is not the same as complying with that requirement.'" (alteration in original) (quoting *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002)). Moreover, the only version of the spreadsheet in the record, as Defendants concede, post-dates the 2013 Addendum and erroneously omits certain BiOps. *See Sierra Club* Defs.' Mem. Supp. at 24 n.14, 30; *see also* FWS-1710–15 (reproducing more recent version of the spreadsheet).

To be sure, nothing in the statute or regulation requires the FWS to rigidly add up each incidental take. *See Oceana, Inc.*, 384 F. Supp. 2d at 230. But in order to fully consider the effects of the 2007 Management Plan when it amended the 2007 BiOp, the FWS must at least "take[] the baseline seriously and make[] a concerted effort to evaluate the impact of [an agency's] proposed action against that backdrop." *Id.* (citation omitted) (final alteration in original). Without any indication in the record that the FWS adequately considered the environmental baseline as of 2013, the Court must grant summary judgment to Plaintiffs because it appears that the agency failed to "consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, and failed to apply the "best scientific and commercial information available," 16 U.S.C. § 1536(a)(2).

The Court believes, however, that the best course here is to remand the 2013 Addendum without vacatur. Although an "unsupported agency action normally warrants vacatur," a court "is not without discretion." *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005); *see also Sec. Indus. & Fin. Mkts. Ass'n v. U.S.*

*Commodities Future Trading Comm'n*, 67 F. Supp. 3d 373, 434 (D.D.C. 2014) ("Courts have the

discretion, however, to remand without vacating an inadequately explained rule.").  Whether to

vacate "depends on 'the seriousness of the order's deficiencies (and thus the extent of doubt

whether the agency chose correctly) and the disruptive consequences of an interim change that

may itself be changed.'"  *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146,

150–51 (D.C. Cir. 1993) (quoting *Int'l Union, UMW v. FMSHA*, 920 F.2d 960, 967 (D.C. Cir.

1990)).  Remanding to the agency without vacatur is "appropriate where 'there is at least a

serious possibility that the [agency] will be able to substantiate its decision on remand.'"  *Nat'l*

*Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 20 (D.D.C. 2014) (alteration in original)

(quoting *Allied-Signal, Inc.*, 988 F.2d at 151).

  Here, the Court believes there is a serious possibility that the FWS will be able to

substantiate its no jeopardy conclusion on remand, once the other incidental takes are taken into

account.  Both Plaintiffs and Defendants agree on the data, but disagree about its import.  The

2013 Addendum based its no jeopardy conclusion, in part, on the "overall sustainable annual

mortality levels" for the grizzly bear the IGBST had reported over the last 5 years.  *See* FWS-

1663–64.  Sierra Club claims that as of 2012, the sustainable annual mortality threshold for

female bears was 9% and, with an estimated adult female bear population of 257, the population

could sustain a maximum of 23 mortalities per year before the population would begin to

decline.[39]  *See Sierra Club* Pls.' Mem. Supp. at 17.  Defendants accept this calculation as

"reasonably accurate."  *Sierra Club* Defs.' Mem. Supp. at 26.  Sierra Club also notes that, by the

---

[39]  Similarly, Sierra Club contends that a comparison of the sustainable annual mortality
threshold to the estimated grizzly bear population indicate that 24 adult male grizzly bears and
17 dependent young could be killed without exceeding the mortality threshold.  *See Sierra Club*
Pls.' Mem. Supp. at 18 n.5.

time the FWS issued the 2013 Addendum, it had already exempted from liability the incidental

killing of 63 grizzly bears in the GYE, 52 of which do not prevent the taking of a female bear, in

particular.  *See Sierra Club* Pls.' Mem. Supp. at 16; *see also Sierra Club* Pls.' Mot. Summ. J. Ex.

1 (listing all BiOps with anticipated incidental take in the GYE).  From this aggregate number of

anticipated takes, Sierra Club jumps to the conclusion that "the amount of grizzly bear takings

anticipated by FWS across the Yellowstone region is sufficient to exceed the sustainable annual

mortality threshold for adult female grizzly bears for two consecutive years."  *Sierra Club* Pls.'

Mem. Supp. at 17–18.

As Defendants point out, however, there is an immediately apparent analytical flaw in

Sierra Club's contention.  Sierra Club assumes that the collective incidental take authorized in

these BiOps (or much of it) will happen in a single year.  Yet, there does not appear to be any

scientific or record-based support for that assumption.  The ESA requires the FWS to "use the

best scientific and commercial data available" in formulating a BiOp, 16 U.S.C. § 1536(a)(2),

and the alarming scenario that Sierra Club has constructed—that all fatalities anticipated by the

incidental take statements will transpire in the same year and that all grizzly bears killed will be

female—is supported by neither the best science nor the available data.

In many cases, the authorized incidental take was forecasted to take place over many

years.  For example, one project in Yellowstone National Park anticipated 4 grizzly bears being

taken, total, over the course of a twenty-year project.  *See* FWS-1710–12 (FWS project number

WY12F0135, noting the anticipated take of 4 bears "through 2032").  Another anticipated the

taking of two grizzly bears in the Shoshone National Park over a ten-year period.  *See* FWS-

1711–13 (FWS project number WY13F0010).  Thus, Defendants are correct to point out that

"take was not anticipated to occur *all at once*," but was anticipated to occur "across the life of

those biological opinions." *Sierra Club* Defs.' Mem. Supp. at 28.  And the spreadsheet included

in the administrative record notes minimal numbers of incidental takes taking place thus far.[40]

*See* FWS-1710–15 (noting 4 bears incidentally taken in 2012 across all projects, and 5 bears in

2013).  Therefore, it appears that there exists a "serious possibility" that the FWS "will be able to

substantiate its decision on remand." *Nat'l Parks Conservation Ass'n*, 62 F. Supp. 3d at 20

(internal quotation mark omitted) (quoting *Allied-Signal, Inc.*, 988 F.2d at 151).

Plaintiffs are correct to note that nothing affirmatively *prevents* multiple takes from

occurring in close succession.  *Sierra Club* Pls.' Opp'n & Reply at 8–9.  But it may not be

unreasonable for the agency to conclude that this possibility is unlikely.  *Cf. Babbitt*, 130 F.

Supp. 2d at 130 ("The Court recognizes that the authorization of an incidental take by these

[BiOps] does not necessarily mean that take will occur, or that it will occur at the level

anticipated.").  Moreover, as Defendants note, Plaintiffs' reference to the mortality limits do not

necessarily provide a perfect comparison, because mortality limits are simply a single

management measure and are not intended as a proxy for the FWS's jeopardy determination.

*See Sierra Club* Defs.' Mem. Supp. at 27.  Indeed, those limits may be exceeded in a single year,

but the IGBST will not necessarily take action unless the trend is sustained over multiple years.

*See, e.g.*, FWS-1597 (2011 IGBST report explaining that "[e]xceeding independent female

mortality limits for 2 consecutive years," and 3 years for both dependent young and independent

adult males, "will trigger a biology and management review").

---

[40] Defendants concede that six biological opinions issued between 2004 and 2013 are
nevertheless "not included on the biological opinion tracking sheet." *Sierra Club* Defs.' Mem.
Supp. at 30.  As noted in Sierra Club's exhibit, however, three of those biological opinions call
for zero incidental takes of grizzly bears.  *See Sierra Club* Pls.' Mot. Summ. J. Ex. 1; *see also*
GB-36–42; GB-53; GB-103.  The other three anticipate the take of two bears, three bears (over a
ten-year plan), and five bears, respectively.  *See Sierra Club* Pls.' Mot. Summ. J. Ex. 1; *see also*
GB-24–25, GB-80; GB-120–123.

As for the second *Allied-Signal* factor—the likely disruptive consequences—the Court does not find this factor to weigh clearly in favor of vacatur or against it.  If the Court were to vacate the FWS's 2013 no jeopardy finding, the status quo is unlikely to change.  Because the incidental take anticipated in the 2007 BiOp has not yet been exceeded (and because the Court has already concluded that Plaintiffs are unable to identify any new information showing that the elk hunt affects the grizzly bear in a manner or to an extent not previously considered), reinitiation of consultation is not yet required, and the 2007 BiOp remains operative on its own terms.  Thus, if the Court were to vacate the 2013 Addendum there would be no immediate change in the status quo while the FWS sought to prepare a new Addendum.  And even if the FWS chose to take no action unless or until the take is exceeded, which would then force the reinitiation of consultation, for the reasons stated above—and barring an interim change in circumstances—the Court does not believe it is likely the FWS would come to a different conclusion.  Therefore, there Court perceives little likelihood of "an interim change that may itself be changed.'"  *Allied-Signal, Inc.*, 988 F.2d at 150–51.

Thus, the Court finds this factor of limited relevance, and bases its conclusion on the serious possibility that the FWS will be able to justify its no jeopardy finding on remand.  *See Fox Tel. Stations, Inc. v. FCC*, 280 F.3d 1027, 1049 (D.C. Cir. 2002) (finding the disruption that might be caused "only barely relevant" and concluding that "though the disruptive consequences of vacatur might not be great, the probability that the Commission will be able to justify retaining the [relevant] Rule is sufficiently high that vacatur of the Rule is not appropriate").

Accordingly, the Court finds that the 2013 Addendum currently fails to adequately justify or explain its consideration of the environmental baseline, because it fails to discuss the

relevance of the other anticipated incidental takes in the action area.[41]   The Court will remand the

addendum to the agency without vacatur.  In addition, because the Court will not vacate the 2013

Addendum, the Court will proceed to consider Plaintiffs' other ESA arguments.  As explained

below, the Court finds that each claim fails on the basis of this record.  Nevertheless, nothing in

the Court's opinion is intended to foreclose the FWS's authority on remand, and in its discretion,

to revisit or further consider some or all of these issues in light of Plaintiffs' concerns.

### c. The Incidental Take Statement

In its amended incidental take statement, the FWS concluded that "up to 4 additional

grizzly bears in the Park . . . may be incidentally taken directly or indirectly as a result of the

Plan during the remaining 9 years this biological opinion is valid."  FWS-1664.  Mayo claims

that the 2013 Addendum "sets forth no methodology at all for how the FWS decided that four

additional grizzly bears would be taken as a result of conflicts with hunters in Grand Teton."

*Mayo* Pls.' Mem. Supp. at 36.  The Court rejects this argument because "the agency's path may

---

[41] In their memoranda, Defendants do not appear to dispute that the FWS should have considered all of the incidental take authorized for the GYE that is identified on the spreadsheet contained in the administrative record.  Yet, although the 2007 BiOp is not entirely clear, the agency seems to have defined the "action area" more narrowly, and as not necessarily encompassing the entire GYE.  *See* FWS-1679 (explaining that "[f]or the purposes of this biological opinion, [the agency] will also consider portions of surrounding lands in the B-TNF [Bridger-Teton National Forest] and other areas outside of the Refuge as part of the action area," but noting that, "[e]cologically" the Refuge, Park, JDR Memorial Parkway, and Yellowstone National Park "are part of a larger area referred to as the GYE").  Accordingly, all of the incidental take statements issued across the GYE may not be directly relevant to determining the environmental baseline at issue for purposes of the 2007 Management Plan.  At the same time, however, Sierra Club notes that the FWS has "chosen to rely on region-wide population levels and sustainable mortality limits to support its 'no-jeopardy' determination," and argues that the FWS therefore "could not rationally ignore all of the region-wide lethal takings of grizzly bears that the agency had previously anticipated and exempted."  *Sierra Club* Pls.' Mem. Supp. at 19.  Defendants' arguments indicate that the FWS will consider all incidental take across the GYE.  But should the agency determine that some of those incidental take statements do not apply to the action area, it may be necessary for the agency nevertheless to further explain whether the authorized incidental take affects the GYE-wide mortality limits on which the agency has relied.

reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

The administrative record contains handwritten notes which spell out the agency's calculation and indicate that the new incidental take figure was based on the rate of take over the first several years of the 2007 Management Plan as well as the increasing grizzly bear population and distribution in the Park. *See* FWS-1569. The notes indicate that the take of one grizzly bear over the first six years of the plan resulted in an average take of 0.167 bear per year. *Id.* Assuming this same rate over the course of the remaining nine years of the plan, the notes project that 1.5 grizzly bears could be taken, which was rounded up to two bears. *Id.* Noting that the population was increasing at an "unknown rate," and that other uncertainties existed, including the variation in the rate of growth over the years potentially spurred by "drought" or "early onset winter," the notes state that it is "reasonable" to increase the incidental take by one to two bears. FWS-1569–70. Thus, the agency proposed a new incidental take of three to four bears in the Park. FWS-1569. These notes sufficiently set forth how the new anticipated incidental take was derived. *See also* NPS-6859–60 (acknowledging, in response to Mayo's notice of intent to sue, that the FWS's "explanation could have been clearer," and providing a description of the calculation that matches the notes). Although this calculation is not reproduced in the 2013 Addendum, the notes contain a "'contemporaneous explanation of the agency decision,' and are therefore appropriate subjects for [a court's] consideration." *Tourus Records, Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 738 (D.C. Cir. 2001) (quoting *Camp v. Pitts*, 411 U.S. 138, 143 (1973)). Contrary to Mayo's assertions, the record therefore makes plain that the FWS did not simply pull

this anticipated take figure "out of thin air."  *Mayo* Pls.' Mem. Supp. at 36–37.  Accordingly, the

new anticipated incidental take determination was not arbitrary and capricious.[42]

### d.  Harassment

Mayo also contends that the 2013 Addendum fails to address the taking of a grizzly bear

by harassment when bears are attracted to the gut piles elk hunters leave behind.  *Mayo* Pls.'

Mem. Supp. at 37.  The ESA defines to "take" as including: "to harass, harm, pursue, hunt,

shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16

U.S.C. § 1532(19).  Harass is further defined by the ESA's implementing regulations as "an

intentional or negligent act or omission which creates the likelihood of injury to wildlife by

annoying it to such an extent as to significantly disrupt normal behavioral patterns which

include, but are not limited to, breeding, feeding, or sheltering."  50 C.F.R. § 17.3.  Mayo argues

that habituating grizzly bears to hunter-caused gut piles disrupts the animal's natural feeding

habits and is a "quintessential example" of a take through harassment.  *Mayo* Pls.' Mem. Supp. at

38.

The 2007 BiOp noted that grizzly bears in the Yellowstone Ecosystem "have the highest

percentage of meat consumption in their diet of any inland grizzly bear population" and that

"[m]eat constitutes as much as 79 percent of the diet of male, and 45 percent of the diet of female

grizzly bears" in that ecosystem.  FWS-1672; *see also* FWS-1682 ("Bears that are typically wary

of humans will often tolerate people at close distances when carcasses or other high quality foods

---

[42] If anything, the two and a half years that have passed since the 2013 Addendum was issued indicate that the FWS's estimate may have been conservative.  Despite anticipating that four additional grizzly bears would be taken during the remaining nine years of the 2007 Management Plan, nearly a third of that time has elapsed with no additional takes, so far as the record indicates.  Thus, the anticipated incidental take of one bear set forth in the 2007 BiOp remains accurate.

are available.").  Moreover, the BiOp explained that ungulates "are an especially important food source for bears in the spring and fall" and that the "use of these carcasses" is "well documented."  FWS-1672.  In the 2013 Addendum, the FWS again noted that grizzly bears "seek[] out gut piles left on the landscape during the ERP [Elk Reduction Program] on Park lands."  FWS-1662.  Despite these acknowledgements, the FWS did not explicitly discuss whether the inclusion of gut piles in the grizzly bear's diet or its efforts to seek those gut piles out "significantly disrupted" the grizzly bear's natural feeding patterns to constitute harassment.

As Defendants point out, the remainder of the record which was before the agency and, in most instances, cited in some regard in the BiOp and Amended BiOp, contains numerous references to animal carcasses as part of the grizzly bear's diet.  For example, a 2005 IGBST report that the FWS cited in its 2007 BiOp found that "[g]rizzly bears most commonly fed on carcasses (including elk calf predations), on insects, or grazed on vegetation."  FWS-1352; *see also* FWS-705 (2001 IGBST report finding that "[t]he grizzly bears have learned to utilize the created food source (elk viscera)").  More to the point, a 2004 study contained in the administrative record indicates that during the "2 bear generations" that "have passed since legal hunting was stopped and grizzly bears in the GYE were given protected status," the "long-standing tradition of early elk harvest seasons adjacent to YNP [Yellowstone National Park] has *provided considerable food resources to bears with presumably little negative impact* (for bears not killed in conflicts) from increasing familiarizations with humans."  FWS-1029 (emphasis added) (internal citation omitted).  The agency's silence in the face of this evidence implies that it did not consider these activities to rise to the level of "harassment," as that term is used in the taking context.

Mayo challenges Defendants' argument as a *post hoc* rationalization, and claims that there is no indication in the record that the FWS explicitly considered the harassment issue. *Mayo* Pls.' Opp'n & Reply at 39–40 & n.22.  But even if the 2007 BiOp and the 2013 Addendum left the agency's conclusion implicit, the agency's response to a letter Mayo submitted indicating his intent to sue for violations of the ESA made the connection explicit.  The FWS and the NPS issued a joint response to that letter, in which Mayo had argued that the FWS had failed to address all forms of take that may be associated with the elk reduction program, including the harassment of grizzly bears through the creation of gut piles.  *See* NPS-6860–61.  The joint response asserted that the agencies "disagree that the seeking out of gut piles by grizzly bears is [a] 'take' in the form of harassment" because, among other things, "[g]ut piles/remains from hunter-killed elk and bison . . . differ little from gut piles/remains from natural predation (such as by cougars or wolves) or death, except that they are the result of human versus natural processes."  NPS-6861.  That response, which sets forth the agency's *own* rationale for its conclusion, cannot be characterized as a *post hoc* rationalization.  *See Local 814, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976) ("The 'post hoc rationalization' rule is not a time barrier which freezes an agency's exercise of its judgment after an initial decision has been made and bars it from further articulation of its reasoning. It is a rule directed at reviewing courts which forbids judges [from] uphold[ing] agency action on the basis of rationales offered by anyone other than the proper decisionmakers."); *cf. Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996) ("[T]here is nothing improper in receiving declarations that merely illuminate[ ] reasons obscured but implicit in the administrative record." (second alteration in original) (internal quotation marks omitted)).

Mayo also argues that "the 'best available' science reflects" that this type of take "is indisputably associated with the hunts" and that the "record is replete with evidence that these gut piles—which exist *only* because of the NPS-authorized hunt—have an enormous effect on grizzly bears' natural feeding behavior in the Park." *Mayo* Pls.' Mem. Supp. at 37.   The evidence Mayo relies on does not support his claim.   Most of the portions of the record he cites either merely acknowledge that bears seek out gut piles during hunting season or describe particular incidents in which bears were observed approaching or feeding on gut piles. *See* NPS-3250 (2008 advisory to hunters that "grizzly bears seek out gut piles during the hunting season"); NPS-4127 (incident report describing grizzly bear's approach of a hunter gutting an elk); NPS-4663 (incident report describing three bears eating gut piles); NPS-4695 (incident report describing seeing four bears congregating around the remains of a hunter-harvested elk); NPS-4697 (incident report describing four bears eating gut piles); NPS-4709 (incident report describing four bears eating gut piles); NPS-5238 (incident report describing four to five bears eating gut piles).   That evidence aligns with, rather than conflicts with, the agency's determination that feeding on gut piles is not unusual or disruptive to the grizzly bear.

The other two sources of information are wholly unpersuasive.   One is a newspaper quote from "a Jackson resident and full-time wildlife photographer"—in other words, not a scientific expert—asserting that he believes "[t]he grizzly bears have become dependent on the gut piles for food before going into hibernation," which "means that the cubs growing up will not know another way to get their food and could starve—even now in hunting season the bears don't bother to hunt for themselves." NPS-7345.   The other is an e-mail message Mayo sent to Park officials asserting that a particular bear, "[g]rizzly mom 399" had "taught her prior three cubs (including her daughter and now grizzly mom 610) to follow the park elk hunters down the

Snake River drainage feasting on abandoned gut piles," implying that such conditioning is unnatural.  NPS-5127.  Yet, this anecdotal, unsupported evidence from laypeople is hardly the "best scientific and commercial data available" that the FWS and NPS are required to rely on when consulting on the ESA.  16 U.S.C. § 1536.  Despite Mayo's contention that the gut piles discarded by hunters during the elk hunt have disrupted the grizzly bear's natural feeding behaviors, the agency has come to the opposite conclusion.  A court must "give an extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise."  *Cmtys. for a Better Env't v. EPA*, 748 F.3d 333, 336 (D.C. Cir. 2014) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 247 (D.C. Cir. 2003)).  Therefore, the Court declines to find the agency's determination arbitrary and capricious.

### e.  Reasonable and Prudent Measures

Finally, Sierra Club argues that the FWS failed to consider specifying additional reasonable and prudent measures in the 2013 Addendum.  The ESA requires that, if the FWS concludes that a federal action will not jeopardize a listed species, the FWS shall "specif[y] those reasonable and prudent measures that [the FWS] considers necessary or appropriate to minimize [the action's] impact" and "set[] forth the terms and conditions" that the agency must comply with in order to implement the reasonable and prudent measures.  16 U.S.C. § 1536(b)(4)(ii), (iv).  The ESA's implementing regulations require that these measures and conditions be included in the incidental take statement.  *See* 50 C.F.R. 402.14(i)(1)(ii), (iv).  Reasonable and prudent measures are defined as "those actions the Director believes necessary or appropriate to minimize the impacts, *i.e.*, the amount or extent of incidental take."  *Id.* § 402.02.

The original 2007 BiOp set one reasonable and prudent measure to minimize the impacts of incidental take of grizzly bears: the "education of hunters."  FWS-1692.  Sierra Club contends

that the FWS acted arbitrarily and capriciously in failing to consider specifying any new reasonable or prudent measures in the 2013 Addendum. *See Sierra Club* Pls.' Mem. Supp. at 27–29; *Sierra Club* Pls.' Opp'n & Reply at 20.   Sierra Club's contention is plainly incorrect, and it is clear from the record that the FWS considered whether to revise the 2007 BiOp's reasonable and prudent measures.   The addendum states that the Service "believes that the Park has adhered to all original conservation measures as required and that these measures are appropriate, adequate, *and do not need revising*."   FWS-1664 (emphasis added); *see also* NPS-6862 (in response to Mayo's intent to sue letter, pointing to the same language and explaining that the agency believed that the 2007 BiOp's reasonable and prudent measure, along with the other measures the Park had implemented, "were thorough and appropriate for minimizing IT [Incidental Take] of grizzly bears from ERP [Elk Reduction Program] implementation").   Sierra Club also points to the addendum's discussion of changes that Park staff and WFGD had made for the 2013 hunt, including the closure of certain areas of the Snake River bottom to hunting, beginning the hunt two weeks later in the season, limiting ammunition carried into the field, and limiting the number of shots hunters can take at a group of running elk.   *See* FWS-1662.   All of these changes were identified in the addendum, and Sierra Club argues that several possible reasonable and prudent measures were therefore "readily apparent" to FWS, but the agency neither discussed nor analyzed whether "any of these limitations should be made permanent as reasonable and prudent measures."   *Sierra Club* Pls.' Mem. Supp. at 28.   It is questionable, however, whether FWS would have the authority to do so.   Congress delegated to the Secretary of the Interior (who has further delegated authority to the NPS) and the WGFC the authority to approve and issue orders and regulations that are "necessary to carry out those portions of the approved plan that fall within their respective jurisdictions."   16 U.S.C. § 673c(b).   And, as

Defendants point out, the ESA's implementing regulations state that reasonable and prudent measures "cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes."  50 C.F.R. § 402.14(i)(2).

In any event, the FWS stated that it "agree[d] with the new measures being implemented"—indicating that the agency was aware of, and considered the measures.  FWS-1664.  The agency nevertheless concluded that the existing measures in the 2007 BiOp "do not need revising."  *Id.*  Because the FWS did consider whether to add additional measures, the Court will not displace the agency's exercise of discretion in declining to specify additional measures beyond the one specified in the 2007 BiOp.  *Cf. Pub. Emps. for Envtl. Responsibility v. Beaudreau*, 25 F. Supp. 3d 67, 109 (D.D.C. 2014) (noting that the FWS did consider reasonable and prudent measures, but granting summary judgment to plaintiffs because the record did not make clear whether the FWS rejected an alternative "based on its independent determination," or simply deferred to the Bureau of Ocean Energy Management's conclusion).

### f. NPS's Reliance on the 2013 Addendum

The NPS, as the action agency in this case, "'need not undertake a separate, independent analysis' of the issues addressed in the BiOp."  *City of Tacoma, Wash. v. FERC*, 460 F.3d 53, 75–76 (D.C. Cir. 2006) (quoting *Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1161 (9th Cir. 1999)).  Nevertheless, an action agency's "reliance on a facially flawed BiOp would likely be arbitrary and capricious," and "the action agency must not blindly adopt the conclusions of the consultant agency, citing that agency's expertise."  *Id.* at 76.  Because the Court has concluded that the 2013 Addendum failed to explicitly discuss the effects of the other BiOps and authorized incidental take statements affecting the action area, the Court similarly

finds that NPS acted arbitrarily and capriciously in relying on the 2013 Addendum.  As

explained above, however, the Court will remand the addendum without vacatur.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' respective motions for summary judgment (*Mayo*

ECF No. 35, *Sierra Club* ECF No. 26) are **GRANTED IN PART AND DENIED IN PART**,

Defendants' cross-motions for summary judgment (*Mayo* ECF No. 39, *Sierra Club* ECF No. 28),

are **GRANTED IN PART AND DENIED IN PART**, and Intervenor-Defendants Wyoming's

and Safari Club's respective cross-motions for summary judgment (*Mayo* ECF Nos. 40, 43,

*Sierra Club* ECF Nos. 30, 33) are **GRANTED IN PART AND DENIED IN PART**.  The Court

remands the 2013 Addendum to the FWS, without vacatur.  An order consistent with this

Memorandum Opinion is separately and contemporaneously issued in each of these related

cases.

Dated:  March 29, 2016                                    RUDOLPH CONTRERAS
                                                          United States District Judge